# EXHIBIT 2

H.R. REP. 105-551(I), H.R. REP. 105-551, H.R. Rep. No. 551(I),
105TH Cong., 2ND Sess. 1998, 1998 WL 261605 (Leg.Hist.)
P.L. 105-304, DIGITAL MILLENNIUM COPYRIGHT ACT

**\*1**  WIPO COPYRIGHT TREATIES IMPLEMENTATION AND ON–
LINE COPYRIGHT INFRINGEMENT LIABILITY LIMITATION

DATES OF CONSIDERATION AND PASSAGE

House: August 4, September 23, 1998
Senate: May 14, August 31, September 17, 1998
Cong. Record Vol. 144 (1998)
House Report (Judiciary Committee) No. 105-551(I),
May 22, 1998
(To accompany H.R. 2281)
House Report (Commerce Committee) No. 105-551(II),
July 22, 1998
(To accompany H.R. 2281)
Senate Report (Judiciary Committee) No. 105-190,
May 6, 1998
(To accompany S. 2037)
House Conference Report No. 105-796,
October 8, 1998
(To accompany H.R. 2281)

HOUSE REPORT NO. 105–551(I)

May 22, 1998

Mr. Coble, from the Committee on the Judiciary, submitted the following

R E P O R T

[To accompany H.R. 2281]

   The Committee on the Judiciary, to whom was referred the bill (H.R. 2281) to amend title 17, United States Code, to implement the World Intellectual Property Organization Copyright Treaty and Performances and Phonograms Treaty, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| The Amendment | 1 |
| Purpose and Summary | 9 |
| Background and Need for the Legislation | 9 |

Hearings.......................................................................................................................................... 12

Committee Consideration................................................................................................................. 13

Committee Oversight Findings......................................................................................................... 13

Committee on Government Reform and Oversight Findings............................................................. 13

New Budget Authority and Tax Expenditures................................................................................... 13

Congressional Budget Office Cost Estimate..................................................................................... 13

Constitutional Authority Statement.................................................................................................. 15

Section-by-Section Analysis and Discussion.................................................................................... 15

Changes in Existing Law Made by the Bill, as Reported.................................................................. 29

The amendment is as follows:

**\*2** Strike out all after the enacting clause and insert in lieu thereof the following:

### TITLE I–WIPO COPYRIGHT TREATIES IMPLEMENTATION

SEC. 101. SHORT TITLE.

This title may be cited as the "WIPO Copyright Treaties Implementation Act".

SEC. 102. TECHNICAL AMENDMENTS.

(a) Definitions.–Section 101 of title 17, United States Code, is amended–

(1) by striking the definition of "Berne Convention work";

(2) in the definition of "The 'country of origin' of a Berne Convention work"–

(A) by striking "The 'country of origin' of a Berne Convention work, for purposes of section 411, is the United States if" and inserting "For purposes of section 411, a work is a 'United States work' only if";

(B) in paragraph (1)–

(i) in subparagraph (B) by striking "nation or nations adhering to the Berne Convention" and inserting "treaty party or parties";
(ii) in subparagraph (C) by striking "does not adhere to the Berne Convention" and inserting "is not a treaty party"; and
(iii) in subparagraph (D) by striking "does not adhere to the Berne Convention" and inserting "is not a treaty party"; and
(C) in the matter following paragraph (3) by striking "For the purposes of section 411, the 'country of origin' of any other Berne Convention work is not the United States.";

(3) by inserting after the definition of "fixed" the following:

"The 'Geneva Phonograms Convention' is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.";

(4) by inserting after the definition of "including" the following:

"An 'international agreement' is–

"(1) the Universal Copyright Convention;

"(2) the Geneva Phonograms Convention;

"(3) the Berne Convention;

"(4) the WTO Agreement;

"(5) the WIPO Copyright Treaty;

"(6) the WIPO Performances and Phonograms Treaty; and

"(7) any other copyright treaty to which the United States is a party.";

(5) by inserting after the definition of "transmit" the following:

"A 'treaty party' is a country or intergovernmental organization other than the United States that is a party to an international agreement.";

(6) by inserting after the definition of "widow" the following:

"The 'WIPO Copyright Treaty' is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.";

(7) by inserting after the definition of "The 'WIPO Copyright Treaty'" the following:

"The 'WIPO Performances and Phonograms Treaty' is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996."; and

(8) by inserting after the definition of "work made for hire" the following:

"The terms 'WTO Agreement' and 'WTO member country' have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.".

(b) Subject Matter of Copyright; National Origin.–Section 104 of title 17, United States Code, is amended–

(1) in subsection (b)–

(A) in paragraph (1) by striking "foreign nation that is a party to a copyright treaty to which the United States is also a party" and inserting "treaty party";

(B) in paragraph (2) by striking "party to the Universal Copyright Convention" and inserting "treaty party";

(C) by redesignating paragraph (5) as paragraph (6);

**\*3** (D) by redesignating paragraph (3) as paragraph (5) and inserting it after paragraph (4);

(E) by inserting after paragraph (2) the following:

"(3) the work is a sound recording that was first fixed in a treaty party; or";

(F) in paragraph (4) by striking "Berne Convention work" and inserting "pictorial, graphic, or sculptural work that is incorporated in a building or other structure, or an architectural work that is embodied in a building and the building or structure is located in the United States or a treaty party"; and

(G) by inserting after paragraph (6), as so redesignated, the following:

"For purposes of paragraph (2), a work that is published in the United States or a treaty party within 30 days after publication in a foreign nation that is not a treaty party shall be considered to be first published in the United States or such treaty party, as the case may be."; and

(2) by adding at the end the following new subsection:

"(d) Effect of Phonograms Treaties.–Notwithstanding the provisions of subsection (b), no works other than sound recordings shall be eligible for protection under this title solely by virtue of the adherence of the United States to the Geneva Phonograms Convention or the WIPO Performances and Phonograms Treaty.".

(c) Copyright in Restored Works.–Section 104A(h) of title 17, United States Code, is amended–

(1) in paragraph (1), by striking subparagraphs (A) and (B) and inserting the following:

"(A) a nation adhering to the Berne Convention;

"(B) a WTO member country;

"(C) a nation adhering to the WIPO Copyright Treaty;

"(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or

"(E) subject to a Presidential proclamation under subsection (g).";

(2) by amending paragraph (3) to read as follows:

"(3) The term 'eligible country' means a nation, other than the United States, that–

"(A) becomes a WTO member country after the date of the enactment of the Uruguay Round Agreements Act;

"(B) on such date of enactment is, or after such date of enactment becomes, a nation adhering to the Berne Convention;

"(C) adheres to the WIPO Copyright Treaty;

"(D) adheres to the WIPO Performances and Phonograms Treaty; or

Case 1:25-cv-08736-PAE    Document 96-4    Filed 07/21/26    Page 6 of 41

"(E) after such date of enactment becomes subject to a proclamation under subsection (g).";

(3) in paragraph (6)–

(A) in subparagraph (C)(iii) by striking "and" after the semicolon;

(B) at the end of subparagraph (D) by striking the period and inserting "; and"; and

(C) by adding after subparagraph (D) the following:

"(E) if the source country for the work is an eligible country solely by virtue of its adherence to the WIPO Performances and Phonograms Treaty, is a sound recording.";

(4) in paragraph (8)(B)(i)–

(A) by inserting "of which" before "the majority"; and

(B) by striking "of eligible countries"; and

(5) by striking paragraph (9).

(d) Registration and Infringement Actions.–Section 411(a) of title 17, United States Code, is amended in the first sentence–

(1) by striking "actions for infringement of copyright in Berne Convention works whose country of origin is not the United States and"; and

(2) by inserting "United States" after "no action for infringement of the copyright in any".

(e) Statute of Limitations.–Section 507(a) of title 17, United State Code, is amended by striking "No" and inserting "Except as expressly provided otherwise in this title, no".

SEC. 103. COPYRIGHT PROTECTIONS SYSTEMS AND COPYRIGHT MANAGEMENT INFORMATION.

Title 17, United States Code, is amended by adding at the end the following new chapter:

**\*4** "CHAPTER 12–COPYRIGHT PROTECTION AND MANAGEMENT SYSTEMS

"Sec.

"1201. Circumvention of copyright protection systems.

"1202. Integrity of copyright management information.

"1203. Civil remedies.

"1204. Criminal offenses and penalties.

"S 1201. Circumvention of copyright protection systems

"(a) Violations Regarding Circumvention of Technological Protection Measures.–(1) No person shall circumvent a technological protection measure that effectively controls access to a work protected under this title.

"(2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that–

"(A) is primarily designed or produced for the purpose of circumventing a technological protection measure that effectively controls access to a work protected under this title;

"(B) has only limited commercially significant purpose or use other than to circumvent a technological protection measure that effectively controls access to a work protected under this title; or

"(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological protection measure that effectively controls access to a work protected under this title.

"(3) As used in this subsection–

"(A) to 'circumvent a technological protection measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological protection measure, without the authority of the copyright owner; and

"(B) a technological protection measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

"(b) Additional Violations.–(1) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that–

"(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

"(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

"(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

"(2) As used in this subsection–

"(A) the term 'circumvent protection afforded by a technological protection measure' means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological protection measure; and

"(B) a technological protection measure 'effectively protects a right of a copyright owner' under this title if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title.

"(c) Importation.–The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee of any technology, product, service, device, component, or part thereof as described in subsection (a) or (b) shall be actionable under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).

"(d) Other Rights, Etc., Not Affected.–Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

"(e) Exemption for Nonprofit Libraries, Archives, and Educational Institutions.–(1) A nonprofit library, archives, or educational institution which gains access to a commercially exploited copyrighted work solely in order to make a good faith determination of whether to acquire a copy of that work for the sole purpose **\*5** of engaging in conduct permitted under this title shall not be in violation of subsection (a)(1). A copy of a work to which access has been gained under this paragraph–

"(A) may not be retained longer than necessary to make such good faith determination; and

"(B) may not be used for any other purpose.

"(2) The exemption available under paragraph (1) shall only apply with respect to a work when an identical copy of that work is not reasonably available in another form.

"(3) A nonprofit library, archives, or educational institution that willfully for the purpose of commercial advantage or financial gain violates paragraph (1)–

"(A) shall, for the first offense, be subject to the civil remedies under section 1203; and

"(B) shall, for repeated or subsequent offenses, in addition to the civil remedies under section 1203, forfeit the exemption provided under paragraph (1).

"(4) This subsection may not be used as a defense to a claim under subsection (a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or educational institution to manufacture, import, offer to the public, provide, or otherwise traffic in any technology which circumvents a technological protection measure.

"(5) In order for a library or archives to qualify for the exemption under this subsection, the collections of that library or archives shall be–

"(A) open to the public; or

"(B) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

"(f) Law Enforcement and Intelligence Activities.–This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

"S 1202. Integrity of copyright management information

"(a) False Copyright Management Information.–No person shall knowingly–

"(1) provide copyright management information that is false, or

"(2) distribute or import for public distribution copyright management information that is false,

with the intent to induce, enable, facilitate, or conceal infringement.

"(b) Removal or Alteration of Copyright Management Information.–No person shall, without the authority of the copyright owner or the law–

"(1) intentionally remove or alter any copyright management information,

"(2) distribute or import for distribution copyright management information, knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

"(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law,

knowing or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

"(c) Definition.–As used in this chapter, the term 'copyright management information' means the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form:

"(1) The title and other information identifying the work, including the information set forth on a notice of copyright.

"(2) The name of, and other identifying information about, the author of a work.

"(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

"(4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

"(5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

**\*6** "(6) Identifying numbers or symbols referring to such information or links to such information.

"(7) Such other information as the Register of Copyrights may prescribe by regulation, but not including any information concerning the user of a copyrighted work.

"(d) Law Enforcement and Intelligence Activities.–This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

"S 1203. Civil remedies

"(a) Civil Actions.–Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.

"(b) Powers of the Court.–In an action brought under subsection (a), the court–

"(1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation;

"(2) at any time while an action is pending, may order the impounding, on such terms as it deems reasonable, of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation;

"(3) may award damages under subsection (c);

"(4) in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;

"(5) in its discretion may award reasonable attorney's fees to the prevailing party; and

"(6) may, as part of a final judgment or decree finding a violation, order the remedial modification or the destruction of any device or product involved in the violation that is in the custody or control of the violator or has been impounded under paragraph (2).

"(c) Award of Damages.–

"(1) In general.–Except as otherwise provided in this chapter, a person committing a violation of section 1201 or 1202 is liable for either–

"(A) the actual damages and any additional profits of the violator, as provided in paragraph (2); or

"(B) statutory damages, as provided in paragraph (3).

"(2) Actual damages.–The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.

"(3) Statutory damages.–(A) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

"(B) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000.

"(4) Repeated violations.–In any case in which the injured party sustains the burden of proving, and the court finds, that a person has violated section 1201 or 1202 within 3 years after a final judgment was entered against that person for another such violation, the court may increase the award of damages up to triple the amount that would otherwise be awarded, as the court considers just.

"(5) Innocent violations.–

"(A) In general.–The court in its discretion may reduce or remit the total award of damages in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation.

"(B) Nonprofit library, archives, or educational institution.–In the case of a nonprofit library, archives, or educational institution, the court shall remit damages in any case in which the library, archives, or educational institution sustains the burden of proving, and the court finds, that the library, archives, or educational institution was not aware and had no reason to believe that its acts constituted a violation.

**\*7** "S 1204. Criminal offenses and penalties

"(a) In General.–Any person who violates section 1201 or 1202 willfully and for purposes of commercial advantage or private financial gain–

"(1) shall be fined not more than $500,000 or imprisoned for not more than 5 years, or both, for the first offense; and

"(2) shall be fined not more than $1,000,000 or imprisoned for not more than 10 years, or both, for any subsequent offense.

"(b) Limitation for Nonprofit Library, Archives, or Educational Institution.–Subsection (a) shall not apply to a nonprofit library, archives, or educational institution.

"(c) Statute of Limitations.–Notwithstanding section 507(a) of this title, no criminal proceeding shall be maintained under subsection (a) unless such proceeding is commenced within 5 years after the cause of action arose.".

SEC. 104. CONFORMING AMENDMENT.

The table of chapters for title 17, United States Code, is amended by adding at the end the following:

1201".

SEC. 105. EFFECTIVE DATE.

(a) In General.–Subject to subsection (b), the amendments made by this title shall take effect on the date of the enactment of this Act.

(b) Amendments Relating to Certain International Agreements.–(1) The following shall take effect upon the entry into force of the WIPO Copyright Treaty with respect to the United States:

(A) Paragraph (5) of the definition of "international agreement" contained in section 101 of title 17, United States Code, as amended by section 102(a)(4) of this Act.

(B) The amendment made by section 102(a)(6) of this Act.

(C) Subparagraph (C) of section 104(h)(1) of title 17, United States Code, as amended by section 102(c)(1) of this Act.

(D) Subparagraph (C) of section 104(h)(3) of title 17, United States Code, as amended by section 102(c)(2) of this Act.

(2) The following shall take effect upon the entry into force of the WIPO Performances and Phonograms Treaty with respect to the United States:

Case 1:25-cv-08736-PAF    Document 96-4    Filed 07/21/26    Page 12 of 41

(A) Paragraph (6) of the definition of "international agreement" contained in section 101 of title 17, United States Code, as amended by section 102(a)(4) of this Act.

(B) The amendment made by section 102(a)(7) of this Act.

(C) The amendment made by section 102(b)(2) of this Act.

(D) Subparagraph (D) of section 104(h)(1) of title 17, United States Code, as amended by section 102(c)(1) of this Act.

(E) Subparagraph (D) of section 104(h)(3) of title 17, United States Code, as amended by section 102(c)(2) of this Act.

(F) The amendments made by section 102(c)(3) of this Act.

TITLE II–ON-LINE COPYRIGHT INFRINGEMENT LIABILITY LIMITATION

SEC. 201. SHORT TITLE.

This title may be cited as the "On-Line Copyright Infringement Liability Limitation Act".

SEC. 202. LIMITATIONS ON LIABILITY FOR COPYRIGHT INFRINGEMENT.

(a) In General.–Chapter 5 of title 17, United States Code, is amended by adding after section 511 the following new section:

"S 512. Limitations on liability relating to material on-line

"(a) Limitation.–Notwithstanding the provisions of section 106, a provider shall not be liable for–

"(1) direct infringement, based solely on the intermediate storage and transmission of material through a system or network controlled or operated by or for that provider, if–

"(A) the transmission was initiated by another person;

"(B) the storage and transmission is carried out through an automatic technological process, without any selection of that material by the provider; and

**\*8** "(C) no copy of the material thereby made by the provider is maintained on the provider's system or network in a manner ordinarily accessible to anyone other than the recipients anticipated by the person who initiated the transmission, and no such copy is maintained on the system or network in a manner ordinarily accessible to such recipients for a longer period than is reasonably necessary for the transmission;

"(2) monetary relief under section 504 or 505 for contributory infringement or vicarious liability, based solely on conduct described in paragraph (1); or

"(3) monetary relief under section 504 or 505 for contributory infringement or vicarious liability, based solely on transmitting or providing access to material over that provider's system or network, other than conduct described in paragraph (1), if the provider–

"(A) does not have actual knowledge that the material is infringing or, in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; and

"(B) does not receive a financial benefit directly attributable to the infringing activity, if the provider has the right and ability to control such activity.

"(b) Protection of Privacy.–Nothing in subsection (a) shall be construed to condition the applicability of subsection (a) on a provider–

"(1) monitoring its service or affirmatively seeking facts indicating infringing activity, or

"(2) accessing, removing, or disabling access to material, if such conduct is prohibited by law.

"(c) Limitation Based Upon Removing or Disabling Access to Infringing Material.–A provider shall not be liable to any person for any claim based on that provider's good faith disabling of access to or removal of material claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing.

"(d) Other Defenses Not Affected.–Removing or disabling access to material which a provider transmits on-line or to which a provider provides on-line access, or the failure to do so, shall not adversely bear upon the consideration by a court of a defense to infringement asserted by that provider on the basis of section 107 or any other provision of law.

"(e) Misrepresentations.–Any person who knowingly materially misrepresents to a provider that material on-line is infringing shall be liable for any damages, including costs and attorneys' fees, incurred by the provider, by the alleged infringer, or by any copyright owner or copyright owner's authorized licensee, who is injured by such misrepresentation, as a result of the provider relying upon such misrepresentation in removing or disabling access to the material claimed to be infringing.

"(f) Definition.–As used in this section, the term 'provider' means a provider of on-line services or network access.".

(b) Conforming Amendment.–The table of sections for chapter 5 of title 17, United States Code, is amended by adding at the end the following:

"512. Limitations on liability relating to material on-line.".

## SEC. 203. LIMITATIONS ON EXCLUSIVE RIGHTS; COMPUTER PROGRAMS.

Section 117 of title 17, United States Code, is amended–

(1) by striking "Notwithstanding" and inserting the following:

"(a) Making of Additional Copy or Adaptation by Owner of Copy.–Notwithstanding";

(2) by striking "Any exact" and inserting the following:

"(b) Lease, Sale, or Other Transfer of Additional Copy or Adaptation.–Any exact"; and

(3) by adding at the end the following:

"(c) Machine Maintenance or Repair.–Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if–

"(1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and

"(2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not **\*9** accessed or used other than to make such new copy by virtue of the activation of the machine.

"(d) Definitions.–For purposes of this section–

"(1) the 'maintenance' of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and

"(2) the 'repair' of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.".

## PURPOSE AND SUMMARY

H.R. 2281 contains two titles. The first, entitled the "WIPO Copyright Treaties Implementation Act," implements World Intellectual Property Organization sponsored copyright agreements signed by the United States. The second, entitled the "On-Line Copyright Infringement Liability Limitation Act," limits the liability on-line and Internet service providers may incur as a result of transmissions containing copyrighted works traveling through systems and networks under their control.

## BACKGROUND AND NEED FOR THE LEGISLATION

The "WIPO Copyright Treaties Implementation Act"

The digital environment now allows users of electronic media to send and retrieve perfect reproductions of copyrighted material easily and nearly instantaneously, to or from locations around the world. With this evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted works.

In Geneva, Switzerland, in December, 1996, a Diplomatic Conference was convened under the auspices of the World Intellectual Property Organization ("WIPO"), to negotiate new multilateral treaties to protect copyrighted material in the digital environment and to provide stronger international protection to performers and producers of phonograms. In addition to the digital issues, the latter is important to provide guarantees abroad of the same strong protection for American records, tapes, and compact discs abroad that is provided domestically.

The conference produced two treaties, the "WIPO Copyright Treaty" and the "WIPO Performances and Phonograms Treaty," which were adopted by consensus by over 150 countries. The treaties will ensure adequate protection for American works in countries around the world at a time when borderless digital means of dissemination are becoming increasingly popular. While such rapid dissemination of perfect copies will benefit both U.S. owners and consumers, it will unfortunately also facilitate pirates who aim to destroy the value of American intellectual property.

The successful negotiation of the treaties brings with it the need for domestic implementing legislation. Title I of this bill contains two substantive additions to U.S. domestic law, in addition to some technical changes, to bring the law into compliance with the treaties so that they may be ratified appropriately.

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works. 13

The treaties do not require any change in the substance of copyright rights or exceptions in U.S. law. They do, however, require two technological adjuncts to the copyright law, intended to ensure a thriving electronic marketplace for copyrighted works on the **\*10** Internet. The treaties address the problems posed by the possible circumvention of technologies, such as encryption, which will be used to protect copyrighted works in the digital environment and to secure on-line licensing systems. To comply with the treaties, the U.S. must make it unlawful to defeat technological protections used by copyright owners to protect their works. This would include preventing unauthorized access as well as the manufacture and sale of devices primarily designed to decode encrypted copyrighted material. Further, the U.S. must, under the treaties, make it unlawful to intentionally provide false information, or to deliberately alter or delete information provided by a copyright owner which identifies a work, its owner or performer, and the terms and conditions for its use.

When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet. In order to protect the owner, copyrighted works will most likely be encrypted and made available to consumers once payment is made for access to a copy of the work. There will be those who will try to profit from the works of others by decoding the encrypted codes protecting copyrighted works, or engaging in the business of providing devices or services to enable others to do so. A new "Section 1201" to the Copyright Act is required by both WIPO Treaties to make it unlawful to engage in such activity. The changes contained in the new Section 1201 are meant to parallel similar types of protection afforded by Federal telecommunications law and state laws. Just as Congress acted in the areas of cable television and satellite transmissions to prevent unauthorized interception and descrambling of signals, it is now necessary to address the on-line environment.

While there are no objections to preventing piracy on the Internet, it is not easy to draw the line between legitimate and non-legitimate uses of decoding devices, and to account for devices which serve legitimate purposes. The bill, as reported, presents a reasonable compromise by preventing only the manufacture or sale of devices that: (1) are "primarily designed" to grant free, unauthorized access to copyrighted works; (2) have only limited commercially significant purpose or use other than to grant such free access; or (3) are intentionally marketed for use in granting such free access. This would not include normal household devices such as Videocasette Recorders or personal computers, since such devices are not "primarily designed" to circumvent technological protections granting access to copyrighted works, have obvious and numerous commercially significant purposes and uses other than circumventing such protections, and are not intentionally marketed to circumvent such protections. It would however, prevent a manufacturer from making a device that is primarily designed for such a purpose and labeling it as a common household device.

A new "Section 1202" to the Copyright Act is required by both WIPO Treaties to ensure the integrity of the electronic marketplace by preventing fraud and misinformation. The section prohibits intentionally providing false copyright management information, such as the title of a work or the name of its author, with the intent to induce, enable, facilitate or conceal infringement. It also prohibits the deliberate deleting or altering copyright management **\*11** information. This section will operate to protect consumers from misinformation as well as authors and copyright owners from interference with the private licensing process.

The "On-Line Copyright Infringement Liability Limitation Act"

The "On-Line Copyright Infringement Liability Limitation Act" addresses concerns raised by a number of on-line service and Internet access providers regarding their potential liability when infringing material is transmitted on-line through their services. While several judicially created doctrines currently address the question of when liability is appropriate, providers have sought greater certainty through legislation as to how these doctrines will apply in the digital environment.

Title II of this bill codifies the core of current case law dealing with the liability of on-line service providers, while narrowing and clarifying the law in other respects. It offers the advantage of incorporating and building on those judicial applications of existing copyright law to the digital environment that have been widely accepted as fair and reasonable.

Case 1:25-cv-08736-PAE    Document 96-4    Filed 07/21/26    Page 16 of 41

The bill distinguishes between direct infringement and secondary liability, treating each separately. This structure is consistent with evolving case law, and appropriate in light of the different legal bases for and policies behind the different forms of liability.

As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another. Thus, the bill essentially codifies the result in the leading and most thoughtful judicial decision to date: Religious Technology Center v. Netcom On-line Communications Services, Inc., 907 F. Supp. 1361 (N.D. Cal. 1995). In doing so, it overrules those aspects of Playboy Enterprises, Inc. v. Frena, 839 F. Supp. 1552 (M.D. Fla. 1993), insofar as that case suggests that such acts by service providers could constitute direct infringement, and provides certainty that Netcom and its progeny, so far only a few district court cases, will be the law of the land.

As to secondary liability, the bill changes existing law in two primary respects: (1) no monetary relief can be assessed for the passive, automatic acts identified in Religious Technology Center v. Netcom On-line Communications Services, Inc.; and (2) the current criteria for finding contributory infringement or vicarious liability are made clearer and somewhat more difficult to satisfy. Injunctive relief will, however, remain available, ensuring that it is possible for copyright owners to secure the cooperation of those with the capacity to prevent ongoing infringement. Failure to qualify for the exemption or limitation does not mean that the provider is necessarily an infringer or liable for monetary damages. If the exemption or limitation does not apply, the doctrines of existing law will come into play, and liability will only attach to the extent that the court finds that the requirements for direct infringement, contributory infringement or vicarious liability have been met, that the conduct is not excused by any other exception or limitation, and that monetary remedies are appropriate. Where monetary remedies remain available under the bill, the ordinary rules for courts to follow in setting the amounts of those remedies will still apply. This includes the remittal of statutory damages under paragraph 504 **\*12** (c)(2) for non-profits and public broadcasting entities based on the reasonable belief that the infringing act was a fair use.

Safeguards in the bill include language intended to guard against interference with privacy; a provision ensuring that nonprofit institutions such as universities will not be prejudiced when they determine that an allegedly infringing use is fair use; a provision protecting service providers from lawsuits when they act to assist copyright owners in limiting or preventing infringement; and a provision requiring payment of costs incurred when someone knowingly makes false accusations of on-line infringement.

## HEARINGS

The Committee's Subcommittee on Courts and Intellectual Property held two days of hearings on this legislation on September 16 and 17, 1997 (Serial #33). Testimony was received from The Honorable Bruce Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, Patent and Trademark Office, United States Department of Commerce; The Honorable Marybeth Peters, Register of Copyrights, United States Copyright Office, The Library of Congress; Roy Neel, President and Chief Executive Officer, United States Telephone Association; Jack Valenti, President and Chief Executive Officer, Motion Picture Association of America; Robert Holleyman, President, Business Software Alliance; M.R.C. Greenwood, Chancellor, University of California, Santa Cruz, on behalf of the Association of American Universities and the National Association of State Universities and Land Grant Colleges; Tushar Patel, Vice President and Managing Director, USWeb; Lawrence Kenswil, Executive Vice President, Business and Legal Affairs, Universal Music Group; Marc Jacobson, General Counsel, Prodigy Services, Inc.; Ken Wasch, President, Software Publishers Association; Ronald G. Dunn, President, Information Industry Association; John Bettis, Songwriter, on behalf of the American Society of Composers Authors and Publishers; Allee Willis, Songwriter, on behalf of Broadcast Music, Incorporated; Robert L. Oakley, Professor of Law, Georgetown University Law Center and Director, Georgetown Law Library, on behalf of a Coalition of Library and Educational Organizations; Johnny Cash, Vocal Artist, with Hilary Rosen, President and Chief Executive Officer, Recording Industry Association of America; Allan Adler, Vice President, Legal and Governmental Affairs, Association of American Publishers; Gail Markels, General Counsel and Senior Vice President, Interactive Digital Software Association; Mike Kirk, Executive Director, American Intellectual Property Law Association; Thomas Ryan, President, SciTech Software, Inc.; Mark Belinsky, Vice President, Copy Protection Group, Macrovision, Inc.; Douglas Bennett, President, Earlham College, Vice President,

American Council of Learned Societies, on behalf of the Digital Future Coalition; Edward J. Black, President, Computer and Communications Industry Association; Christopher Byrne, Director of Intellectual Property, Silicon Graphics, Inc., on behalf of the Information Technology Industry Council; and Gary Shapiro, President, Consumer Electronics Manufacturer's Association (a sector of the Electronic Industries Association), and Chairman, Home Recording Rights Coalition.

## **13** COMMITTEE CONSIDERATION

On February 26, 1998, the Subcommittee conducted a markup of H.R. 2281, the "WIPO Copyright Treaties Implementation Act," and on H.R. 3209, the "On-Line Copyright Infringement Liability Limitation Act."

H.R. 2281 was reported favorably by voice vote, a quorum being present, to the full Committee in the form of a single amendment in the nature of a substitute incorporating amendments adopted by the Subcommittee.

H.R. 3209 was reported favorably by voice vote, a quorum being present, to the full Committee, without amendment.

On April 1, 1998, the full Committee conducted a markup of H.R. 2281, as reported by the Subcommittee. The Committee adopted, by voice vote, an amendment in the nature of a substitute offered by Mr. Coble, which made the provisions of H.R. 2281, as reported, title I of the bill, and certain provisions of H.R. 3209 title II of the bill.

The Committee favorably reported, by voice vote, a quorum being present, H.R. 2281, as amended, to the House.

## COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

## COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

## NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(C)(3) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill, H.R. 2281, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

**14** U.S. Congress,
Congressional Budget Office,
Washington, DC, April 16, 1998.

Hon. Henry J. Hyde,

Chairman, Committee on the Judiciary,

House of Representatives, Washington, DC.

Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 2281, the WIPO Copyright Treaties Implementation Act.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Kim Cawley, who can be reached at 226–2860.

Sincerely,

June E. O'Neill, Director.

Enclosure.

cc: Honorable John Conyers, Jr.,

Ranking Minority Member.

H.R. 2281–WIPO Copyright Treaties Implementation Act

CBO estimates that enacting H.R. 2281 would have no significant impact on the federal budget. Enacting the bill would establish new criminal penalties and thus could affect both receipts and direct spending. Hence, pay-as-you-go procedures would apply, but we expect that any changes in receipts and direct spending would be insignificant.

Title I of H.R. 2281 would amend U.S. copyright law to comply with two treaties produced by the December 1996 conference of the World Intellectual Property Organization one regarding the use of copyrighted material in digital environments, and the other dealing with international copyright protection of performers and producers of phonograms. Section 1204 would establish criminal fines of up to $1 million for anyone attempting to circumvent copyright protection systems, or falsifying or altering copyright management information. Enacting this provision could increase governmental receipts from the collection of fines, but we estimate that any such increase would be less than $500,000 annually. Criminal fines are deposited in the Crime Victims Fund and are spent in the following year. Thus any change in direct spending from the fund would also amount to less than $500,000 annually.

Title II would limit the liability for copyright infringement of persons who are providers of on-line services or network access. Based on information from the Copyright Office, CBO estimates this provision would have no budgetary impact.

Section 4 of the Unfunded Mandates Reform Act of 1995 excludes from the application of that act any legislative provisions that are necessary for the ratification or implementation of international treaty obligations. CBO has determined that Title I of the bill fits within that exclusion because it is necessary for the implementation of the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty. Title II of the bill does not contain any intergovernmental or private-sector mandates.

 **\*15**  The CBO staff contact for this estimate is Kim Cawley, who can be reached at 226–2860. This estimate was approved by Robert A. Sunshine, Deputy Assistant Director for Budget Analysis.

CONSTITUTIONAL AUTHORITY

Pursuant to Rule XI, clause 2(1)(4) of the Rules of the House of Representatives, the Committee finds the authority for this legislation in Article I, clause 8, section 8 of the Constitution.

SECTION-BY-SECTION ANALYSIS

Section 101: Short Title

This section provides that this Act may be cited as the "WIPO Copyright Treaties Implementation Act."

Section 102: Technical Changes

Summary

To comply with the obligations of the WIPO Treaties, several technical amendments to the U.S. Copyright Act are necessary. These amendments are needed to ensure that works from countries that join the two new WIPO Treaties, including works in existence on the date each treaty becomes effective for the United States, will be protected in the United States on a formality-free basis, as required by the provisions of each treaty. Three sections of the Copyright Act require amendment: (1) section 104, which specifies the conditions on which works from other countries are protected in the United States; (2) section 104A, which restores protection to certain preexisting works from other countries that have fallen into the public domain in the United States; and (3) section 411(a), which makes copyright registration a precondition to bringing suit for infringement for some works. In addition, the amendments made to these sections require some additions to, and changes in, the definition section of the Copyright Act, section 101.

Changes to Section 101: Definitions.

The bill amends section 101 to define "treaty party" as "any country or intergovernmental organization that is a party to an international agreement" and to define "international agreement" to include, inter alia, the two new WIPO Treaties. Definitions of the two new WIPO Treaties are also provided. In addition, a definition of "United States work" was added for purposes of amended section 411.

Changes to Section 104: Subject Matter of Copyright: National Origin.

Existing section 104 identifies the criteria that must be met for a work to qualify for protection under the U.S. copyright law (i.e., "points of attachment"). Among those protected under section 104 are nationals or domiciliaries of those countries with which we have an appropriate Treaty relationship. Section 104, as it is presently written, explicitly identifies those Treaty relationships, but does not refer to the two new WIPO Treaties. Therefore, **\*16** section 104 needs to be amended to provide for points of attachment for the two new WIPO Treaties.

This bill amends section 104 so that all countries that have copyright relations with the United States would be referred to collectively by the term "treaty parties." This change, in conjunction with the amendments to section 101, which define "treaty party" and "international agreement," serves to ensure that the two new WIPO Treaties are covered by section 104. The bill also amends section 104 to extend protection to foreign works from any treaty party based on four points of attachment: nationality of the author, place of first publication of the work, place of fixation of the sounds embodied in a sound recording, and the situs of a constructed architectural work.

The way section 104 is presently written requires that it be amended each time U.S. treaty membership changes. By defining "treaty party" in section 101 and amending section 104 to refer to "treaty party," future changes in the treaties to which the U.S. is a party would not require changes to section 104. It is much clearer and less unwieldy to have a single set of criteria for eligibility in section 104 as proposed by this bill, rather than multiple, overlapping criteria in a long list of complex definitions in section 101. If we join any future treaties, they can simply be added to the list of "international agreements" without any detailed amendments repeating the criteria for eligibility. The amendment to section 104 also makes clear that membership

in the Geneva Phonograms Convention and the WIPO Performances and Phonograms Treaty provides national eligibility for sound recordings only, not other types of works.

Changes to Section 104A: Copyright in Restored Works

The bill amends section 104A(h) by adding the two new WIPO Treaties to the definitions of "date of adherence or proclamation" and "eligible country." It would also add a paragraph to the definition of "restored work" to ensure that copyrighted works other than sound recordings do not qualify as restored works where the sole basis for protection in the United States is adherence to the WIPO Performances and Phonograms Treaty.

Changes to Section 411(a): Registration and Infringement Actions

In its current form, section 411(a) requires works to be registered with the Copyright Office before suit can be brought for their infringement, but exempts Berne Convention works whose country of origin is not the United States. The section must be amended to exempt works from members of the two new WIPO Treaties.

Amendments to section 411(a) reframe the registration requirement in the affirmative–essentially the converse of the current section. In other words, the provision would state affirmatively that "United States works" must be registered before suit, with "United States works" defined as the converse of the current definition of works whose country of origin is not the United States. Similar to the changes in section 104, this section could be easily updated each time the United States joins another treaty, without the need to change several interrelated provisions of the Act.

 **\*17**  Change to Section 507(a)

Currently, section 507(a) provides for a three-year statute of limitations period for all criminal copyright actions. Section 507(a) is amended to recognize exceptions to the three-year limitations period if expressly provided elsewhere in Title 17. New chapter 12 of Title 17 provides for a five-year criminal limitation period.

Section 103: Copyright Protection Systems and Copyright Management Information

Summary

The two new WIPO Treaties include substantively identical provisions on technological measures of protection (also commonly referred to as the "black box" or "anticircumvention" provisions). These provisions require contracting parties to provide "adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law."

Both of the new WIPO treaties also include substantively identical provisions on copyright management information. These provisions require contracting parties to protect the integrity of copyright management information. The treaties define copyright management information as "information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a work or appears in connection with the communication of a work to the public."

Legislation is required to comply with both of these provisions. To accomplish this, the bill adds a new chapter (chapter twelve) to Title 17 of the United States Code. This new chapter twelve includes four sections–(1) section 1201, which prohibits the circumvention of technological copyright protection measures; (2) section 1202, which protects the integrity of copyright

management information; (3) section 1203, which provides for civil remedies for violations of sections 1201 and 1202; and (4) section 1204, which provides for criminal penalties for violations of sections 1201 and 1202.

Section 1201: Circumvention of Copyright Protection Systems

Subsection (a) applies when a person has not obtained authorized access to a copy or a phonorecord of a work for which the copyright owner has put in place a technological measure that effectively controls access to his or her work. The relevant terminology is defined in paragraph (a)(3), as described below.

Paragraph (a)(1). The act of circumventing a technological protection measure put in place by a copyright owner to control access to a copyrighted work is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book. Paragraph (a)(1) establishes a general prohibition against gaining unauthorized access **\*18** to a work by circumventing a technological protection measure put in place by the copyright owner where such protection measure otherwise effectively controls access to a work protected under Title 17 of the U.S. Code.

Paragraph (a)(1) does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under Title 17, even if such actions involve circumvention of additional forms of technological protection measures. In a fact situation where the access is authorized, the traditional defenses to copyright infringement, including fair use, would be fully applicable. So, an individual would not be able to circumvent in order to gain unauthorized access to a work, but would be able to do so in order to make fair use of a work which he or she has acquired lawfully.

Paragraph (a)(2). In order to provide meaningful protection and enforcement of the copyright owner's right to control access to his or her copyrighted work, this paragraph supplements the prohibition against the act of circumvention in paragraph (a)(1) with prohibitions on creating and making available certain technologies, products and services used, developed or advertised to defeat technological protections against unauthorized access to a work. Similar laws have been enacted in related contexts. See, e.g., 17 U.S.C. S 1002(a) (prohibiting the import, manufacture, or distribution of digital audio recording equipment lacking specified characteristics and prohibiting the import, manufacture, or distribution of any device, or the offer to perform any service, the primary purpose or effect of which is to circumvent the serial copy management system required for digital audio equipment); 47 U.S.C. S 553(a)(2) (prohibiting the manufacture or distribution of equipment intended for the unauthorized reception of cable television service); 47 U.S.C. S 605(e)(4) (prohibiting the manufacture, assembly, import, and sale of equipment used in the unauthorized decryption of satellite cable programming.)

Specifically, paragraph (a)(2) prohibits manufacturing, importing, offering to the public, providing, or otherwise trafficking in certain technologies, products, services, devices, components, or parts that can be used to circumvent a technological protection measure that otherwise effectively controls access to a work protected under Title 17. It is drafted carefully to target "black boxes," and to ensure that legitimate multipurpose devices can continue to be made and sold. For a technology, product, service, device, component, or part thereof to be prohibited under this subsection, one of three conditions must be met. It must:

(1) be primarily designed or produced for the purpose of circumventing;

(2) have only a limited commercially significant purpose or use other than to circumvent; or

(3) be marketed by the person who manufactures it, imports it, offers it to the public, provides it or otherwise traffics in it, or by another person acting in concert with that person, for use in circumventing a technological protection measure that effectively controls access to a work protected under Title 17.

This provision is designed to protect copyright owners, and simultaneously allow the development of technology.

**\*19** Paragraph (a)(3) defines certain terms used throughout paragraph (a):

(1) "circumvent a technological protection measure"–for purposes of paragraph (a) only, which covers protections against unauthorized initial access to a work, this term means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological protection measure, without the authority of the copyright owner."

(2) "effectively controls access to a work"–a technological protection measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

Subsection (b) applies when a person has obtained authorized access to a copy or a phonorecord of a work, but the copyright owner has put in place technological measures that effectively protect his or her right under Title 17 to control or limit further use of the copyrighted work.

Paragraph(b)(1). Paralleling paragraph (a)(2), above, paragraph (b)(1) seeks to provide meaningful protection and enforcement of copyright owners' use of technological protection measures to protect their rights under Title 17 by prohibiting the act of making or selling the technological means to overcome these protections and facilitate copyright infringement. Paragraph (b)(1) prohibits manufacturing, importing, offering to the public, providing, or otherwise trafficking in certain technologies, products, services, devices, components, or parts thereof that can be used to circumvent a technological protection measure that effectively protects a right of a copyright owner under Title 17 in a work or portion thereof. Again, for a technology, product, service, device, component, or part thereof to be prohibited under this subsection, one of three conditions must be met. It must:

(1) be primarily designed or produced for the purpose of circumventing;

(2) have only limited commercially significant purpose or use other than to circumvent; or

(3) be marketed by the person who manufactures it, imports it, offers it to the public, provides it, or otherwise traffics in it, or by another person acting in concert with that person, for use in circumventing a technological protection measure that effectively protects the right of a copyright owner under Title 17 in a work or a portion thereof.

Like paragraph (a)(2), this provision is designed to protect copyright owners, and simultaneously allow the development of technology.

Paragraph (b)(2) defines certain terms used in subsection (b):

(1) "circumvent protection afforded by a technological protection measure" is defined as "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological protection measure."

(2) "effectively protects a right of a copyright owner under Title 17"–a technological protection measure effectively protects *20 a right of a copyright owner under Title 17 "if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right under Title 17 of a copyright owner."

Subsection (c) prohibits the importation, sale for importation, or sale within the United States after importation by the owner, importer or consignee of any technology, product, service, device, component, or part thereof covered by subsections (a) or (b). This paragraph further provides that violations of this provision are actionable under section 1337 of Title 19 of the U.S. Code, which authorizes actions by the International Trade Commission against unfair import practices.

Subsection (d) provides that section 1201 shall not have any effect on rights, remedies, limitations, or defenses to copyright infringement, including fair use, under Title 17. This provision is intended to ensure that none of the provisions in section 1201 affect the existing legal regime established in the Copyright Act and case law interpreting that statute.

Subsection (e) allows a nonprofit library, nonprofit archives or nonprofit educational institution to obtain access to a copyrighted work for the sole purpose of making a good faith determination as to whether it wishes to acquire a copy, or portion of a copy, of that work in order to engage in conduct permitted under the Copyright Act, such as a fair use under section 107. A qualifying institution may not gain access for a period of time longer than necessary to determine whether it wishes to obtain a copy, or portion of a copy, for such purposes and the right to gain access shall not apply for any other purpose.

The right to obtain access under this paragraph only applies when the nonprofit library, nonprofit archives, or nonprofit educational institution cannot obtain a copy of an identical work by other means, and such an entity may not use the exemption in this paragraph for commercial advantage or financial gain without penalty.

This paragraph shall not be used as a defense to the prohibitions on manufacturing or selling devices contained in paragraph (a)(2) or subsection (b).

Subsection (f) makes clear that the prohibitions in section 1201 do not prohibit any lawfully authorized investigative, protective, or intelligence activity by or at the direction of a federal, state, or local law enforcement agency, or of an intelligence agency of the United States.

Section 1202: Integrity of Copyright Management Information

Subsection (a) establishes a general prohibition against intentionally providing false copyright management information ("CMI"), as defined in subsection (c), and against distributing or importing for distribution false CMI. There are two prerequisites that must be met for these prohibitions to be violated: (1) the person providing, distributing or importing the false CMI must know the CMI is false, and (2) the person providing, distributing, or importing the false CMI must do so with the intent to induce, enable, facilitate or conceal an infringement of any right under Title 17. The prohibition in this subsection does not include ordinary and customary  *21  practices of broadcasters or inadvertent omission of credits from broadcasts of audiovisual works since, inter alia, such omissions do not entail knowing provision of false CMI with intent to induce, enable, facilitate or conceal a copyright infringement.

Subsection (b) establishes a general prohibition against removing or altering CMI and against distributing or importing for distribution altered CMI or distributing, importing for distribution or publicly performing works in which CMI has been removed. There are three specific acts prohibited if they are committed without the authority of the copyright owner or the law, and if they are done knowing, or with respect to civil remedies under section 1203, having reasonable grounds to know, that they will induce, enable, facilitate or conceal a copyright infringement: (1) intentionally removing or altering CMI; (2) distributing or importing for distribution CMI knowing that it has been altered without the authority of the copyright owner or the law; or (3) distributing, importing for distribution, or publicly performing works, copies of works, or phonorecords knowing that CMI has been removed or altered without the authority of the copyright owner or the law. The prohibition in this subsection does not include ordinary and customary practices of broadcasters or inadvertent omission of credits from broadcasts of audiovisual works since, inter alia, such omissions are not made with knowledge that they will induce, enable, facilitate or conceal a copyright infringement.

Subsection (c) defines CMI. To fall within the definition, there is a threshold requirement that the information be conveyed in connection with copies or phonorecords, performances or displays of the copyrighted work. The term "conveyed" is used in its broadest sense and is not meant to require any type of transfer, physical or otherwise, of the information. It merely requires that the information be accessible in conjunction with, or appear with, the work being accessed.

Subsection (c) defines CMI as (1) the title of a work or other information that identifies the work; (2) the author's name or other information that identifies the author; (3) the copyright owner's name or other information that identifies the copyright owner; and (4) terms and conditions for use of a work. Numbers and symbols which refer to or represent the above information are also included within the definition of CMI. As noted above, both treaties require that numbers and symbols be included within the definition of CMI. Links, such as embedded pointers and hyperlinks, to the above information are also included. The phrase "links to such information" was included because removing or altering a link to the information will have the same adverse effect as removing or altering the information itself. Finally, paragraph (c)(6) of the definition permits the Register of Copyrights to prescribe by regulation other information that, if conveyed in connection with a work, is to be protected as CMI. To protect the privacy of users of copyrighted works, however, the Register of Copyrights may not include within the definition of CMI any information concerning users of copyrighted works.

Subsection (d) makes clear that the prohibitions in section 1202 do not prohibit any lawfully authorized investigative, protective or intelligence activity by or at the direction of a federal, state or local **\*22** law enforcement agency, or of an intelligence agency of the United States.

Section 1202 does not mandate the use of any type of CMI. It merely protects the integrity of CMI if a party chooses to use it in connection with a copyrighted work, prohibiting its deliberate deletion or alteration. It also should be noted that the definition of "copyright management information" does not encompass, nor is it intended to encompass, tracking or usage information relating to the identity of users of the works. The definition of CMI encompasses only the types of information listed, such as the author's name, the copyright owner's name, copyright notice information, and title of the work. It would be inconsistent with the purpose and construction of this bill and contrary to the protection of privacy to include tracking and usage information within the definition of CMI.

Section 1202 imposes liability for specified acts. It does not address the question of liability for persons who manufacture devices or provide services.

Section 1203. Civil Remedies

Section 1203 is divided into three paragraphs. Subsection (a) sets forth the general proposition that civil remedies are available for violations of sections 1201 and 1202. This paragraph establishes the jurisdiction for such civil actions as the "appropriate U.S. district court" and limits standing to bring a civil action to those persons injured by a violation of section 1201 or 1202.

Subsection (b) sets out the powers of the court that hears the case. Subsection (b) permits the court to (1) grant temporary and permanent injunctions; (2) order the impounding of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation; (3) award damages; (4) allow the recovery of costs by or against any party; (5) award reasonable attorney's fees to the prevailing party; and (6) order the remedial modification or the destruction of any device or product involved in the violation that is in the custody or control of the violator or has been impounded.

Subsection (c) is divided into five sections, each of which addresses the awarding of damages to the prevailing party. Paragraph (c)(1) establishes the general proposition that a person who violates section 1201 or 1202 is liable for either actual damages and any additional profits of the violator or statutory damages. Paragraphs (c)(2) and (c)(3) specify that the complaining party may finalize a choice between the two types of damage awards at any time until the final judgment is entered.

Paragraph (c)(2) provides that, when the prevailing party opts for actual damages, the court shall award to that party the actual damages suffered by the party as a result of the violations, as well as any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages.

Paragraph (c)(3) provides different statutory award amounts depending upon whether the civil action involves a section 1201 or 1202 violation. When the violation is a section 1201 violation and the prevailing party opts to recover an award of statutory damages, the prevailing party will be awarded statutory damages of not less **\*23** than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service. When the violation is a section 1202 violation and the prevailing party opts to recover an award of statutory damages, the prevailing party will be awarded statutory damages of not less than $2,500 or more than $25,000 for each violation.

Paragraphs (c)(4) and (c)(5) set forth circumstances in which it would be appropriate to increase or decrease a damage award. Paragraph (c)(4) provides for an increased damage award when the violator is a repeat offender. Specifically, when the prevailing party establishes that a person violated section 1201 or 1202 within three years after a final judgment was entered against that person for another such violation, the award of damages may be increased to a sum of up to triple the amount that would otherwise be awarded. Paragraph (c)(5)(A) provides that, when a violator of section 1201 or 1202 was not aware and had no reason to believe that its acts constituted a violation, the damage award may be reduced or remitted. Paragraph (c)(5)(B) provides that, when a nonprofit library, nonprofit archives, or nonprofit educational institution violator of section 1201 or 1202 was not aware and had no reason to believe that its acts constituted a violation, the damage award shall be remitted entirely.

Section 1204: Criminal Penalties

Subsection (a) provides for the availability of criminal penalties for violations of sections 1201 and 1202. The standard applicable under this section is identical to the standard used in section 506 of the Copyright Act to establish criminal violations. Subsection (a) also sets forth the penalties available for a criminal violations of sections 1201 and 1202 as "not more than $500,000 or imprisonment for not more than five years, or both." If the person who is found guilty of criminal violation of sections 1201 or 1202 is a repeat offender, section 1204 provides that penalties may be increased to "not more than $1,000,000 or imprisonment for not more than ten years, or both.".

Subsection (b) exempts completely any nonprofit library, nonprofit archives or nonprofit educational institution from the criminal penalties contained in subsection (a).

Subsection (c) provides for a five-year statute of limitations for criminal offenses under chapter 12.

Section 104: Conforming Amendments

This section amends the table of chapters for Title 17 to reflect the addition of new chapter twelve.

Section 105: Effective Date

This section establishes the effective date of the proposed amendments in this bill as the date the bill is enacted into law. There are several exceptions to this effective date. These exceptions only apply to the technical amendments that are proposed in section 102 of the bill. Section 105 of the bill changes the effective date of any provision in section 102 of the bill that specifically refers to the WIPO Copyright Treaty or the WIPO Performances and **\*24** Phonograms Treaty from the date the bill is enacted into law to the date the Treaty enters into force.

These exceptions were necessary because, as of the drafting of this bill, the two treaties have not entered into force and will not do so until three months after 30 States deposit their instruments of ratification or accession with the Director General of WIPO. The exceptions ensure that the amendments that refer specifically to the two treaties do not become effective until the treaties themselves become effective. In addition, it was necessary to refer to the each treaty separately in this section, because it is possible that the two treaties may enter into force at different times and the amendments particular to each treaty had to be grouped together to ensure that the provisions relating specifically to one treaty do not become effective once the other treaty

enters into force. Finally, it was necessary to add the phrase "with respect to the United States" to ensure that, if the Treaties enter into force before the United States deposits its instrument of accession, the United States does not extend benefits to Member States of these Treaties until the United States becomes party to the Treaties.

Section 201: Short Title

This section establishes the short title of the bill as the "On-Line Copyright Infringement Liability Limitation Act."

Section 202: Limitations

Paragraph 512(a)(1) exempts a provider from liability on the basis of direct infringement for transmitting material over its system or network at the request of a third party, and for the intermediate storage of such material, in certain circumstances. The exempted storage and transmissions are those carried out through an automatic technological process that is indiscriminate– i.e., the provider takes no part in the selection of the particular material transmitted–where the copies are retained no longer than necessary for the purpose of carrying out the transmission. This conduct would ordinarily include forwarding of customers' Usenet postings to other Internet sites in accordance with configuration settings that apply to all such postings. It would also include routing of packets from one point to another on the Internet.

This exemption codifies the result of Religious Technology Center v. Netcom On-line Communications Services, Inc., 907 F. Supp. 1361 (N.D. Cal. 1995) ("Netcom"), with respect to liability of providers for direct infringement. See id. at 1368-70. In Netcom the court held that a provider is not liable for direct infringement where it takes no "affirmative action that [directly results] in copying . . . works other than by installing and maintaining a system whereby software automatically forwards messages received from subscribers . . . and temporarily stores copies on its system." By referring to temporary storage of copies, Netcom recognizes implicitly that intermediate copies may be retained without liability for only a limited period of time. The requirement in paragraph 512(a)(1) that "no copy [be] maintained on the system or network . . . for a longer period than reasonably necessary for the transmission" is drawn from the facts of the Netcom case, and is intended to codify this implicit limitation in the Netcom holding.

**\*25** Paragraph 512(a)(2) exempts a provider from any type of monetary relief under theories of contributory infringement or vicarious liability for the same activities for which providers are exempt from liability for direct infringement under paragraph 512(a)(1). This provision extends the Netcom holding with respect to direct infringement to remove monetary exposure for such limited activities for claims arising under doctrines of secondary liability. Taken together, paragraphs (1) and (2) mean that providers will never be liable for any monetary damages for this type of transmission of material at the request of third parties or for intermediate storage of such material in the course of the transmission. Copyright owners may still seek an injunction against such activities under theories of secondary liability, if they can establish the necessary elements of a claim.

Paragraph 512(a)(3) similarly exempts a provider from monetary relief under theories of contributory infringement or vicarious liability for conduct going beyond the scope of paragraph (1), where a provider's level of participation in and knowledge of the infringement are low. Such conduct could include providing storage on a server and transmitting material from such storage in response to requests from users of the Internet. In addition, the provision modifies and clarifies the knowledge element of contributory infringement and the financial benefit element of vicarious liability. Even if a provider satisfies the common-law elements of contributory infringement or vicarious liability, it will be exempt from monetary liability if it satisfies the criteria in subparagraphs (A) and (B). As under paragraph (2), copyright owners may still seek an injunction even if the provider qualifies for the exemption from monetary relief.

The knowledge standard in subparagraph (A), in addition to actual knowledge, includes "facts or circumstances from which infringing activity is apparent." This would include a notice or any other "red flag"–information of any kind that a reasonable person would rely upon. It may, in appropriate circumstances include the absence of customary indicia of ownership or

Case 1:25-cv-08736-PAE    Document 96-4    Filed 07/21/26    Page 27 of 41

authorization, such as a standard and accepted digital watermark or other copyright management information. As subsection (b) makes clear, the bill imposes no obligation on a provider to seek out such red flags. Once a provider becomes aware of a red flag, however, it ceases to qualify for the exemption.

This standard differs from existing law, under which a defendant may be liable for contributory infringement if it knows or should have known that material was infringing.

The financial benefit standard in subparagraph (B) is intended to codify and clarify the direct financial benefit element of vicarious liability as it has been interpreted in cases such as Marobie-FL, Inc. v. National Association of Fire Equipment Distributors,–F. Supp.–(N.D. Ill. 1997). As in Marobie, receiving a one-time set-up fee and flat periodic payments for service from a person engaging in infringing activities would not constitute receiving "a financial benefit directly attributable to the infringing activity." Nor is subparagraph (B) intended to cover fees based on the length of the message (per number of bytes, for example) or by connect time. It **\*26** would, however, include any such fees where the value of the service lies in providing access to infringing material.

The "right and ability to control" language in Subparagraph (B) codifies the second element of vicarious liability. It is not intended to limit this element purely to formal indicia of control such as the presence or absence of a contractual provision. Rather, Subparagraph (B) is intended to preserve existing case law that examines all relevant aspects of the relationship between the primary and secondary infringer.

Paragraph (b)(1) states specifically that the knowledge standard in subsection (a) shall not be construed to condition the limitation contained in that subsection on monitoring a network for infringement or searching out suspicious information. Once one becomes aware of such information, however, one may have an obligation to check further. Paragraph (b)(2) states specifically that nothing in subsection (a) shall condition the limitation contained in that subsection on accessing, removing or disabling access to material, if such accessing, removing or disabling is prohibited by law. This is intended to prevent the accessing, removing or disabling of information contained in transmissions protected under other laws, such as electronic mail protected under the Electronic Communications Privacy Act.

The exemption and limitations provided in this subsection are affirmative defenses, like the exceptions and limitations established elsewhere in title 17. While the burden of proving the elements of direct or contributory infringement, or vicarious liability, rests with the copyright owner in a suit brought for copyright infringement, a defendant asserting this exemption or limitation as an affirmative defense in such a suit bears the burden of establishing its entitlement.

Subsections (c) through (e) are intended to protect providers when they remove, disable or block access to material and remove possible disincentives to cooperate with copyright owners by taking steps to prevent infringement. These paragraphs ensure that a person who responds to information indicating infringement by removing, disabling or blocking access to material will not be penalized for having done so.

Subsection (c) is essentially a "Good Samaritan" defense. It ensures that a person who acts responsibly upon obtaining information indicating an infringement, whether by receiving a notice or otherwise, and removes, disables or blocks access to the relevant material, cannot be held liable for having done so. This section would block claims by anyone based on the take-down itself (e.g., interference with contract claims).

Subsection (d) preserves potential legal defenses. It ensures that whatever decision is made by a person who has obtained information indicating infringement, whether to remove, disable or block access to the material, or not to do so because of a potential defense, cannot be used against that person in an infringement suit. For example, an educational institution which receives notice of infringement and determines that the material may be subject to a fair use defense would still be able to assert such a defense whether or not it chose to block access to the material.

**\*27**  Subsection (e) protects against losses caused by reliance on false information. It provides penalties for knowing material misrepresentations that material on-line is infringing, allowing the recovery of any damages incurred by a person who relies on such misrepresentations in removing, disabling or blocking access to such material.

Subsection (f) defines a "provider" as a provider of on-line services or network access.

Section 203: Limitations on Exclusive Rights; Computer Programs

This legislation amends Section 117 to ensure that independent service organizations do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components.

When a computer is activated, that is when it is turned on, certain software or parts thereof (generally the machine's operating system software) is automatically copied into the machine's random access memory, or "RAM". During the course of activating the computer, different parts of the operating system may reside in the RAM at different times because the operating system is sometimes larger than the capacity of the RAM. Because such copying has been held to constitute a "reproduction" under S 106 of the Copyright Act (see MAI Sys. Corp. v. Peak Computer, 991 F.2d 511 (9th Cir. 1993), cert. dismissed, 114 S.Ct. 671 (1994)), a person who activated the machine without the authorization of the copyright owner of that software could be liable for copyright infringement. This legislation has the narrow and specific intent of relieving independent service providers, persons unaffiliated with either the owner or lessee of the machine, from liability under the Copyright Act when, solely by virtue of activating the machine in which a computer program resides, they inadvertently cause an unauthorized copy of that program to be made.

The legislation is narrowly crafted to achieve the foregoing objective without prejudicing the rights of copyright owners of computer software. Thus, for example, the amendment does not relieve from liability persons who make unauthorized adaptations, modifications or other changes to the software. The amendment also does not relieve from liability persons who make any unauthorized copies of software other than those caused solely by activation of the machine.

The operative provisions, and limitations, are in two new subsections to Section 117: subsections (c) and (d).

Subsection (c) delineates the specific circumstances under which a reproduction of a computer program would not constitute infringement of copyright. The goal is to maintain undiminished copyright protection afforded under the Copyright Act to authors of computer programs, while making it possible for third parties to perform servicing of the hardware. It states that it is not an infringement of copyright for the owner or lessee of a machine to make or authorize the making of a copy of a computer program provided that the following conditions are met:

First, subsection (c) itself makes clear that the copy of the computer program must have been made solely and automatically by virtue of turning on the machine in order to perform repairs or **\*28**  maintenance on the hardware components of the machine. Moreover, the copy of the computer program which is reproduced as a direct and sole consequence of activation must be an authorized copy that has lawfully been installed in the machine. Authorized copies of computer programs are only those copies that have been made available with the consent of the copyright owner. Also, the acts performed by the service provider must be authorized by the owner or lessee of the machine.

Second, in accordance with paragraph (c)(1), the resulting copy may not be used by the person performing repairs or maintenance of the hardware components of the machine in any manner other than to effectuate the repair or maintenance of the machine. Once these tasks are completed, the copy of the program must be destroyed, which generally will happen automatically once the machine is turned off.

Third, as is made clear in paragraph (c)(2), the amendment is not intended to diminish the rights of copyright owners of those computer programs, or parts thereof, that also may be loaded into RAM when the computer is turned on, but which did

not need to be so loaded in order for the machine to be turned on. A hardware manufacturer or software developer might, for example, provide diagnostic and utility programs that load into RAM along with or as part of the operating system, even though they market those programs as separate products–either as freestanding programs, or pursuant to separate licensing agreements. Indeed, a password or other technical access device is sometimes required for the owner of the machine to be able to gain access to such programs. In other cases, it is not the hardware or software developer that has arranged for certain programs automatically to be reproduced when the machine is turned on; rather, the owner of the machine may have configured its computer to load certain applications programs into RAM as part of the boot-up process (such as a word processing program on a personal computer). This amendment is not intended to derogate from the rights of the copyright owners of such programs. In order to avoid inadvertent copyright infringement, these programs need to be covered by subsection (c), but only to the extent that they are automatically reproduced when the machine is turned on. This legislation is not intended to legitimize unauthorized access to and use of such programs just because they happen to be resident in the machine itself and are reproduced with or as part of the operating system when the machine is turned on. According to paragraph (c)(2), if such a program is accessed or used without the authorization of the copyright owner, the initial reproduction of the program shall not be deemed exempt from infringement under subsection (c).

Subsection (d) defines two terms not previously defined by the Copyright Act. Paragraph (1) defines the term "maintenance." These acts can include, but are not limited to, cleaning the machine, tightening connections, installing new components such as memory chips, circuit boards and hard disks, checking the proper functioning of these components, and other similar acts.

Paragraph (2) of subsection (d) defines the term "repair." Acts of repairing the hardware include, but are not limited to, replacing worn or defective components such as memory chips, circuit boards **\*29** and hard disks, correcting the improper installation of new components, and other similar acts.

Both paragraphs (1) and (2) of subsection (d) are subject to the same limitations, which are intended to clarify that activating a machine in order to perform maintenance or repair does not constitute infringement under subsection (c) if the maintenance or repair is undertaken to make the machine work in accordance with the parameters specified for such a machine and its component parts. Because technological improvements may lead customers to upgrade their machines, the language of both definitions authorizes service providers to maintain those components of the hardware that have been installed since the time the machine was originally acquired, or to install new components. But their acts shall be deemed non-infringing under subsection (c) only if the components being serviced have been lawfully acquired and installed. Finally, the terms "maintenance" and "repair" do not include unauthorized adaptations, modifications, error corrections or any other changes to any software which may be in the machine being serviced.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

TITLE 17, UNITED STATES CODE

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
* * * * * * *

CHAPTER 1–SUBJECT MATTER AND SCOPE OF COPYRIGHT

* * * * * * *

S 101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

\* \* \* \* \* \* \*

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

[A work is a "Berne Convention work" if–

[(1) in the case of an unpublished work, one or more of the authors is a national of a nation adhering to the Berne Convention, or in the case of a published work, one **\*30** or more of the authors is a national of a nation adhering to the Berne Convention on the date of first publication;

[(2) the work was first published in a nation adhering to the Berne Convention, or was simultaneously first published in a nation adhering to the Berne Convention and in a foreign nation that does not adhere to the Berne Convention;

[(3) in the case of an audiovisual work–

[(A) if one or more of the authors is a legal entity, that author has its headquarters in a nation adhering to the Berne Convention; or
[(B) if one or more of the authors is an individual, that author is domiciled, or has his or her habitual residence in, a nation adhering to the Berne Convention;
[(4) in the case of a pictorial, graphic, or sculptural work that is incorporated in a building or other structure, the building or structure is located in a nation adhering to the Berne Convention; or

[(5) in the case of an architectural work embodied in a building, such building is erected in a country adhering to the Berne Convention.

For purposes of paragraph (1), an author who is domiciled in or has his or her habitual residence in, a nation adhering to the Berne Convention is considered to be a national of that nation. For purposes of paragraph (2), a work is considered to have been simultaneously published in two or more nations if its dates of publication are within 30 days of one another.]

\* \* \* \* \* \* \*

[The "country of origin" of a Berne Convention work, for purposes of section 411, is the United States if] For purposes of section 411, a work is a "United States work" only if–

(1) in the case of a published work, the work is first published–

(A) in the United States;
(B) simultaneously in the United States and another [nation or nations adhering to the Berne Convention] treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;
(C) simultaneously in the United States and a foreign nation that [does not adhere to the Berne Convention] is not a treaty party; or
(D) in a foreign nation that [does not adhere to the Berne Convention] is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;
\* \* \* \* \* \* \*

(3) in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

**\*31**  [For the purposes of section 411, the "country of origin" of any other Berne Convention work is not the United States.]

\* \* \* \* \* \* \*

The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.

\* \* \* \* \* \* \*

An "international agreement" is–

(1) the Universal Copyright Convention;

(2) the Geneva Phonograms Convention;

(3) the Berne Convention;

(4) the WTO Agreement;

(5) the WIPO Copyright Treaty;

(6) the WIPO Performances and Phonograms Treaty; and

(7) any other copyright treaty to which the United States is a party.

\* \* \* \* \* \* \*

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

\* \* \* \* \* \* \*

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

\* \* \* \* \* \* \*

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.

\* \* \* \* \* \* \*

S 104. Subject matter of copyright: National origin

(a) Unpublished Works.–The works specified by sections 102 and 103, while unpublished, are subject to protection under this title without regard to the nationality or domicile of the author.

(b) Published Works.–The works specified by sections 102 and 103, when published, are subject to protection under this title if–

(1) on the date of first publication, one or more of the authors is a national or domiciliary of the United States, or is a national, domiciliary, or sovereign authority of a [foreign nation that is a party to a copyright treaty to which the United States is also a party] treaty party, or is a stateless person, wherever that person may be domiciled; or

(2) the work is first published in the United States or in a foreign nation that, on the date of first publication, is a [party to the Universal Copyright Convention] treaty party; or

**\*32** (3) the work is a sound recording that was first fixed in a treaty party; or

(4) the work is a [Berne Convention work] pictorial, graphic, or sculptural work that is incorporated in a building or other structure, or an architectural work that is embodied in a building and the building or structure is located in the United States or a treaty party; or

[(3)] (5) the work is first published by the United Nations or any of its specialized agencies, or by the Organization of American States; or

[(5)] (6) the work comes within the scope of a Presidential proclamation. Whenever the President finds that a particular foreign nation extends, to works by authors who are nationals or domiciliaries of the United States or to works that are first published in the United States, copyright protection on substantially the same basis as that on which the foreign nation extends protection to works of its own nationals and domiciliaries and works first published in that nation, the President may by proclamation extend protection under this title to works of which one or more of the authors is, on the date of first publication, a national, domiciliary, or sovereign authority of that nation, or which was first published in that nation. The President may revise, suspend, or revoke any such proclamation or impose any conditions or limitations on protection under a proclamation.

For purposes of paragraph (2), a work that is published in the United States or a treaty party within 30 days after publication in a foreign nation that is not a treaty party shall be considered to be first published in the United States or such treaty party, as the case may be.

\* \* \* \* \* \* \*

(d) Effect of Phonograms Treaties.–Notwithstanding the provisions of subsection (b), no works other than sound recordings shall be eligible for protection under this title solely by virtue of the adherence of the United States to the Geneva Phonograms Convention or the WIPO Performances and Phonograms Treaty.

S 104A. Copyright in restored works

(a) \* \* \*

\* \* \* \* \* \* \*

(h) Definitions.–For purposes of this section and section 109(a):

(1) The term "date of adherence or proclamation" means the earlier of the date on which a foreign nation which, as of the date the WTO Agreement enters into force with respect to the United States, is not a nation adhering to the Berne Convention or a WTO member country, becomes–

[(A) a nation adhering to the Berne Convention or a WTO member country; or

[(B) subject to a Presidential proclamation under subsection (g).]

(A) a nation adhering to the Berne Convention;

(B) a WTO member country;

**\*33** (C) a nation adhering to the WIPO Copyright Treaty;

(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or

(E) subject to a Presidential proclamation under subsection (g).

\* \* \* \* \* \* \*

[(3) The term "eligible country" means a nation, other than the United States, that–

[(A) becomes a WTO member country after the date of the enactment of the Uruguay Round Agreements Act;

[(B) on such date of enactment is, or after such date of enactment becomes, a member of the Berne Convention; or

[(C) after such date of enactment becomes subject to a proclamation under subsection (g).

For purposes of this section, a nation that is a member of the Berne Convention on the date of the enactment of the Uruguay Round Agreements Act shall be construed to become an eligible country on such date of enactment.]

(3) The term "eligible country" means a nation, other than the United States, that–

(A) becomes a WTO member country after the date of the enactment of the Uruguay Round Agreements Act;

(B) on such date of enactment is, or after such date of enactment becomes, a nation adhering to the Berne Convention;

(C) adheres to the WIPO Copyright Treaty;

(D) adheres to the WIPO Performances and Phonograms Treaty; or

(E) after such date of enactment becomes subject to a proclamation under subsection (g).

\* \* \* \* \* \* \*

(6) The term "restored work" means an original work of authorship that–

(A) \* \* \*

\* \* \* \* \* \* \*

(C) is in the public domain in the United States due to–

(i) \* \* \*

\* \* \* \* \* \* \*

(iii) lack of national eligibility; [and]

(D) has at least one author or rightholder who was, at the time the work was created, a national or domiciliary of an eligible country, and if published, was first published in an eligible country and not published in the United States during the 30-day period following publication in such eligible country[.]; and

(E) if the source country for the work is an eligible country solely by virtue of its adherence to the WIPO Performances and Phonograms Treaty, is a sound recording.

\* \* \* \* \* \* \*

**\*34**  (8) The "source country" of a restored work is–

(A) a nation other than the United States;

(B) in the case of an unpublished work–

(i) the eligible country in which the author or rightholder is a national or domiciliary, or, if a restored work has more than 1 author or rightholder, of which the majority of foreign authors or rightholders are nationals or domiciliaries [of eligible countries]; or

\* \* \* \* \* \* \*

[(9) The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.]

\* \* \* \* \* \* \*

S 117. Limitations on exclusive rights: Computer programs

[Notwithstanding] (a) Making of Additional Copy or Adaptation by Owner of Copy.–Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

(1) \* \* \*

\* \* \* \* \* \* \*

[Any exact] (b) Lease, Sale, or Other Transfer of Additional Copy or Adaptation.–Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

(c) Machine Maintenance or Repair.–Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if–

(1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and

(2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

(d) Definitions.–For purposes of this section–

(1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and

(2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications  **\*35**  and any changes to those specifications authorized for that machine.

\* \* \* \* \* \* \*

CHAPTER 4–COPYRIGHT NOTICE, DEPOSIT, AND REGISTRATION

\* \* \* \* \* \* \*

S 411. Registration and infringement actions

(a) Except for [actions for infringement of copyright in Berne Convention works whose country of origin is not the United States and] an action brought for a violation of the rights of the author under section 106A(a), and subject to the provisions of subsection (b), no action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights. The Register may, at his or her option, become a party to the action with respect to the issue of registrability of the copyright claim by entering an appearance within sixty days after such service, but the Register's failure to become a party shall not deprive the court of jurisdiction to determine that issue.

\* \* \* \* \* \* \*

CHAPTER 5–COPYRIGHT INFRINGEMENT AND REMEDIES

Sec.

501. Infringement of copyright.

\* \* \* \* \* \* \*

512. Limitations on liability relating to material on-line.

\* \* \* \* \* \* \*

S 507. Limitations on actions

(a) Criminal Proceedings.–[No] Except as expressly provided otherwise in this title, no criminal proceeding shall be maintained under the provisions of this title unless it is commenced within 5 years after the cause of action arose.

\* \* \* \* \* \* \*

S 512. Limitations on liability relating to material on-line

(a) Limitation.–Notwithstanding the provisions of section 106, a provider shall not be liable for–

(1) direct infringement, based solely on the intermediate storage and transmission of material through a system or network controlled or operated by or for that provider, if–

(A) the transmission was initiated by another person;

**\*36** (B) the storage and transmission is carried out through an automatic technological process, without any selection of that material by the provider; and

(C) no copy of the material thereby made by the provider is maintained on the provider's system or network in a manner ordinarily accessible to anyone other than the recipients anticipated by the person who initiated the transmission, and no such copy is maintained on the system or network in a manner ordinarily accessible to such recipients for a longer period than is reasonably necessary for the transmission;

(2) monetary relief under section 504 or 505 for contributory infringement or vicarious liability, based solely on conduct described in paragraph (1); or

(3) monetary relief under section 504 or 505 for contributory infringement or vicarious liability, based solely on transmitting or providing access to material over that provider's system or network, other than conduct described in paragraph (1), if the provider–

(A) does not have actual knowledge that the material is infringing or, in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; and

(B) does not receive a financial benefit directly attributable to the infringing activity, if the provider has the right and ability to control such activity.

(b) Protection of Privacy.–Nothing in subsection (a) shall be construed to condition the applicability of subsection (a) on a provider–

(1) monitoring its service or affirmatively seeking facts indicating infringing activity, or

(2) accessing, removing, or disabling access to material, if such conduct is prohibited by law.

(c) Limitation Based Upon Removing or Disabling Access to Infringing Material.–A provider shall not be liable to any person for any claim based on that provider's good faith disabling of access to or removal of material claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing.

(d) Other Defenses Not Affected.–Removing or disabling access to material which a provider transmits on-line or to which a provider provides on-line access, or the failure to do so, shall not adversely bear upon the consideration by a court of a defense to infringement asserted by that provider on the basis of section 107 or any other provision of law.

(e) Misrepresentations.–Any person who knowingly materially misrepresents to a provider that material on-line is infringing shall be liable for any damages, including costs and attorneys' fees, incurred by the provider, by the alleged infringer, or by any copyright owner or copyright owner's authorized licensee, who is injured by such misrepresentation, as a result of the provider relying upon such misrepresentation in removing or disabling access to the material claimed to be infringing.

**\*37** (f) Definition.–As used in this section, the term "provider" means a provider of on-line services or network access.

\* \* \* \* \* \* \*

CHAPTER 12–COPYRIGHT PROTECTION AND MANAGEMENT SYSTEMS

Sec.

1201. Circumvention of copyright protection systems.

1202. Integrity of copyright management information.

1203. Civil remedies.

1204. Criminal offenses and penalties.

S 1201. Circumvention of copyright protection systems

(a) Violations Regarding Circumvention of Technological Protection Measures.–(1) No person shall circumvent a technological protection measure that effectively controls access to a work protected under this title.

(2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that–

(A) is primarily designed or produced for the purpose of circumventing a technological protection measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological protection measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological protection measure that effectively controls access to a work protected under this title.

(3) As used in this subsection–

(A) to "circumvent a technological protection measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological protection measure, without the authority of the copyright owner; and

(B) a technological protection measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

(b) Additional Violations.–(1) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that–

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

**\*38** (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

(2) As used in this subsection–

(A) the term "circumvent protection afforded by a technological protection measure" means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological protection measure; and

(B) a technological protection measure "effectively protects a right of a copyright owner" under this title if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title.

(c) Importation.–The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee of any technology, product, service, device, component, or part thereof as described in subsection (a) or (b) shall be actionable under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).

(d) Other Rights, Etc., Not Affected.–Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

(e) Exemption for Nonprofit Libraries, Archives, and Educational Institutions.–(1) A nonprofit library, archives, or educational institution which gains access to a commercially exploited copyrighted work solely in order to make a good faith determination of whether to acquire a copy of that work for the sole purpose of engaging in conduct permitted under this title shall not be in violation of subsection (a)(1). A copy of a work to which access has been gained under this paragraph–

(A) may not be retained longer than necessary to make such good faith determination; and

(B) may not be used for any other purpose.

(2) The exemption available under paragraph (1) shall only apply with respect to a work when an identical copy of that work is not reasonably available in another form.

(3) A nonprofit library, archives, or educational institution that willfully for the purpose of commercial advantage or financial gain violates paragraph (1)–

(A) shall, for the first offense, be subject to the civil remedies under section 1203; and

(B) shall, for repeated or subsequent offenses, in addition to the civil remedies under section 1203, forfeit the exemption provided under paragraph (1).

(4) This subsection may not be used as a defense to a claim under subsection (a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or educational institution to manufacture, import, offer to the public, provide, or otherwise traffic in any technology which circumvents a technological protection measure.

(5) In order for a library or archives to qualify for the exemption under this subsection, the collections of that library or archives shall be–

**\*39**  (A) open to the public; or

(B) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

(f) Law Enforcement and Intelligence Activities.–This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

Case 1:25-cv-08736-PAF    Document 96-4    Filed 07/21/26    Page 39 of 41

S 1202. Integrity of copyright management information

(a) False Copyright Management Information.–No person shall knowingly–

(1) provide copyright management information that is false, or

(2) distribute or import for public distribution copyright management information that is false,

with the intent to induce, enable, facilitate, or conceal infringement.

(b) Removal or Alteration of Copyright Management Information.–No person shall, without the authority of the copyright owner or the law–

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information, knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law,

knowing or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

(c) Definition.–As used in this chapter, the term "copyright management information" means the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form:

(1) The title and other information identifying the work, including the information set forth on a notice of copyright.

(2) The name of, and other identifying information about, the author of a work.

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

(5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

**\*40**  (6) Identifying numbers or symbols referring to such information or links to such information.

(7) Such other information as the Register of Copyrights may prescribe by regulation, but not including any information concerning the user of a copyrighted work.

(d) Law Enforcement and Intelligence Activities.–This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

S 1203. Civil remedies

(a) Civil Actions.–Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.

(b) Powers of the Court.–In an action brought under subsection (a), the court–

(1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation;

(2) at any time while an action is pending, may order the impounding, on such terms as it deems reasonable, of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation;

(3) may award damages under subsection (c);

(4) in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;

(5) in its discretion may award reasonable attorney's fees to the prevailing party; and

(6) may, as part of a final judgment or decree finding a violation, order the remedial modification or the destruction of any device or product involved in the violation that is in the custody or control of the violator or has been impounded under paragraph (2).

(c) Award of Damages.–

(1) In general.–Except as otherwise provided in this chapter, a person committing a violation of section 1201 or 1202 is liable for either–

(A) the actual damages and any additional profits of the violator, as provided in paragraph (2); or

(B) statutory damages, as provided in paragraph (3).

(2) Actual damages.–The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.

(3) Statutory damages.–(A) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per **\*41** act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

(B) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000.

(4) Repeated violations.–In any case in which the injured party sustains the burden of proving, and the court finds, that a person has violated section 1201 or 1202 within 3 years after a final judgment was entered against that person for another

Case 1:25-cv-08736-PAE    Document 96-4    Filed 07/21/26    Page 41 of 41

such violation, the court may increase the award of damages up to triple the amount that would otherwise be awarded, as the court considers just.

(5) Innocent violations.–

(A) In general.–The court in its discretion may reduce or remit the total award of damages in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation.

(B) Nonprofit library, archives, or educational institution.–In the case of a nonprofit library, archives, or educational institution, the court shall remit damages in any case in which the library, archives, or educational institution sustains the burden of proving, and the court finds, that the library, archives, or educational institution was not aware and had no reason to believe that its acts constituted a violation.

S 1204. Criminal offenses and penalties

(a) In General.–Any person who violates section 1201 or 1202 willfully and for purposes of commercial advantage or private financial gain–

(1) shall be fined not more than $500,000 or imprisoned for not more than 5 years, or both, for the first offense; and

(2) shall be fined not more than $1,000,000 or imprisoned for not more than 10 years, or both, for any subsequent offense.

(b) Limitation for Nonprofit Library, Archives, or Educational Institution.–Subsection (a) shall not apply to a nonprofit library, archives, or educational institution.

(c) Statute of Limitations.–Notwithstanding section 507(a) of this title, no criminal proceeding shall be maintained under subsection (a) unless such proceeding is commenced within 5 years after the cause of action arose.

H.R. REP. 105-551(I), H.R. REP. 105-551, H.R. Rep. No. 551(I), 105TH Cong., 2ND Sess. 1998, 1998 WL 261605 (Leg.Hist.)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.