# EXHIBIT 3

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 2 of 72

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623 (Leg.Hist.)

P.L. 105-304, **\*1** THE DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998

DATES OF CONSIDERATION AND PASSAGE

House: August 4, September 23, 1998
Senate: May 14, August 31, September 17, 1998
Cong. Record Vol. 144 (1998)
House Report (Judiciary Committee) No. 105-551(I),
May 22, 1998
(To accompany H.R. 2281)
House Report (Commerce Committee) No. 105-551(II),
July 22, 1998
(To accompany H.R. 2281)
Senate Report (Judiciary Committee) No. 105-190,
May 6, 1998
(To accompany S. 2037)
House Conference Report No. 105-796,
October 8, 1998
(To accompany H.R. 2281)

SENATE REPORT NO. 105–190

May 11, 1998

Mr. Hatch, from the Committee on the Judiciary, submitted the following

REPORT

together with

ADDITIONAL VIEWS

[To accompany S. 2037]

The Committee on the Judiciary reported an original bill (S. 2037), to amend title 17, United States Code, to implement the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty, to provide limitations on copyright liability relating to material online, and for other purposes, having considered the same, reports favorably thereon and recommends that the bill do pass.

**CONTENTS**

| | Page |
|---|---|
| I. Purpose | 1 |
| II. Legislative history | 2 |
| III. Discussion | 8 |

IV. Vote of the committee.................................................................................................... 24

V. Section-by-section analysis.......................................................................................... 25

VI. Cost estimate............................................................................................................... 62

VII. Regulatory impact statement....................................................................................... 64

VIII. Additional views of Mr. Leahy................................................................................... 65

IX. Changes in existing law.............................................................................................. 70

## I. PURPOSE

The "Digital Millennium Copyright Act of 1998" is designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education **\*2** in the digital age. Title I will implement the new World Intellectual Property Organization (WIPO) Copyright Treaty and the WIPO Performances and Phonograms Treaty, thereby bringing U.S. copyright law squarely into the digital age and setting a marker for other nations who must also implement these treaties. Title II will provide certainty for copyright owners and Internet service providers with respect to copyright infringement liability online. Title III will provide a clarifying exemption in the Copyright Act to ensure that the lawful owner or lessee of a computer machine May authorize an independent service technician to activate the computer in order to service its hardware components. Finally, Title IV will begin to update our nation's copyright laws with respect to library, archive, and educational uses of copyrighted works in the digital age.

## II. LEGISLATIVE HISTORY

Copyright laws have struggled through the years to keep pace with emerging technology from the struggle over music played on a player piano roll in the 1900's[1] to the introduction of the VCR in the 1980's.[2] With this constant evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials. The legislation implementing the treaties, Title I of this bill, provides this protection and creates the legal platform for launching the global digital on-line marketplace for copyrighted works. It will also make available via the Internet the movies, music, software, and literary works that are the fruit of American creative genius. Title II clarifies the liability faced by service providers who transmit potentially infringing material over their networks. In short, Title II ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will expand.

The process to update U.S. copyright law with respect to digital transmissions began in February, 1993, with the formation of the Information Infrastructure Task Force (IITF) to implement the Administration's vision for the National Information Infrastructure (NII).[3] The IITF then established the Working Group on Intellectual Property Rights to investigate the effects of emerging digital technology on intellectual property rights and make recommendations on any appropriate changes to U.S. intellectual property law and policy. This task force issued a report in 1995 known as the White Paper, which discussed the application of existing copyright law to the NII and recommended changes to keep copyright law current with new technology.[4]

To prepare the report, the Working Group held a public hearing in November 1993, at which 30 witnesses testified reflecting the views of copyright industries, libraries, educators, and beneficiaries of the public domain. The Working Group also solicited written comments and received some 70 statements during a public comment **\*3** period.[5] Following the Working Group's review of the public comments and analysis of the issues, it released a "Green Paper" on July 7, 1994.[6] Following the release of the Green Paper, the Working Group again heard testimony from the public in four days of hearings in Chicago, Los Angeles, and

Washington, D.C., in September 1994. More than 1,500 pages of written comments were filed during the four-month comment period by more than 150 individuals and organizations. [7]

The Working Group also convened a Conference on Fair Use (CONFU) to explore the particularly complex issue of fair use in a digital environment and to develop guidelines for uses of copyrighted works by librarians and educators. [8] CONFU issued an Interim Report in December, 1996, and a report in September, 1997, that concluded the first phase of CONFU. [9] The 1997 report addressed the issues of digital images, distance learning, educational multimedia, electronic reserve systems, and use of computer software in libraries.

Interested parties had numerous opportunities to submit their views on the intellectual property implications of the development and use of the NII and on the Working Group's Green Paper. This open process resulted in a voluminous record indicating the views of a wide variety of interested parties including service providers, libraries, copyright owners, and the entertainment industries. [10]

On September 28, 1995, Chairman Hatch, with Senator Leahy, introduced the National Information Infrastructure (NII) Copyright Protection Act of 1995 (S. 1284), which embodied the legislative recommendations of the White Paper. Congressman Moorhead introduced identical legislation (H.R. 2441) in the House on September 29, 1995, with Congresswoman Schroeder as an original cosponsor. [11] The Senate Judiciary Committee and the Subcommittee on Courts and Intellectual Property of the House Judiciary Committee held a joint hearing on November 15, 1995, to consider the NII legislation. Dr. Mihaly Ficsor, Assistant Director General, World Intellectual Property Organization; Bruce A. Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks; and Marybeth Peters, Register of Copyrights and Associate Librarian for Copyright Services testified at the hearing.

The House Subcommittee on Courts and Intellectual Property held a second set of hearings to consider H.R. 2441 on February 7 and 8, 1996. On February 7, the Subcommittee heard testimony from Jack Valenti, Chairman and CEO, Motion Picture Association of America; Frances W. Preston, President and CEO, Broadcast **\*4** Music, Inc. (BMI); Edward P. Murphy, President and CEO, National Music Publishers Association; Robert Holleyman, II, President, Business Software Alliance; Edward J. Black, Computer & Communications Industry Association; Barbara A. Munder, Senior Vice President, Corporate Affairs, McGraw Hill Co. and on behalf of the Information Industry Association; Gary L. Shapiro, Chairman, Home Recording Rights Coalition and President, Consumer Electronics Manufacturers Association; Garry L. McDaniels, President, Skills Bank Corporation; and David M. Ostfeld, Vice Chairman, U.S. Activities Board Institute for Electrical and Electronics Engineers, and Vice Chairman, United States Intellectual Property Committee.

On February 8, the Subcommittee heard testimony from Jeanne Hurley Simon, Chair, U.S. National Commission on Libraries and Information Science; Dr. Tuck Tinsley III, President, American Printing House for the Blind, Inc.; Richard Robinson, Chair, President & CEO, Scholastic Corp., for the Association of American Publishers; Cornelius Pings, President, Association of American Universities; Stephen M. Heaton, Secretary and General Counsel, CompuServe, Inc.; Scott Purcell, President, HLC-Internet, Inc.; William J. Cook, Partner, William, Brinks, Hofer, Gilson & Lione; Catherine Simmons-Gill, President, International Trademark Association.

On May 7, 1996, the Senate Judiciary Committee also an additional hearing to consider S. 1284. The Committee heard testimony from John Bettis of the American Society of Composers, Authors, and Publishers (ASCAP); William W. Burrington, Assistant General Counsel and Director of Public Policy, America Online, Inc.; Robert L. Oakley, Professor of Law and Director of the Law Library, Georgetown University Law Center, on behalf of the Digital Future Coalition; and Daniel Burton, Vice President of Government Relations, Novell, Inc.

These hearings were supplemented by a series of negotiations overseen by Congressman Goodlatte of the House Subcommittee on Courts and Intellectual Property in which representatives of copyright owners and Internet and online service

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 5 of 72

providers sought to resolve the contentious issue of the scope of liability of service providers for the infringing acts of their users. Agreement was reached on some issues, but many of the core issues reMained unresolved. Negotiations resumed under the auspices of the Patent and Trademark Office in the summer of 1996, but produced no resolution of those issues. Ultimately, the NII Copyright Protection Act stalled in the 104th Congress due largely to the unsettled nature of these and other issues.

Meanwhile, parallel efforts to ensure protection of copyrighted works in the digital age proceeded on the international front. These efforts originated shortly after the United States ratified the Berne Convention in 1989, when the governing body of the Berne Union called upon WIPO to form a Committee of Experts concerning a possible supplementary agreement to the Berne Convention to clarify the existing provisions and explore the scope of the treaty. [12] The **\*5** result was the introduction of formal proposals to update the Berne Convention to reflect the challenges of the digital age ("Protocol") and to supplement that instrument with enhanced protections for performers and producers of phonograms ("New Instrument"). In December, 1996, the World Intellectual Property Organization held a diplomatic conference in Geneva, Switzerland, which culminated with the adoption of two treaties, the "WIPO Copyright Treaty" and the "WIPO Performances and Phonograms Treaty," which were agreed to by consensus of 160 countries.

The WIPO Copyright Treaty originally contained a provision, article 7, which would have defined the term "reproduction" of a copyrighted work to include any direct or indirect reproduction whether permanent or temporary, in any manner or form. [13] This article proved to be too controversial and was deleted from the treaty prior to its adoption. Instead, the treaty was accompanied by an agreed upon statement that simply confirmed that the reproduction right in Article 9 of the Berne Convention applies fully in the digital environment. The treaty also originally contained language that banned circumvention devices. Again, controversy resulted in a milder declaration that member countries "shall provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty." [14] The end result is that the treaty shifted the debate over technological circumvention measures and on-line service provider liability back to the national level, where each nation will determine how to best conform with the treaty.

The President submitted the WIPO treaties to the U.S. Senate on July 29, 1997, where they were referred to the Foreign Relations Committee. The Administration also submitted draft implementing legislation, which Chairman Hatch introduced by request as S. 1121 on July 31, 1997. Senators Leahy, Thompson, and Kohl joined as original cosponsors. Congressman Coble introduced identical legislation in the House as H.R. 2281 on July 29, 1997. [15] S. 1121 later became the basis for Title I of the Digital Millennium Copyright Act in the Senate Judiciary Committee.

With respect to the issue of service provider liability, two bills were introduced in the first session of the 105th Congress. Congressman Coble introduced H.R. 2180 on July 17, 1997, with Congressman Hyde as a cosponsor. Senator Ashcroft introduced S. 1146 on September 3, 1997, which proposed limitations on copyright liability relating to material on-line for service providers as well as amendments to the Copyright Act to implement the WIPO Treaties and make certain changes to accommodate libraries and educators in the digital environment.

The Senate Judiciary Committee conducted hearings on September 4, 1997, to consider the issues surrounding service provider liability. **\*6** Testimony was heard from Fritz Attaway, Senior Vice President, Government Relations and Washington General Counsel, Motion Picture Association of America; Cary Sherman, General Counsel, Recording Industry Association of America; Daniel F. Burton, Vice President, Government Relations, Novell; George Vradenburg, Senior Vice President and General Counsel, America Online, Inc.; Roy Neel, President and C.E.O., U.S. Telephone Association; and Professor Robert L. Oakley, Director of Law Library and Professor Law, Georgetown University Law Center. At this hearing, parties on all sides were urged by Chairman Hatch and the Ranking Member, Senator Leahy, to resolve the remaining issues prior to the end of the year.

Shortly thereafter, a series of hearings were held in the House on these issues as well as on the issue of WIPO implementation. The Subcommittee on Courts and Intellectual Property of the House Judiciary Committee held two days of hearings on H.R.

2281, the WIPO Copyright Treaties Implementation Act, and H.R. 2180, the Online Copyright Liability Limitation Act, on September 16 and 17, 1997. Bruce Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, Patent and Trademark Office, and Marybeth Peters, Register of Copyrights, Copyright Office of the United States, Library of Congress testified on behalf of the Administration. The Subcommittee also heard testimony from Roy Neel, President and Chief Executive Officer, United States Telephone Association; Jack Valenti, President and Chief Executive Officer, Motion Picture Association of America; Robert Holleyman, II, President, Business Software Alliance; M.R.C. Greenwood, Chancellor, University of California, Santa Cruz, on behalf of the Association of American Universities and the National Association of State Universities and Land Grant Colleges; Tushar Patel, Vice President and Managing Director, USWeb, Lawrence Kenswil, Executive Vice President, Business and Legal Affairs, Universal Music Group; Marc Jacobson, General Counsel, Prodigy Services, Inc.; Ken Wasch, President, Software Publishers Association; Ronald G. Dunn, President, Information Industry Association; John Bettis, Songwriter, on behalf of the American Society of Composers, Authors, and Publishers; Allee Willis, Songwriter, on behalf of Broadcast Music, Inc. (BMI); Robert L. Oakley, Professor of Law, Georgetown University Law Center and Director, Georgetown Law Library, on behalf of a Coalition of Library and Educational Organizations; Johnny Cash, Vocal Artist, with Hilary Rosen, President and Chief Executive Officer, Recording Industry Association of America; Allan Adler, Vice President, Legal and Governmental Affairs, Association of American Publishers; Gail Markels, General Counsel and Senior Vice President, Interactive Digital Software Association; Mike Kirk, Executive Director, American Intellectual Property Law Association; Thomas Ryan, President, SciTech Software, Inc.; Mark Belinsky, Vice President Copy Protection Group, Macrovision, Inc.; Douglas Bennett, President, Earlham College, Vice President, American Council of Learned Societies, on behalf of the Digital Futures Coalition; Edward J. Black, President, Computer and Communications Industry Association; Christopher Byrne, Director of Intellectual Property, Silicon Graphics, Inc., on behalf of the Information Technology Industry Council; and Gary **\*7** Shapiro, President, Consumer Electronics Manufacturer's Association, and Chairman, Home Recording Rights Coalition.

In January, 1998, Chairman Hatch initiated comprehensive negotiations within the Judiciary Committee among copyright owners and Internet and online service providers to resolve the issue of service provider liability. These negotiations centered around a draft proposal put forth by Chairman Hatch, which built upon the efforts over the previous two years. These negotiations continued under the supervision of the Chairman for three months, from January to April, 1998.

On February 26, 1998, the House Subcommittee on Courts and Intellectual Property conducted a markup of H.R. 2281, the WIPO Copyright Treaties Implementation Act, and of H.R. 3209, the On-Line Copyright Infringement Liability Limitation Act. H.R. 2281 and H.R. 3209 were reported favorably by voice vote to the House Judiciary Committee. On April 1, 1998, the full Committee adopted a substitute amendment to H.R. 2281, offered by Congressmen Coble, Hyde, Conyers, and Goodlatte, which incorporated both the provisions of H.R. 2281 and provisions regarding service provider liability in anticipation of a resolution of this issue that appeared to be close in the Senate Judiciary Committee. H.R. 2281 was then favorably reported to the House of Representatives.

On April 2, 1998, Chairman Hatch offered the "Digital Millennium Copyright Act of 1998" at an executive business meeting of the Committee. This bill incorporated the text of S. 1121, a proposal for resolving the issue of service provider liability for copyright infringement, and a provision that had been agreed to by the House Judiciary Committee with respect to computer maintenance and repair.

On April 23, 1998, the Committee met again in executive session to consider the bill. At that meeting, the Committee considered and accepted two amendments offered by Chairman Hatch, with Senators Leahy and Ashcroft, and one amendment offered by Senator Ashcroft, with Senators Leahy and Hatch, en bloc, by unanimous consent. These amendments dealt with reverse engineering of computer programs for interoperability purposes, ephemeral recordings, and an exemption for libraries and archives from copyright infringement liability.

On April 30, 1998, the Judiciary Committee resumed consideration of the bill and accepted the following ten amendments en bloc, by unanimous consent: an amendment by the Chairman (for himself, Mr. Leahy and Mr. Ashcroft), with respect to

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 7 of 72

ephemeral recordings; an amendment by the Chairman (for himself, Mr. Leahy and Mr. Ashcroft), with respect to the use of copyright management information in the course of certain analog and digital transmissions; an amendment by the Chairman (for himself and Mr. Leahy), to make certain clarifying amendments; an amendment by Mr. Ashcroft (for himself, Mr. Leahy and Mr. Hatch), with respect to protection of subscribers of online and Internet service providers; an amendment by Mr. Ashcroft (for himself, Mr. Hatch and Mr. Leahy), with respect to the accommodation of particular technological protection measures; an amendment by Mr. Ashcroft (for himself, Mr. Hatch and Mr. Leahy), with respect to protection of personal privacy interests; an amendment by Mr. Ashcroft (for **\*8** himself, Mr. Hatch and Mr. Leahy), with respect to the preservation of the ability to control minors' access to material on the Internet; an amendment by Mr. Ashcroft (for himself, Mr. Leahy and Mr. Hatch), with respect to distance education through digital technologies; an amendment by Mr. Grassley (for himself and Mr. Kyl), with respect to law enforcement and intelligence activities; and an amendment by Mrs. Feinstein, with respect to the liability of nonprofit educational institutions for copyright infringement online. The Committee then unanimously ordered the Digital Millennium Copyright Act of 1998 reported favorably, as amended.

## III. DISCUSSION

The Digital Millennium Copyright Act (DMCA) in Title I implements the World Intellectual Property (WIPO) treaties on copyright and on performers and phonograms, and in Title II limits the copyright infringement liability of on-line and Internet service providers (OSPs and ISPs) under certain circumstances. The DMCA also provides in Title III a minor but important clarification of copyright law that the lawful owner or lessee of a computer may authorize someone to turn on their computer for the purposes of maintenance or repair. Title IV addresses the issues of ephemeral recordings, distance education, and digital preservation for libraries and archives.

Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy. Legislation implementing the treaties provides this protection and creates the legal platform for launching the global digital on-line marketplace for copyrighted works. It will facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative genius. It will also encourage the continued growth of the existing off-line global marketplace for copyrighted works in digital format by setting strong international copyright standards.

At the same time, without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet. In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. For example, service providers must make innumerable electronic copies by simply transmitting information over the Internet. Certain electronic copies are made to speed up the delivery of information to users. Other electronic copies are made in order to host World Wide Web sites. Many service providers engage in directing users to sites in response to inquiries by users or they volunteer sites that users may find attractive. Some of these sites might contain infringing material. In short, by limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.

Besides the major copyright owners and the major OSP's and ISP's (e.g., the local telephone companies, the long distance carriers, **\*9** America OnLine, etc.), the Committee heard from representatives of individual copyright owners and small ISP's, from representatives of libraries, archives and educational institutions, from representatives of broadcasters, computer hardware manufacturers, and consumers. Title II, for example, reflects 3 months of negotiations supervised by Chairman Hatch and assisted by Senator Ashcroft among the major copyright owners and the major OSP's and ISP's. Intense discussions took place on distance education too, with the participation of representatives of libraries, teachers, and educational institutions, under the supervision of Chairman Hatch, Senator Leahy, Senator Ashcroft, and the Copyright Office.

Case 1:25-cv-08736-PAE     Document 96-5     Filed 07/21/26     Page 8 of 72

As a result, the Committee took substantial steps to refine the discussion draft that Chairman Hatch laid down before the Committee through a series of amendments, each of which was adopted unanimously. For example, the current legislation contains: (1) a provision to ensure that parents will be able to protect their children from pornography and other inappropriate material on the Internet; (2) provisions to provide for the updating of the copyright laws so that educators, libraries, and archives will be able to take advantage of the promise of digital technology; (3) important procedural protections for individual Internet users to ensure that they will not be mistakenly denied access to the World Wide Web; (4) provisions to ensure that the current practice of legitimate reverse engineering for software interoperability may continue; and (5) provisions to accommodate the needs of broadcasters for ephemeral recordings and regarding copyright management information. These provisions are in addition to provisions Chairman Hatch had already incorporated into the discussion draft, such as provisions on library browsing, provisions addressing the special needs of individual creators regarding copyright management information, and provisions exempting nonprofit archives, nonprofit educational institutions, and nonprofit libraries from criminal penalties and, in the case of civil penalties, remitting damages entirely when such an institution was not aware and had no reason to believe that its acts constituted a violation.

Consequently, the DMCA enjoys widespread support from the motion picture, recording, software, and publishing industries, as well as the telephone companies, long distance carriers, and other OSP's and ISP's. It is also supported by the Information Technology Industry Council, which includes the leading computer hardware manufacturers, and by representatives of individual creators, such as the Writers Guild, the Directors Guild, the Screen Actors Guild, and the American Federation of Television and Radio Artists. The breadth of support for this bill is reflected in the unanimous roll call vote (18–0) by which the DMCA was reported out of Committee.

### TITLE I

Title I implements the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty. These treaties were concluded by the Clinton administration in December 1996. The treaties are best understood as supplements to the Berne Convention for the Protection of Literary and Artistic Works. The Berne Convention is the leading multilateral treaty on copyright and related **\*10** rights, with 130 countries adhering to it. The United States ratified the Berne Convention in 1989. The two new WIPO treaties were adopted at a diplomatic conference by a consensus of over 150 countries. In general, the Copyright Treaty updates the Berne Convention for digital works and the growth of the Internet and other digital communications networks, and the Performances and Phonograms Treaty supplements the Berne Convention with comprehensive copyright protection for performances and sound recordings (called "phonograms" in international parlance).

The importance of the treaties to the protection of American copyrighted works abroad cannot be overestimated. The treaties, as well as the Berne Convention, are based on the principle of national treatment; that is, that adhering countries are obliged to grant the same protection to foreign works that they grant to domestic works. Even more importantly, the Berne Convention and the treaties set minimum standards of protection. Thus, the promise of the treaties is that, in an increasing global digital marketplace, U.S. copyright owners will be able to rely upon strong, non-discriminatory copyright protection in most of the countries of the world.

The copyright industries are one of America's largest and fastest growing economic assets. According to International Intellectual Property Alliance statistics, in 1996 (when the last full set of figures was available), the U.S. creative industries accounted for 3.65 percent of the U.S. gross domestic product (GDP)–$278.4 billion. In the last 20 years (1977–1996), the U.S. copyright industries' share of GDP grew more than twice as fast as the remainder of the economy–5.5 percent vs. 2.6 percent. Between 1977 and 1996, employment in the U.S. copyright industries more than doubled to 3.5 million workers–2.8 percent of total U.S. employment. Between 1977 and 1996 U.S. copyright industry employment grew nearly three times as fast as the annual rate of the economy as a whole–4.6 percent vs. 1.6 percent. In fact, the copyright industries contribute more to the U.S. economy and employ more workers than any single manufacturing sector, including chemicals, industrial equipment, electronics, food processing, textiles and apparel, and aircraft. More significantly for the WIPO treaties, in 1996 U.S. copyright

industries achieved foreign sales and exports of $60.18 billion, for the first time leading all major industry sectors, including agriculture, automobiles and auto parts, and the aircraft industry.

The WIPO treaties contain many important provisions. For example, the Copyright Treaty contains significant provisions such as: (1) explicit recognition that computer programs are covered by the Berne Convention; (2) recognition of a broad right of public distribution; (3) recognition of a broad right of communication to the public that includes the Internet; (4) an official statement that interprets the existing reproduction right of the Berne Convention to "fully apply in the digital environment"; [16] (5) an obligation to provide "legal protection and effective legal remedies" against circumventing technological measures, e.g. encryption and password protection, that are used by copyright owners to protect their works **\*11** from piracy; [17] and (6) an obligation to provide "adequate and effective legal remedies" to preserve the integrity of "rights management information." [18] The Performances and Phonograms Treaty recognizes certain rights of performers over their performances and basically gives the copyright owners of sound recordings the same protection for their works as exist in the Berne Convention for other works.

The Committee believes that in order to adhere to the WIPO treaties, legislation is necessary in two primary areas–anticircumvention of technological protection measures and protection of the integrity of rights management information, or "copyright management information" (CMI), as it is referred to in the bill. This view is shared by the Clinton administration. In drafting implementing legislation for the WIPO treaties, the Committee has sought to address those two areas, as well as avoid government regulation of the Internet and encourage technological solutions. The Committee is keenly aware that other countries will use U.S. legislation as a model.

## A. ANTICIRCUMVENTION

Title I encourages technological solutions, in general, by enforcing private parties' use of technological protection measures with legal sanctions for circumvention and for producing and distributing products or providing services that are aimed at circumventing technological protection measures that effectively protect copyrighted works. For example, if unauthorized access to a copyrighted work is effectively prevented through use of a password, it would be a violation of this section to defeat or bypass the password and to make the means to do so, as long as the primary purpose of the means was to perform this kind of act. [19] This is roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses.

Legislation prohibiting circumvention devices is not unprecedented. The Copyright Act in section 1002(c) already protects sound recordings and musical works by prohibiting devices which circumvent any program or circuit that implements a serial copy management system or similar system included in digital audio recording devices and digital audio interface devices. The Communications Act in section 605(e)(4) prohibits devices that are "primarily of assistance in the unauthorized decryption of satellite cable programming." In addition to the WIPO Copyright Treaty, the NAFTA in article 1707(b) requires each party to make it a criminal offense to make available a device or system that is "primarily of assistance in decoding an encrypted program-carrying **\*12** satellite signal without the authorization of the lawful distributor of such signal.'

Although sections 1201(a)(2) and 1201(b) of the bill are worded similarly and employ similar tests, they are designed to protect two distinct rights and to target two distinct classes of devices. Subsection 1201(a)(2) is designed to protect access to a copyrighted work. Section 1201(b) is designed to protect the traditional copyright rights of the copyright owner. As a consequence, subsection 1201(a)(2) prohibits devices primarily designed to circumvent effective technological measures that limit access to a work. Subsection 1201(b), on the other hand, prohibits devices primarily designed to circumvent effective technological protection measures that limit the ability of the copyrighted work to be copied, or otherwise protect the copyright rights of the owner of the copyrighted work. The two sections are not interchangeable, and many devices will be subject to challenge only under one of the subsections. For example, if an effective technological protection measure does nothing to prevent access to the plain text of the work, but is designed to prevent that work from being copied, then a potential cause of action against the manufacturer of a device designed to circumvent the measure lies under subsection 1201(b), but not under

subsection 1201(a)(2). Conversely, if an effective technological protection measure limits access to the plain text of a work only to those with authorized access, but provides no additional protection against copying, displaying, performing or distributing the work, then a potential cause of action against the manufacturer of a device designed to circumvent the measure lies under subsection 1201(a)(2), but not under subsection 1201(b).

This, in turn, is the reason there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1). The prohibition in 1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful. The device limitation in 1201(a)(2) enforces this new prohibition on conduct. The copyright law has long forbidden copyright infringements, so no new prohibition was necessary. The device limitation in 1201(b) enforces the longstanding prohibitions on infringements.

Accommodation of particular technological protection measures

The Committee was concerned that the provisions of subsections 1201(a)(2) and (b) might be read to mandate that manufacturers of consumer electronics, telecommunications, and computing products design their products and components to respond to particular technological protection measures employed to protect copyrighted works. Subsection 1201(d)(3) addresses this concern and clarifies that section 1201 does not impose any affirmative design mandates on manufacturers of consumer electronics, telecommunications, and computing products. The fact that a product or component does not respond to any particular technological protection measure, standing alone, neither creates liability under section 1201 nor immunizes those trafficking in the product, part or component from liability. This provision recognizes that there may be legitimate reasons for a product or component's failure to respond to a particular technological measure–such as design efficiency or ensuring high **\*13** quality output from the product–as well as illegitimate reasons–such as an unlawful intent to circumvent the protection measure.

That a component or part's failure to respond to a technological measure does not immunize the product or component from further review under section 1201 is made clear by the following example. Suppose a device expressly intended to circumvent an effective technological protection measure commonly employed to protect copyrighted works contained a component that was critical to the effectiveness of the device in achieving its stated purpose. Suppose further that the product was marketed as a circumvention device and had no commercially significant purposes or use other than to circumvent. That component would not provide the desired response to the effective technological protection measure, but the product would still clearly run afoul of section 1201 in light of the device manufacturer's unlawful intent, the marketing strategy and the lack of other commercially significant uses for the product.

On the other hand, suppose a manufacturer of a state-of-the-art consumer electronics device, which did not circumvent any technological protection measure when it was introduced into the market and which was designed and marketed for a purpose other than circumventing any technological protection measures, was sued for violating section 1201 because the device did not accommodate a particular technological protection measure developed after the device was designed and sold. In such a case, section 1201(d)(3) would make it clear that the device's failure to accommodate this new protection measure does not render the device unlawful, and in light of the nature of the product, the manner in which it functions, the way it had been marketed and its obvious legitimate uses (assuming the device continues to be marketed and produced for the same legitimate uses), there would clearly be no basis for arguing that the device was unlawful under section 1201.

Library browsing

Section 1201(e) allows nonprofit libraries, archives, and educational institutions to gain access to a commercially exploited copyrighted work solely to make the determination of whether to acquire a copy of the work.

Reverse engineering

Sections 1201(g)–(j) are intended to allow legitimate software developers to continue engaging in certain activities for the purpose of achieving interoperability to the extent permitted by law prior to the enactment of this chapter. The objective is to ensure that the effect of current case law interpreting the Copyright Act is not changed by enactment of this legislation for certain acts of identification and analysis done in respect of computer programs. See, Sega Enterprises Ltd. v Accolade, Inc., 977 F.2d 1510, 24 U.S.P.Q.2d 1561 (9th Cir. 1992.). The purpose of this section is to foster competition and innovation in the computer and software industry.

Controlling the access of minors to material on the Internet

The Committee supports the voluntary efforts underway by a broad group of Internet users, library groups, publishers and other **\*14** copyright industry groups, family-focused organizations, on-line service providers, and civil liberties groups to empower parents to supervise and control the material their children access from the Internet. Nothing in this bill is intended to undercut these efforts.

To emphasize this point, an amendment (section 1201(k)) sponsored by Senator Ashcroft, Chairman Hatch and Senator Leahy was adopted unanimously by the Committee to ensure that the prohibitions in section 1201(a) did not inadvertently make it unlawful for parents to protect their children from pornography and other inappropriate material available on the Internet, or have unintended legal consequences for manufacturers of products designed solely to enable parents to protect their children in this fashion. Section 1201(k) makes clear that in a suit brought under section 1201(a), a court may consider the necessity for a challenged component or part's intended and actual incorporation into a technology, product, service or device, which does not itself violate the provisions of new chapter 12 on Copyright Protection and Management Systems, and which has the sole purpose of preventing the access of minors to pornography or other inappropriate material on the Internet. This provision applies to subsection 1201(a) in its entirety (as opposed to subsection 1201(a)(2) alone) in order to clarify that the bill protects the actions of parents in ensuring that their children do not have access to inappropriate material on-line.

A variety of tools available now allow parents to exercise control in a manner consistent with their own family values, of their children's access to online materials. In the event that, in the future, any of these tools incorporates a part or component which circumvents a technological protection measure effectively controlling access to a copyrighted work solely in order to provide a parent with the information necessary to ascertain whether that material is appropriate for his or her child, this provision authorizes a court to take into consideration the necessity for incorporating such part or component in a suit alleging a violation of section 1201(a).

This provision is limited to the application of subsection (a) because the Committee does not anticipate that it would be necessary for parental empowerment tools to make copies of questionable material, or to distribute or perform it, in order to carry out their important function of assisting parents in guiding their children on the Internet. Accordingly, circumvention of copy controls, or of similar measures, should never be a necessary capability of a parental empowerment tool. By the same token, if a technology, product, service or device which (1) has the sole purpose of preventing the access of minors to certain materials on the Internet, and (2) that technology, product, service or device circumvents a technological protection measure that effectively controls access to a work as defined in subsection 1201(a)(3) only for the purpose of gaining access to the work to ascertain whether it is suitable for a minor, but does not otherwise defeat any copy protection for that work, then that technology, product, service or device is only subject to challenge under subsection 1201(a)(2) and not subsection 1201(b). In such circumstances, no cause of action would lie under section 1201(b) and therefore limiting language would be unnecessary.

This provision is not to be interpreted to allow the wholesale access to copyrighted works in their entirety, but merely to allow parents **\*15** to have an ability to determine whether a work is inappropriate for that parent's child.

Encryption research

The purpose of the Committee in proposing enactment of section 1201 is to improve the ability of copyright owners to prevent the theft of their works, including by applying technological protection measures. The effectiveness of such measures depends in large part on the rapid and dynamic development of better technologies, including encryption-based technological protection measures. The development of encryption sciences requires, in part, ongoing research and testing activities by scientists of existing encryption methods, in order to build on those advances, thus promoting and advancing encryption technology generally.

The goals of section 1201 would be poorly served if these provisions had the undesirable and unintended consequence of chilling legitimate research activities in the area of encryption. It is the view of the Committee, after having conducted extensive consultations, and having examined a number of hypothetical situations, that Section 1201 should not have such an unintended negative effect.

It is the view of the Committee that generally available encryption testing tools would not be made illegal by this Act. Each of those tools has a legitimate and substantial commercial purpose–testing security and effectiveness–and are not prohibited by Section 1201. In addition, the testing of specific encryption algorithms would not fall within the scope of 1201, since mathematical formulas as such are not protected by copyright. Thus, testing of an encryption algorithm or program that has multiple uses, including a use as a technical protection measure for copyrighted works, would not fall within the prohibition of section 1201(a) when that testing is performed on the encryption when it is in a form not implemented as a technical protection measure. Similarly, the testing of encryption technologies developed by or on behalf of the government of the United States, would not violate section 1201 since copyright does not subsist in such subject matter. Finally, there are many situations in which encryption research will be undertaken with the consent or at the direction of the copyright owner and therefore will not give rise to any action under section 1201.

For these reasons, it is the view of the Committee that the following types of encryption testing are not generally prohibited by section 1201.

If a cryptographer uses various cryptanalytic research techniques to discover a flaw in, for example, the U.S. government's Escrowed Encryption Standard (EES) used in the Clipper Chip and Fortezza cards. The flaw allows users to circumvent essential features of the algorithm. Since these encryption products are not covered by copyright, because they are merely mathematical algorithms in addition to being owned by the U.S. government, these acts do not violate 1201, and the results may be made available to the public.

If a company, in the course of developing a new cryptographic product, sponsors a crypto-cracking contest with cash prizes, contestants would not violate section 1201 since the research acts are specifically authorized.

**\*16**  Significantly, section 1201 does not make illegal cryptographic devices that have substantial legitimate purposes other than to circumvent technological protection measures as applied to a work. For example, many popular word processing and other computer programs include a security feature allowing users to password-protect documents (employing a low-grade form of encryption.) It is not uncommon for users of such products to forget or lose their passwords for such documents, making their own protected works unrecoverable. As a result, many independent programmers have created utilities designed to assist in the recovery of passwords or password-protected works. Several of these utilities are distributed over the Internet as freeware or shareware. Because these utilities have a substantial legitimate use, and because they would be used by persons to gain access to their own works, these devices do not violate section 1201.

The law would also not prohibit certain kinds of commercial "key-cracker" products, e.g., a computer program optimized to crack certain 40-bit encryption keys. Such machines are often rented to commercial customers for the purpose of quick data recovery of encrypted data. So long as these devices would have a substantial legitimate use, and they do not become principally used to facilitate infringement, they would not be prohibited by section 1201.

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 13 of 72

Today, network and web site management and security tools increasingly contain components that automatically test systems security and identify common vulnerabilities. These programs are valuable tools for systems administrators and web site operators, to use in the course of their regular testing of their systems' security. Again, because these devices do not meet the test of section 1201, because they are good products put to a good use, the devices do not fall within the scope of this statute.

## B. COPYRIGHT MANAGEMENT INFORMATION

Copyright Management Information (CMI) is an important element in establishing an efficient Internet marketplace in copyrighted works free from governmental regulation. Such information will assist in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership.

Under the bill, CMI includes such items as the title of the work, the author, the copyright owner, and in some instances, the writer, performer, and director. CMI need not be in digital form, but CMI in digital form is expressly included. It is important to note that the DMCA does not require CMI, but if CMI is provided, the bill protects it from falsification, removal or alteration. Information that is not defined as CMI under the bill would not be protected by these provisions, although its removal or falsification might be protected under other laws, such as unfair trade. The definition of CMI may be expanded by regulation prescribed by the Register of Copyrights.

Section 1202(a) prohibits knowingly providing CMI that is false or knowingly distributing CMI that is false with the intent to induce, enable, facilitate or conceal infringement. Section 1202(b) prohibits (1) the intentional removal or alteration of CMI, (2) the distribution of CMI knowing that the information has been removed  **\*17**  or altered, and (3) the distribution or public performance of works knowing or having reason to know that CMI has been removed or altered, so long as, regarding the prohibited acts described in section 1202(b), there is knowledge or reasonable grounds to know that these acts will induce, enable, facilitate or conceal an infringement.

Section 1202(e) recognizes special problems that certain broadcasting entities may have with the transmission of copyright management information. Under this subsection, radio and television broadcasters, cable systems, and persons who provide programming to such broadcasters or systems, who do not intend to induce, enable, facilitate or conceal infringement (eligible persons) may be eligible for a limitation on liability for violation of the copyright management information provisions of section 1202(b) in certain, limited circumstances.

## C. CIVIL REMEDIES AND CRIMINAL PENALTIES

Section 1203 gives civil remedies and section 1204 imposes criminal penalties for violations of sections 1201 and 1202.

In addition to an award of damages, section 1203(b) provides for various kinds of affirmative relief in civil actions such as temporary and permanent injunctions, impoundment, and, as part of a final judgment or decree finding a violation, the court may order remedial modification or destruction of the offending device or product. Such affirmative relief is currently found in the Copyright Act for copyright infringements.

Regarding monetary relief, section 1203 provides for actual damages, profits derived from the unlawful activity, statutory damages, and treble damages for repeat offenders. Such monetary relief is available under the current Copyright Act.

An important feature of section 1203 is the remittitur for innocent violators and for nonprofit libraries, archives, and educational institutions. In the case of a violator who was not aware and had no reason to believe that the acts at issue constituted a violation, the court may reduce or remit the total award of damages. In the cases of nonprofit libraries, archives, and educational institutions the court must remit damages if the institution was not aware and had no reason to believe that its acts constituted a violation.

The current Copyright Act provides for criminal penalties for copyright infringement. Section 1204 of the bill also provides criminal penalties for violations of section 1201(a) and (b). Specifically, willful violations of sections 1201 or 1202 for purposes of commercial advantage or private financial gain are punished by up to $500,000 in fines or imprisonment for up to 5 years. Repeat offenses are punishable by up to $1,000,000 in fines or imprisonment for up to 10 years. The bill requires that criminal proceedings be commenced within 5 years after the cause of action arose. Criminal penalties do not apply to nonprofit libraries, archives, and educational institutions.

### D. PROTECTING PERSONAL PRIVACY INTERESTS

Section 1205 responds to concerns expressed by some that certain technologies used to gather personally identifiable information **\*18** from Internet users could be characterized as technological protection measures for copyrighted materials, and that therefore efforts by Internet users to protect their privacy by disabling or bypassing such technologies could be prohibited by section 1201. The Committee does not believe that enactment of this legislation will have this effect. No specific example of such a privacy-invasive technology in use today that would be affected in this way has been called to the Committee's attention. For example, even if "cookie" files–which are automatically deposited on the hard drives of computers of users who visit World Wide Web sites–are considered to be invasive of personal privacy (and are deemed to be copyrighted works), all commercially significant browser programs can be readily configured to reject "cookies," and such a configuration raises no issue of any violation of section 1201.

In fact, enactment of section 1201 should have a positive impact on the protection of personal privacy on the Internet. The same technologies that copyright owners use to control access to and use of their works can and will be used to protect the personal privacy of Internet users by, for example, encrypting e-mail communications, or requiring a password for access to personal copyrighted information on an individual's web site. By outlawing the activities of those who make it their business to provide the tools for circumventing these protective technologies, this legislation will substantially enhance the degree to which individuals may protect their privacy as they work, play and communicate on the Internet.

However, because of the privacy concerns expressed that existing or future technologies may evolve in such a way that an individual would have to circumvent a technological protection measure to protect his or her privacy, the committee concluded that it was prudent to rule out any scenario in which section 1201 might be relied upon to make it harder, rather than easier, to protect personal privacy on the Internet. Accordingly, Senator Ashcroft, Chairman Hatch and Senator Leahy proposed a savings clause to clarify that nothing in the new chapter 12 will abrogate, diminish or weaken the provisions of any Federal or State law that prevents the violation of an individual's privacy in connection with the individual's use of the Internet. The savings clause also specifies that section 1201 cannot be used to provide a defense, or an element of mitigation, in any civil or criminal action to enforce such a law. For example, if a valid Federal or State law regulates, on personal privacy grounds, the use of "cookie" files, which are automatically placed on the computer hard drives of users as they visit Internet web sites, and a party with standing sues to enforce the limitations contained in that law, the defendant may not excuse his actions in violation of those limitations by pointing to anything in chapter 12 of title 17.

Law enforcement

Sections 1201(f) and 1202(d) create exceptions for the lawfully authorized investigative, protective, or intelligence activities of an officer, agent, or employee of, the United States, a State, or a political subdivision of a State, or of persons acting pursuant to a contract with such an entity. These exceptions will protect officers, agents, employees, or contractors of, or other persons acting at the **\*19** direction of, a law enforcement or intelligence agency of the United States, a State, or a political subdivision of a State, who are performing lawfully authorized investigative, protective, or intelligence activities. These exceptions will also protect officers, agents, employees, or contractors of, or other persons acting at the direction of, elements or divisions of an agency or department of the United States, a State, or a political subdivision of a State, which does not have law enforcement or

intelligence as its primary function, but who may nevertheless, in the course of lawfully authorized protective, intelligence, or criminal investigative activities, engage in actions otherwise prohibited by this bill. These exceptions only apply to individuals covered under this section when they are performing investigative, protective, or intelligence activities, within the scope of their duties and in furtherance of lawfully authorized activities.

The Committee is concerned that these sections should not be misinterpreted as an opportunity to circumvent the WIPO Copyright Treaty. It should be clear that this is a routine law enforcement and intelligence exception. As such, the exceptions under sections 1201(f) and 1202(d) are to be narrowly construed. In addition, these exceptions are to be construed in a manner consistent with similar law enforcement and intelligence exceptions found elsewhere in U.S. law, such as 18 U.S.C. 1029(f), 1030(f), or 2512(2)(b).

## TITLE II

Although the copyright infringement liability of on-line and Internet service providers (OSPs and ISPs) is not expressly addressed in the actual provisions of the WIPO treaties, the Committee is sympathetic to the desire of such service providers to see the law clarified in this area. There have been several cases relevant to service provider liability for copyright infringement.[20] Most have approached the issue from the standpoint of contributory and vicarious liability. Rather than embarking upon a wholesale clarification of these doctrines, the Committee decided to leave current law in its evolving state and, instead, to create a series of "safe harbors," for certain common activities of service providers. A service provider which qualifies for a safe harbor, receives the benefit of limited liability.

In the beginning, the Committee identified the following activities: (1) digital network communications, (2) system caching, (3) information stored on service providers, and (4) information location tools. In the end, Title II contains five general categories of activities, which are addressed in a newly created section 512 in Chapter 5 of the Copyright Act. This new section contains limitations on service providers' liability for five general categories of activity set forth in subsections (a) through (d) and subsection (f). As provided in subsection (k), Section 512 is not intended to imply that a service provider is or is not liable as an infringer either for conduct that qualifies for a limitation of liability or for conduct that fails to so qualify. Rather, the limitations of liability apply if the provider is found to be liable under existing principles of law.

**\*20** The limitations in subsections (a) through (d) protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement. Monetary relief is defined in subsection (j)(2) as encompassing damages, costs, attorneys' fees, and any other form of monetary payment. These subsections also limit injunctive relief against qualifying service providers to the extent specified in subsection (I). To qualify for these protections, service providers must meet the conditions set forth in subsection (h), and service providers' activities at issue must involve a function described in subsection (a), (b), (c), (d) or (f), respectively. The liability limitations apply to networks "operated by or for the service provider," thereby protecting both service providers who offer a service and subcontractors who may operate parts of, or an entire, system or network for another service provider.

Title II preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment. At the same time, it provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.

Particular concerns of educational institutions

At least two concerns have been raised concerning the applicability of section 512 to educational institutions, such as universities and libraries, when they act as on-line service providers. The first concerns the extent to which the knowledge of faculty members using the Internet will be imputed to a college or university as a whole or the specific department within the college or university responsible for providing Internet service. To the extent such knowledge is imputed, the on-line service

provider might fail to qualify for certain of the exceptions to liability included in this section. This is one of the specific questions upon which the Copyright Office study authorized in section 204 of this Act will focus. Without prejudging any issues to be considered in that study, it seems that the extent to which knowledge is imputed to the service provider in the case of colleges and universities, and in other settings in which the service provider and end-user share an employee-employer or other relationship, is a matter of the relevant State law of respondeat superior, rather than a matter of Federal copyright law. As a consequence, there may be much that a non-profit educational institution can do to structure the internal relationships between its faculty and its online service provider functions. What is more, nothing in this Act should be read to preclude a Federal court from taking into account the special circumstances of a non-profit educational institution in applying agency law to determine whether knowledge should be imputed to such an institution in its capacity as an online service provider.

The second concern raised about the applicability of section 512 to public universities and libraries, and indeed other public entities which operate as online service providers, is that by complying with the notice and take-down provisions of section 512, the public entities might violate the due process rights of their users. Any such due process objection suffers at least two flaws. In the first place, a prerequisite to any due process claim is a state law property **\*21** interest. In the case of the relatively new concept of Internet access, the service provider contract, rather than any common law property interest, would appear to be the yardstick of the Internet user's property interest in continued access. The contract for Internet service, therefore, can limit any property interest that would form the basis for a procedural due process claim. Second, and even more important, the procedural protections afforded by the notification requirements of subsection 512(c)(3) and the provisions for the replacement of removed or disabled materials in subsection 512(f) provide all the process that is due. The Committee was acutely concerned that it provide all end-users–whether contracting with private or public sector online service providers–with appropriate procedural protections to ensure that material is not disabled without proper justification. The provisions in the bill balance the need for rapid response to potential infringement with the end-users legitimate interests in not having material removed without recourse.

In order to explore these and other issues more fully, the Committee provides in section 204 for a study to be conducted by the Register of Copyrights.

TITLE III

Computer maintenance or repair

Title III of the bill amends section 117 of the Copyright Act (17 U.S.C. 117) to ensure that independent service organizations do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components.

When a computer is activated, that is when it is turned on, certain software or parts thereof (generally the machine's operating system software) is automatically copied into the machine's random access memory, or "RAM". During the course of activating the computer, different parts of the operating system may reside in the RAM at different times because the operating system is sometimes larger than the capacity of the RAM. Because such copying has been held to constitute a "reproduction" under section 106 of the Copyright Act (17 U.S.C. 106),[21] a person who activated the machine without the authorization of the copyright owner of that software could be liable for copyright infringement. This legislation has the narrow and specific intent of relieving independent service providers, persons unaffiliated with either the owner or lessee of the machine, from liability under the Copyright Act when, solely by virtue of activating the machine in which a computer program resides, they inadvertently cause an unauthorized copy of that program to be made.

This title is narrowly crafted to achieve the foregoing objective without prejudicing the rights of copyright owners of computer software. Thus, for example, 1201(k) does not relieve from liability persons who make unauthorized adaptations, modifications, or other changes to the software. This title also does not relieve from liability **\*22** persons who make any unauthorized copies of software other than those caused solely by activation of the machine.

TITLE IV

A. EPHEMERAL RECORDINGS

Section 401 of the bill amends section 112 of the Copyright Act to address two issues concerning the application of the ephemeral recording exemption in the digital age.

The first of these issues is the relationship between the ephemeral recording exemption and the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA"). The DPRA granted sound recording copyright owners the exclusive right to perform their works publicly by means of digital audio transmission, subject to certain limitations, particularly those set forth in section 114(d). Among those limitations is an exemption for nonsubscription broadcast transmissions, which are defined as those made by terrestrial broadcast stations licensed as such by the FCC. 17 U.S.C. 114(d)(1)(A)(iii) and (j)(2). The ephemeral recording exemption presently privileges certain activities of a transmitting organization when it is entitled to transmit a performance or display under a license or transfer of copyright ownership or under the limitations on exclusive rights in sound recordings specified by section 114(a). The Committee believes that the ephemeral recording exemption should apply to broadcast radio and television stations when they make nonsubscription digital broadcasts permitted by the DPRA. The Committee has therefore changed the existing language of the ephemeral recording exemption (redesignated as 112(a)(1)) to extend explicitly to broadcasters the same privilege they already enjoy with respect to analog broadcasts.

The second of these issues is the relationship between the ephemeral recording exemption and the anticircumvention provisions that the bill adds as section 1201 of the Copyright Act. Concerns were expressed that if use of copy protection technologies became widespread, a transmitting organization might be prevented from engaging in its traditional activities of assembling transmission programs and making ephemeral recordings permitted by section 112 for purposes of its own transmissions within its local service area and of archival preservation and security. To address this concern, the Committee has added to section 112 a new paragraph that permits transmitting organizations to engage in activities that otherwise would violate section 1201(a)(1) in certain limited circumstances when necessary for the exercise of the transmitting organization's privilege to make ephemeral recordings under redesignated section 112(a)(1). By way of example, if a radio station could not make a permitted ephemeral recording from a commercially available phonorecord without violating section 1201(a)(1), then the radio station could request from the copyright owner the necessary means of making a permitted ephemeral recording. If the copyright owner did not then either provide a phonorecord that could be reproduced or otherwise provide the necessary means of making a permitted ephemeral recording from the phonorecord already in the possession of the radio station, the radio station would not be liable for violating section 1201(a)(1) for taking the steps  **\*23**  necessary for engaging in activities permitted under section 112(a)(1). The radio station would, of course, be liable for violating section 1201(a)(1) if it engaged in activities prohibited by that section in other than the limited circumstances permitted by section 112(a)(1).

B. DISTANCE EDUCATION

New technology, especially digital technology, is increasingly being used by educational institutions in their distance learning programs. In the past, distance learning programs were developed primarily for students who, because of their special circumstances, could not be taught in a traditional classroom. Section 110(2) of the copyright law contains an exemption that accommodates this type of activity. The current exemption is designed to cover instructional broadcasting, and allows the use of only certain categories of works. Future distance education, however, may involve a wider range of activities, including the use of interactive digital transmissions, and be designed for a broader audience of students working from personal computers in their own homes.

The Committee believes that the scope of the distance education exemption should be re-examined in light of the range of educational activities made possible by digital technologies. The Committee therefore initiated discussions on distance learning with representatives of libraries, educational institutions and copyright owners, and asked the Register of Copyrights to recommend any appropriate legislative language for an updated distance education exemption. In response to this request by

Chairman Hatch, Senator Leahy and Senator Ashcroft, the Register reported the conclusion that digital distance education is an evolving field, and the range of activities contemplated is diverse and potentially far-reaching in impact and scope.

In light of the complexity, importance and potential scope of the issues implicated by distance education, the Committee has determined that further study of the issues would be useful. The Committee therefore has directed the Copyright Office to provide Congress with a report recommending ways to promote distance learning through digital technologies no later than six months after enactment of this legislation. In conducting this study, the Copyright Office is required to consult with representatives of copyright owners, nonprofit educational institutions, libraries and archives. The Committee anticipates that the Copyright Office will also consult with others with relevant expertise, where appropriate, such as the Department of Education.

The Committee underscores the importance to the public of a speedy resolution of any copyright issues associated with distance learning and commits itself to developing a fair and effective distance learning regime promptly after receipt of the Register's Report.

Fair use

The bill does not amend section 107 of the Copyright Act, the fair use provision. The Committee determined that no change to section 107 was required because section 107, as written, is technologically **\*24** neutral, and therefore, the fair use doctrine is fully applicable in the digital world as in the analog world.

### C. EXEMPTION FOR LIBRARIES AND ARCHIVES

Section 108 of title 17 permits libraries and archives of the type described in that section to make and, in some cases, distribute a limited number of copies of certain types of copyrighted works, without the permission of the copyright holder, for specified purposes relating to these entities' functions as repositories of such works for public reference. Section 403 of the bill updates section 108 to allow these entities to take advantage of digital technologies when engaging in specified preservation activities.

### IV. VOTE OF THE COMMITTEE

Pursuant to paragraph 7 of rule XXVI of the Standing Rules of the Senate, each Committee is to announce the results of rollcall votes taken in any meeting of the Committee on any measure or amendment. The Senate Committee on the Judiciary, with a quorum present, met on Thursday, April 23, 1998, at 10 a.m., to consider the Digital Millennium Copyright Act of 1998. The Committee considered and accepted the following three amendments en bloc, by unanimous consent: an amendment by the Chairman (for himself, Mr. Leahy, and Mr. Ashcroft), with respect to reverse engineering of computer programs for interoperability purposes; an amendment by the Chairman (for himself, Mr. Leahy and Mr. Ashcroft), with respect to ephemeral recordings; and, an amendment by Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch), with respect to the exemption from copyright infringement liability for libraries and archives.

The Committee, with a quorum present, met to resume consideration of the Digital Millennium Copyright Act on Thursday, April 30, 1998, at 10 a.m. The Committee considered and accepted the following amendments en bloc, by unanimous consent: an amendment by the Chairman (for himself, Mr. Leahy, and Mr. Ashcroft), with respect to ephemeral recordings; an amendment by the Chairman (for himself, Mr. Leahy, and Mr. Ashcroft), with respect to the use of copyright management information in the course of certain analog and digital transmissions; an amendment by the Chairman (for himself and Mr. Leahy), to make certain clarifying amendments; an amendment by Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch), with respect to protection of subscribers of online and Internet service providers; an amendment by Mr. Ashcroft (for himself, Mr. Hatch, and Mr. Leahy), with respect to the accommodation of particular technological protection measures; an amendment by Mr. Ashcroft (for himself, Mr. Hatch, and Mr. Leahy), with respect to protection of personal privacy interests; an amendment by Mr. Ashcroft (for himself, Mr. Hatch, and Mr. Leahy), with respect to the preservation of the ability to control minors'' access to material on

the Internet; an amendment by Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch), with respect to distance education through digital technologies; an amendment by Mr. Grassley (for himself and Mr. Kyl), with respect to law enforcement and intelligence activities; and an amendment by Mrs. Feinstein, with respect **\*25** to the liability of nonprofit educational institutions for copyright infringement online. The Committee then ordered the Digital Millennium Copyright Act of 1998 reported favorably, as amended, with a recommendation that the bill do pass, by a rollcall vote of 18 yeas to 0 nays.

| YEAS | NAYS |
|---|---|
| Thurmond (by proxy) | |
| Grassley (by proxy) | |
| Specter (by proxy) | |
| Thompson | |
| Kyl | |
| DeWine | |
| Ashcroft | |
| Abraham (by proxy) | |
| Sessions | |
| Leahy | |
| Kennedy | |
| Biden (by proxy) | |
| Kohl (by proxy) | |
| Feinstein | |
| Feingold | |
| Durbin (by proxy) | |
| Torricelli (by proxy) | |
| Hatch | |

## V. SECTION-BY-SECTION ANALYSIS

Section 1. Short title

This Act may be cited as the ''Digital Millennium Copyright Act of 1998.'

Section 2. Table of contents

TITLE I–WIPO TREATIES IMPLEMENTATION

Section 101. Short title

This Title may be cited as the "WIPO Copyright and Performances and Phonograms Treaties Implementation Act of 1998."

Section 102. Technical amendments

To comply with the obligations of the WIPO Treaties, several technical amendments to the U.S. Copyright Act are necessary. These amendments are needed to ensure that works from countries that join the two new WIPO Treaties, including works in existence on the date each treaty becomes effective for the United States, will be protected in the United States on a formality-free basis, as required by the provisions of each treaty. Three sections of the Copyright Act require amendment: (1) section 104, which specifies the conditions on which works from other countries are protected in the United States; (2) section 104A, which restores protection to certain preexisting works from other countries that have fallen into the public domain in the United States; and (3) section 411(a), which makes copyright registration a precondition to bringing suit for infringement for some works. In addition, the amendments made to  **\*26**  these sections require some additions to, and changes in, the definition section of the Copyright Act, section 101.

Subsection (a)–Amendments to Section 101: Definitions.–The bill amends section 101 of the Copyright Act (17 U.S.C. 101) to define "treaty party" as "any country or intergovernmental organization that is a party to an international agreement" and to define "international agreement" to include, inter alia, the two new WIPO Treaties. Definitions of the two new WIPO Treaties are also provided. In addition, a definition of "United States work" was added for purposes of section 411 of the Copyright Act (17 U.S.C. 411), as amended by the bill.

Subsection (b)–Amendments to Section 104: Subject Matter of Copyright: National Origin.–Section 104 of the Copyright Act (17 U.S.C. 104) identifies the criteria that must be met for a work to qualify for protection under the U.S. copyright law (i.e., "points of attachment'). Among those protected under section 104 are nationals or domiciliaries of those countries with which we have an appropriate treaty relationship. Section 104, as it is presently written, explicitly identifies those treaty relationships, but does not refer to the two new WIPO Treaties. Therefore, section 104 needs to be amended to provide for points of attachment for the two new WIPO Treaties.

Subsection (b) amends section 104 so that all countries that have copyright relations with the United States would be referred to collectively by the term "treaty parties." This change, in conjunction with the amendments to section 101, which define "treaty party" and "international agreement," serves to ensure that the two new WIPO Treaties are covered by section 104. This subsection also amends section 104 to extend protection to foreign works from any treaty party based on four points of attachment: nationality of the author, place of first publication of the work, place of fixation of the sounds embodied in a sound recording, and the situs of a constructed architectural work.

The way section 104 is presently written requires that it be amended each time U.S. treaty membership changes. By defining "treaty party" in section 101 and amending section 104 to refer to "treaty party," future changes in the treaties to which the U.S. is a party would not require changes to section 104. It is much clearer and less unwieldy to have a single set of criteria for eligibility in section 104 as proposed by this bill, rather than multiple, overlapping criteria in a long list of complex definitions in section 101. If the U.S. joins any future treaties, those treaties can simply be added to the list of "international agreements" without any detailed amendments repeating the criteria for eligibility. The amendment to section 104 also makes clear that membership in the Geneva Phonograms Convention and the WIPO Performances and Phonograms Treaty provides national eligibility for sound recordings only, not other types of works.

Subsection (c)–Amendments to Section 104A: Copyright in Restored Works.–Subsection (c) amends section 104A(h) of the Copyright Act (17 U.S.C. 104A(h)) by adding the two new WIPO Treaties to the definitions of "date of adherence or proclamation" and "eligible country." It would also add a paragraph to the definition of "restored work" to ensure that

copyrighted works other than **\*27** sound recordings do not qualify as restored works where the sole basis for protection in the United States is adherence to the WIPO Performances and Phonograms Treaty.

Subsection (d)–Amendments to Section 411(a): Registration and Infringement Actions.–In its current form, section 411(a) of the Copyright Act (17 U.S.C. 411(a)) requires works to be registered with the Copyright Office before suit can be brought for their infringement, but exempts Berne Convention works whose country of origin is not the United States. Subsection (d) amends section 411(a) of the Copyright Act to include works from members of the two new WIPO Treaties within the exemption.

The amendments made by subsection (d) reframe the registration requirement in the affirmative–essentially the converse of the current section 411(a). In other words, the provision would state affirmatively that "United States works" must be registered before suit. Rather than frame an exemption from that requirement for certain works whose origin is not the United States, section 411(a) would, as amended by this subsection, merely limit the requirement of registration as a precondition to suit to those works whose country of origin is the United States. "United States works" are defined in section 101 of the Copyright Act (17 U.S.C. 101), as amended by this Title. As discussed with respect to the amendments in subsection (b) to section 104 of the Copyright Act, section 411(a), as amended by this subsection, may be easily updated each time the United States joins another treaty, without the need to change several interrelated provisions of the Act.

Subsection (e)–Amendment to section 507(a).–Section 507(a) of the Copyright Act (17 U.S.C. 507(a)) provides for a 3-year statute of limitations period for all criminal copyright actions. Subsection (e) amends section 507(a) to recognize exceptions to the 3-year limitations period if expressly provided elsewhere in title 17. This amendment is necessary in light of the 5-year criminal limitation period contained in the new chapter 12 of title 17, which is created by this title.

Section 103. Copyright protection systems and copyright management information

The two new WIPO Treaties include substantively identical provisions on technological measures of protection (also commonly referred to as the "black box" or "anticircumvention" provisions). These provisions require contracting parties to provide "adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law."

Both of the new WIPO treaties also include substantively identical provisions requiring contracting parties to protect the integrity of copyright management information. The treaties define copyright management information as "information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information, **\*28** when any of these items of information is attached to a copy of a work or appears in connection with the communication of a work to the public.'

Legislation is required to comply with both of these provisions. To accomplish this, the bill adds a new chapter (chapter twelve) to title 17 of the United States Code. This new chapter twelve includes five sections–(1) section 1201, which prohibits the circumvention of technological copyright protection measures; (2) section 1202, which protects the integrity of copyright management information; (3) section 1203, which provides for civil remedies for violations of sections 1201 and 1202; (4) section 1204, which provides for criminal penalties for violations of sections 1201 and 1202; and (5) section 1205, which provides a savings clause to preserve the effectiveness of federal and state laws in protecting individual privacy on the Internet.

Section 1201. Circumvention of copyright protection systems

Subsection (a)–Violations regarding circumvention of technological protection measures.–Subsection (a) applies when a person has not obtained authorized access to a copy or a phonorecord of a work that is protected under the Copyright Act and

for which the copyright owner has put in place a technological measure that effectively controls access to his or her work. The relevant terminology is defined in paragraph (a)(3), as described below.

Paragraph (a)(1) establishes a general prohibition against gaining unauthorized access to a work by circumventing a technological protection measure put in place by the copyright owner where such protection measure otherwise effectively controls access to a work protected under title 17 of the U.S. Code. This paragraph does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under title 17, even if such actions involve circumvention of other types of technological protection measures.

In order to provide meaningful protection and enforcement of the copyright owner's right to control access to his or her copyrighted work, paragraph (a)(2) supplements the prohibition against the act of circumvention in paragraph (a)(1) with prohibitions on creating and making available certain technologies, products and services used, developed or advertised to defeat technological protections against unauthorized access to a work. Similar laws have been enacted in related contexts. See, e.g., 17 U.S.C. 1002(a) (prohibiting the import, manufacture, or distribution of digital audio recording equipment lacking specified characteristics and prohibiting the import, manufacture, or distribution of any device, or the offer to perform any service, the primary purpose or effect of which is to circumvent the serial copy management system required for digital audio equipment); 47 U.S.C. 553(a)(2) (prohibiting the manufacture or distribution of equipment intended for the unauthorized reception of cable television service); 47 U.S.C. 605(e)(4) (prohibiting the manufacture, assembly, import, and sale of equipment used in the unauthorized decryption of satellite cable programming.)

Specifically, paragraph (a)(2) prohibits manufacturing, importing, offering to the public, providing, or otherwise trafficking in certain technologies, products, services, devices, components, or parts that **\*29** can be used to circumvent a technological protection measure that otherwise effectively controls access to a work protected under title 17. It is drafted carefully to target "black boxes," and to ensure that legitimate multipurpose devices can continue to be made and sold. For a technology, product, service, device, component, or part thereof to be prohibited under this subsection, one of three conditions must be met. It must: (1) be primarily designed or produced for the purpose of circumventing; (2) have only a limited commercially significant purpose or use other than to circumvent; or (3) be marketed by the person who manufactures it, imports it, offers it to the public, provides it or otherwise traffics in it, or by another person acting in concert with that person with that person's knowledge, for use in circumventing a technological protection measure that effectively controls access to a work protected under title 17. This provision is designed to protect copyright owners, and simultaneously allow the development of technology.

Paragraph (a)(3) defines certain terms used throughout paragraph (a). Subparagraph (1) defines the term "circumvent a technological protection measure" as meaning "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological protection measure, without the authority of the copyright owner." This definition applies to paragraph (a) only, which covers protections against unauthorized initial access to a copyrighted work. Subparagraph (2) states that a technological protection measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

Subsection (b)–Additional violations.–Subsection (b) applies to those technological measures employed by a copyright owner that effectively protect his or her copyright rights in a work, as opposed to those technological protection measures covered by subsection (a), which prevent unauthorized access to a copyrighted work. Unlike subsection (a), which prohibits the circumvention of access control technologies, subsection (b) does not, by itself, prohibit the circumvention of effective technological copyright protection measures. It is anticipated that most acts of circumventing a technological copyright protection measure will occur in the course of conduct which itself implicates the copyright owners rights under title 17. This subsection is not intended in any way to enlarge or diminish those rights. Thus, for example, where a copy control technology is employed to prevent the unauthorized reproduction of a work, the circumvention of that technology would not itself be actionable under section 1201, but any reproduction of the work that is thereby facilitated would remain subject to the protections embodied in title 17.

Paralleling paragraph (a)(2), above, paragraph (b)(1) seeks to provide meaningful protection and enforcement of copyright owners' use of technological protection measures to protect their rights under title 17 by prohibiting the act of making or selling the technological means to overcome these protections and thereby facilitate copyright infringement. Paragraph (b)(1) prohibits manufacturing, importing, offering to the public, providing, or otherwise **\*30** trafficking in certain technologies, products, services, devices, components, or parts thereof that can be used to circumvent a technological protection measure that effectively protects a right of a copyright owner under title 17 in a work or portion thereof. Again, for a technology, product, service, device, component, or part thereof to be prohibited under this subsection, one of three conditions must be met. It must: (1) be primarily designed or produced for the purpose of circumventing; (2) have only limited commercially significant purpose or use other than to circumvent; or (3) be marketed by the person who manufactures it, imports it, offers it to the public, provides it, or otherwise traffics in it, or by another person acting in concert with that person with that person's knowledge, for use in circumventing a technological protection measure that effectively protects the right of a copyright owner under title 17 in a work or a portion thereof. Like paragraph (a)(2), this provision is designed to protect copyright owners, and simultaneously allow the development of technology.

Paragraph (b)(2) defines certain terms used in subsection (b). Subparagraph (b)(2)(A) defines the term "circumvent protection afforded by a technological protection measure" as "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological protection measure." Subparagraph (b)(2)(B) provides that a technological protection measure "effectively protects a right of a copyright owner under title 17" if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right under Title 17 of a copyright owner.

Subsection (c)–Importation.–Subsection (c) prohibits the importation, sale for importation, or sale within the United States after importation by the owner, importer or consignee of any technology, product, service, device, component, or part thereof covered by subsections (a) or (b). This paragraph further provides that violations of this provision are actionable under section 337 of the Tariff Act (19 U.S.C. 1337), which authorizes actions by the International Trade Commission against unfair import practices.

Subsection (d)–Other rights, etc., not affected.–Subsection (d) sets forth several provisions clarifying the scope of section 1201. Paragraph (d)(1) provides that section 1201 shall not have any effect on rights, remedies, limitations, or defenses to copyright infringement, including fair use, under title 17. Paragraph (d)(2) provides that section 1201 shall not alter the existing doctrines of contributory or vicarious liability for copyright infringement in connection with any technology, product, service, device, component or part thereof. Together, these provisions are intended to ensure that none of the provisions in section 1201 affect the existing legal regime established in the Copyright Act and case law interpreting that statute.

Paragraph (d)(3) clarifies that nothing in section 1201 creates a mandate requiring manufacturers of consumer electronics, telecommunications, and computing products to design their products or their parts and components to respond to any particular technological measure employed to protect a copyrighted work. The provision also makes clear, however, that while the failure of a product to respond to a particular technological measure does not in and of itself create liability, neither does the failure of the product to respond **\*31** to a particular technological protection measure immunize those trafficking in the product from liability under section 1201(a)(2) or (b), if the tests of liability in those provisions are met.

Subsection (e)–Exemption for nonprofit libraries, archives, and educational institutions.–Subsection (e) provides a limited exemption from the prohibition on circumvention of technological protection measures contained in section 1201(a)(1) for qualified nonprofit libraries, archives, and educational institutions.

Paragraph (1) of this subsection allows a nonprofit library, nonprofit archives or nonprofit educational institution to obtain access to a copyrighted work for the sole purpose of making a good faith determination as to whether it wishes to acquire a copy, or portion of a copy, of that work in order to engage in conduct permitted under the Copyright Act, such as a fair use under

section 107. A qualifying institution may not gain access for a period of time longer than necessary to determine whether it wishes to obtain a copy, or portion of a copy, for such purposes, and the right to gain access shall not apply for any other purpose.

Paragraph (2) provides that the right to obtain access under this paragraph only applies when the nonprofit library, nonprofit archives, or nonprofit educational institution cannot obtain a copy of an identical work by other means, and such an entity may not use the exemption in this paragraph for commercial advantage or financial gain without penalty.

Paragraph (3) seeks to protect the legitimate interests of copyright owners by providing a civil remedy against a library, archive, or educational institution that violates section 1201(a) by gaining access to a commercially exploited copyrighted work and willfully and for the purpose of commercial advantage or financial gain failing to comply with the provisions of paragraph (1)(A) (requiring that a qualifying library, archive, or educational institution not retain the work for longer than necessary to make a good faith determination as to whether to acquire a copy or portion of the work) or paragraph (1)(B) (requiring that a qualifying library, archive, or educational institution not use the work to which it has gained access for any purpose other than to make a good faith determination as to whether to acquire a copy or portion of the work). Under this paragraph, a violator shall be subject to civil remedies under section 1203 for the first time it gains access in violation of section 1201(a) without complying with the requirements of paragraph (1). For subsequent offenses, the violator shall not only be subject to civil remedies under section 1203, but also lose the benefit of the exemption provided by this subsection.

Paragraph (4) provides that this subsection may not be used as a defense to the prohibitions on manufacturing or selling devices contained in sections 1201(a)(2) or 1202(b).

Finally, paragraph (5) provides that a library or archive, to be eligible for the exemption in paragraph (1), must maintain its collections open to the public and available, not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

Subsection (f)–Law enforcement and intelligence activities.–Subsection (f) creates an exception for the lawfully authorized investigative, **\*32** protective, or intelligence activities of an officer, agent, or employee of, the United States, a State, or a political subdivision of a State, or of persons acting pursuant to a contract with such an entity. This exception will protect officers, agents, employees, or contractors of, or other persons acting at the direction of, a law enforcement or intelligence agency of the United States, a State, or a political subdivision of a State, who are performing lawfully authorized investigative, protective, or intelligence activities. This exception will also protect officers, agents, employees, or contractors of, or other persons acting at the direction of, elements or divisions of an agency or department of the United States, a State, or a political subdivision of a State, which does not have law enforcement or intelligence as its primary function, but who may nevertheless, in the course of lawfully authorized protective, intelligence, or criminal investigative activities, engage in actions otherwise prohibited by this bill. This exception only applies to individuals covered under this section when they are performing investigative, protective, or intelligence activities, within the scope of their duties and in furtherance of lawfully authorized activities.

Subsections (g)–(j)–Interoperability of computer programs.–Subsections (g) through (j) are intended to allow legitimate software developers to continue engaging in certain activities for the purpose of achieving interoperability to the extent permitted by law prior to the enactment of this chapter. The objective is to ensure that the effect of current case law interpreting the Copyright Act is not changed by enactment of this legislation for certain acts of identification and analysis done in respect of computer programs. See, Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 24 U.S.P.Q.2d 1561 (9th Cir. 1992.). The purpose of this section is to foster competition and innovation in the computer and software industry.

Subsection (g) permits the circumvention of access control technologies for the sole purpose of achieving software interoperability. For example, this subsection permits a software developer to circumvent an access control technology applied to a portion or portions of a program in order to perform the necessary steps to identify and analyze the information necessary to achieve interoperability. Subsection (g) permits the act of circumvention in only certain instances. First, the copy of the computer program which is the subject of the analysis must be lawfully acquired. That is the computer program must be acquired

from a legitimate source, along with any necessary serial codes, passwords, or other such means as may be necessary to be able to use the program as it was designed to be used by a consumer of the product. The permitted acts must be limited to those elements of the program which must be analyzed to achieve the sole permitted purpose, which is interoperability of an independently created program with other programs. Interoperability is defined in subsection (j) as the ability of computer programs to exchange information, and for such programs mutually to use the information which has been exchanged. The resulting product must be a new and original work, in that it may not infringe the original computer program. In addition, the objective of the analysis must be to identify and extract such elements as are necessary to achieve interoperability which are not **\*33** otherwise available to the person. Finally, the goal of this section is to ensure that current law is not changed, and not to encourage or permit infringement. Thus, each of the acts undertaken must avoid infringing the copyright of the author of the underlying computer program.

Subsection (h) recognizes that to accomplish the acts permitted under subsection (g) a person may, in some instances, have to make and use certain tools. In most instances these will be generally available tools that programmers use in developing computer programs, such as compilers, trace analyzers and disassemblers, which are not prohibited by this section. In certain instances, it is possible that a person may have to develop special tools to achieve the permitted purpose of interoperability. Thus, this provision creates an exception to the prohibition on making circumvention tools contained in subsections 1201(a) (2) and (b). These tools can be either software or hardware. Again, this provision is limited by a general admonition not to act in a way that constitutes infringing activity.

Subsection (i) recognizes that developing complex computer programs often involves the efforts of many persons. For example, some of these persons may be hired to develop a specific portion of the final product. For that person to perform these tasks, some of the information acquired through the permitted analysis, and the tools to accomplish it, may have to be made available to that person. This subsection allows developers of independently created software to rely on third parties either to develop the necessary circumvention tools or to identify the necessary information to achieve interoperability. The ability to rely on third parties is particularly important for small software developers who do not have the capability of performing these functions in-house. This provision permits such sharing of information and tools. Recognizing, however, that making such circumvention information or tools generally available would undermine the objectives of this Act, this section imposes strict limitations. Such acts of sharing information and tools is permitted solely for the purpose of achieving interoperability of an independently created computer program with other programs. If a person makes this information available for a purpose other than to achieve interoperability of an independently created computer program with other programs, that action is a violation of this Act. In addition, these acts are permitted only to the extent that doing so does not constitute infringement under this title, or violate applicable law other than this title.

Subsection (j) defines "interoperability" as the ability of computer programs to exchange information, and for such programs mutually to use the information which has been exchanged. The seamless exchange of information is an key element of creating such an interoperable independently created program. This provision applies to computer programs as such, regardless of their medium of fixation and not to works generally, such as music or audiovisual works, which may be fixed and distributed in digital form. Accordingly, since the goal of interoperability is the touchstone of the exceptions contained in subsections 1201(g) through (j), nothing in those subsections can be read to authorize the circumvention of any technological protection measure that controls access to any work other **\*34** than a computer program, or the trafficking in products or services for that purpose.

Subsection (k).–The Committee was concerned that section 1201(a) might inadvertently make it unlawful for parents to protect their children from pornography and other harmful material available on the Internet, or have unintended legal consequences for manufacturers of products designed solely to enable parents to protect their children in this fashion. Subsection (k) addresses these concerns.

Section 1202: Integrity of copyright management information

Section 1202 implements the obligation contained in Article 12 of the WIPO Copyright Treaty and Article 19 of the WIPO Performances and Phonograms Treaty that Contracting Parties "provide adequate and effective legal remedies" against any person who knowingly and without authority removes or alters copyright management information (CMI), or who distributes, imports, broadcasts, or communicates to the public, works or copies of works knowing that such information has been removed or altered without authority. [22] This section does not mandate the use of CMI, nor does it prescribe the choice of any particular type of CMI for those who do use it. It merely protects the integrity of CMI if a party chooses to use it in connection with a copyrighted work by prohibiting its deliberate deletion or alteration. Furthermore, this section imposes liability for specified acts. It does not address the question of liability for persons who manufacture devices or provide services.

Subsection (a)–False copyright management information.–Subsection (a) establishes a general prohibition against intentionally providing false copyright management information, as defined in subsection (c), and against distributing or importing for distribution false copyright management information. There are two prerequisites that must be met for these prohibitions to be violated:  **\*35**  (1) the person providing, distributing or importing the false CMI must know the CMI is false, and (2) the person providing, distributing, or importing the false CMI must do so with the intent to induce, enable, facilitate or conceal an infringement of any right under title 17.

Subsection (b)–Removal or alteration of copyright management information.–Subsection (b) establishes general prohibitions against removing or altering CMI, against distributing or importing for distribution altered CMI, and against distributing, importing for distribution or publicly performing works in which CMI has been removed. There are three specific acts prohibited if they are committed without the authority of the copyright owner or the law, and if they are done knowing, or with respect to civil remedies under section 1203, having reasonable grounds to know, that they will induce, enable, facilitate or conceal a copyright infringement: (1) intentionally removing or altering CMI; (2) distributing or importing for distribution CMI knowing that it has been altered without the authority of the copyright owner or the law; or (3) distributing, importing for distribution, or publicly performing works, copies of works, or phonorecords knowing that CMI has been removed or altered without the authority of the copyright owner or the law.

Subsection (c)–Definition.–Subsection (c) defines "copyright management information." To fall within the definition, there is a threshold requirement that the information be conveyed in connection with copies or phonorecords, performances or displays of the copyrighted work. The term "conveyed" is used in its broadest sense and is not meant to require any type of transfer, physical or otherwise, of the information. It merely requires that the information be accessible in conjunction with, or appear with, the work being accessed. Such information is "copyright management information" as defined in this subsection if it falls within the categories enumerated in paragraphs (1) through (6).

Paragraph (1) describes information that identifies the copyrighted work, including the title of a work. This paragraph makes clear that the information set forth on a notice of copyright is included within the definition of copyright management information.

Paragraph (2) describes information that identifies the author of the work.

Paragraph (3) describes information that identifies the copyright owner.

Paragraph (4) describes information that identifies a performer whose performance is fixed in a work, other than an audiovisual work. Information that identifies such a performer is excluded from the definition of CMI, however, when such information is conveyed by a radio or television broadcast station in connection with the public performance of a work.

Paragraph (5) describes, in the case of an audiovisual work, information that identifies the writer, performer, or director who is credited in the work. Paralleling paragraph (4), information that identifies such a writer, performer, or director is excluded from the definition of CMI when such information is conveyed by a radio or television broadcast station in connection with the public performance of a work.

**\*36** Paragraph (6) describes numbers and symbols which refer to or represent the above information. As noted above, both the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty require that numbers and symbols be included within the definition of CMI. Links, such as embedded pointers and hypertext links, to the above information are also included. The phrase "links to such information" was included because removing or altering a link to the information will have the same adverse effect as removing or altering the information itself.

Finally, paragraph (7) permits the Register of Copyrights to prescribe by regulation other information that, if conveyed in connection with a work, is to be protected as copyright management information. To protect the privacy of users of copyrighted works, however, the Register of Copyrights may not include within the definition of CMI any information concerning users of copyrighted works.

Consistent with the proviso contained in paragraph (7), it should be noted that the definition of "copyright management information" does not encompass, nor is it intended to encompass, tracking or usage information relating to the identity of users of the works. The definition of CMI is limited by this subsection to the types of information listed, and it would be inconsistent with the purpose and construction of this bill, and contrary to the protection of privacy to include, tracking and usage information within the definition of CMI.

Subsection (d)–Law enforcement and intelligence activities.–Section 1202(d) creates an exception for the lawfully authorized investigative, protective, or intelligence activities of an officer, agent, or employee of, the United States, a State, or a political subdivision of a State, or of persons acting pursuant to a contract with such an entity. This exception will protect officers, agents, employees, or contractors of, or other persons acting at the direction of, a law enforcement or intelligence agency of the United States, a State, or a political subdivision of a State, who are performing lawfully authorized investigative, protective, or intelligence activities. This exception will also protect officers, agents, employees, or contractors of, or other persons acting at the direction of, elements or divisions of an agency or department of the United States, a State, or a political subdivision of a State, which does not have law enforcement or intelligence as its primary function, but who may nevertheless, in the course of lawfully authorized protective, intelligence, or criminal investigative activities, engage in actions otherwise prohibited by this section. This exception only applies to individuals covered under this subsection when they are performing investigative, protective, or intelligence activities, within the scope of their duties and in furtherance of lawfully authorized activities.

Subsection (e)–Limitations on Liability.–Subsection (e) recognizes special problems that certain broadcasting entities may have with the transmission of copyright management information. Under this subsection, radio and television broadcasters, cable systems, and persons who provide programming to such broadcasters or systems, who do not intend to induce, enable, facilitate or conceal infringement (eligible persons) may be eligible for a limitation on liability for violation of the copyright management information provisions of subsection (b) in certain, limited circumstances.

**\*37** In the case of an analog transmission, paragraph (1) provides that an eligible person will not be held liable for violating provisions of subsection (b) if it is not "technically feasible" for that person to avoid the violation or if avoiding the violation would "create an undue financial hardship." Avoiding a violation of subsection (b) with respect to the transmission of credits that are of an excessive duration in relation to standard practice in the relevant industries (for instance, the motion picture and television broadcast industries) is one example of an activity that may "create an undue financial hardship" under paragraph (1). As indicated above, this limitation on liability applies only if such person did not intend, by engaging in such activity, to induce, enable, facilitate or conceal infringement.

Paragraph (2) provides a limitation on liability in the case of a digital transmission, and contemplates voluntary digital transmission standards for the placement of copyright management information. Separate standards are likely to be set for the location of copyright management information in different categories of works. For instance, the standard(s) for the location of the name of the copyright owner in a sound recording or musical work to be broadcast by radio stations may differ–and be

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 28 of 72

set in a separate standard-setting process(es)–from the standard for the location of such information in a motion picture to be broadcast by television stations.

Paragraph (2)(A) provides that if a digital transmission standard for the placement of copyright management information for a category of works is set in a voluntary, consensus standard-setting process involving a representative cross-section of the relevant copyright owners and relevant transmitting industry, including but not limited to representatives of radio or television broadcast stations, cable systems, and copyright owners of a category of works that are intended for public performance by such stations or systems, an eligible person will not be liable for a violation of subsection (b) if the copyright management information involved in the violation was not placed in a location specified by the standard for that information. The eligible person, however, cannot qualify for this limitation on liability if that person was responsible for the nonconforming placement.

Paragraph (2)(B)(i) provides that until such a standard is set for a category of works, an eligible person will not be liable for a violation of subsection (b) if the transmission of the copyright management information would cause a perceptible visual or aural degradation of the digital signal. Paragraph (2)(B)(ii) provides that during this time period before a standard is set, an eligible person also will not be liable if the digital transmission of the information would conflict with an applicable government regulation or industry standard relating to transmission of information in a digital signal, such as the regulation requiring the placement of closed captioning in line 21 of the vertical blanking interval (47 C.F.R. 79.1, implementing 47 U.S.C. 613). For purposes of this paragraph, however, the applicable industry-wide standard must be of a type specified in paragraphs (2)(B)(ii) (II) or (III). The first type, defined in paragraph (2)(B)(ii)(II), includes only those standards that were adopted by a voluntary, consensus standards body, such as the Advanced **\*38** Television Systems Committee, before the effective date of section 1202. The other type, defined in paragraph (2)(B)(ii)(III), includes only those standards adopted in a voluntary, consensus standards-setting process open to participation by groups, including but not limited to a representative cross-section of radio or television broadcast stations, cable systems, and copyright owners of a category of works that are intended for public performance by such stations or systems.

Section 1203–Civil remedies

Subsection (a)–Civil actions.–Subsection (a) sets forth the general proposition that civil remedies are available for violations of sections 1201 and 1202. This paragraph establishes the jurisdiction for such civil actions as the "appropriate U.S. district court" and limits standing to bring a civil action to those persons injured by a violation of section 1201 or 1202.

Subsection (b)–Powers of the court.–Subsection (b) sets out the powers of the court that hears the case. Paragraph (1) authorizes the court to grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation of section 1201 or 1202. Paragraph (2) authorizes the court to order the impounding of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation. Under paragraph (3), the court may award damages as provided in subsection (c). Paragraph (4) authorizes the court to allow the recovery of costs by or against any party other than the United States or an officer thereof. Under paragraph (5), the court may award reasonable attorneys' fees to the prevailing party. Finally, paragraph (6) authorizes the court to order the remedial modification or the destruction of any device or product involved in a violation of section 1201 or 1202 that is in the custody or control of the violator or has been impounded under paragraph (2).

Subsection (c)–Award of damages.–Subsection (c) is divided into five paragraphs, each of which addresses the awarding of damages to the prevailing party.

Paragraph (1) establishes the general proposition that a person who violates section 1201 or 1202 is liable for either actual damages and any additional profits of the violator, or statutory damages.

Paragraphs (2) and (3) specify that the complaining party may finalize a choice between the two types of damage awards at any time until the final judgment is entered.

Paragraph (2) provides that, when the prevailing party opts for actual damages, the court shall award to that party the actual damages suffered by the party as a result of the violations, as well as any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages.

Paragraph (3) provides different statutory award amounts depending upon whether the civil action involves a section 1201 or 1202 violation. When the violation is a section 1201 violation and the prevailing party opts to recover an award of statutory damages, the prevailing party will be awarded statutory damages of not less than $200 or more than $2,500 per act of circumvention, device, **\*39** product, component, offer, or performance of service. When the violation is a section 1202 violation and the prevailing party opts to recover an award of statutory damages, the prevailing party will be awarded statutory damages of not less than $2,500 or more than $25,000 for each violation.

Paragraphs (4) and (5) set forth circumstances in which it would be appropriate to increase or decrease a damage award.

Paragraph (4) provides for an increased damage award when the violator is a repeat offender. Specifically, when the prevailing party establishes that a person violated section 1201 or 1202 within three years after a final judgment was entered against that person for another such violation, the award of damages may be increased to a sum of up to triple the amount that would otherwise be awarded.

Paragraph (5)(A) provides that, when a violator of section 1201 or 1202 was not aware and had no reason to believe that its acts constituted a violation, the damage award may be reduced or remitted. Paragraph (5)(B) requires the reduction or remission of damages in certain circumstances by providing that, when a nonprofit library, nonprofit archives, or nonprofit educational institution violator of section 1201 or 1202 was not aware and had no reason to believe that its acts constituted a violation, the damage award shall be remitted entirely.

Section 1204–Criminal offenses and penalties

Subsection (a)–In general.–Subsection (a) provides for the availability of criminal penalties for violations of sections 1201 and 1202. The standard applicable under this subsection is identical to the standard used in section 506 of the Copyright Act to establish criminal violations. Subsection (a)(1) sets forth the penalties available for a criminal violation of sections 1201 and 1202 as "not more than $500,000 or imprisonment for not more than five years, or both" for the first offense. If the person who is found guilty of criminal violation of sections 1201 or 1202 is a repeat offender, subsection (a)(2) provides that penalties may be increased to "not more than $1,000,000 or imprisonment for not more than ten years, or both."

Subsection (b)–Limitation for nonprofit library, archives, or educational institution.–Subsection (b) exempts completely any nonprofit library, nonprofit archives or nonprofit educational institution from the criminal penalties contained in subsection (a).

Subsection (c)–Statute of limitations.–Subsection (c) provides for a 5-year statute of limitations for criminal offenses under chapter 12.

Section 104. Conforming amendment

This section amends the table of chapters for title 17 to reflect the addition of new chapter 12.

Section 105. Effective date

Subsection (a)–In general.–Subsection (a) establishes the effective date of the proposed amendments in this bill as the date the bill is enacted into law, subject to the exceptions enumerated in subsection (b).

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 30 of 72

**\*40** Subsection (b)–Amendments relating to certain international agreements.–Subsection (b) sets forth several exceptions to the effective date established by subsection (a). These exceptions only apply to the technical amendments that are proposed in section 102 of the bill. Section 105 of the bill changes the effective date of any provision in section 102 of the bill that specifically refers to the WIPO Copyright Treaty or the WIPO Performances and Phonograms Treaty from the date the bill is enacted into law to the date the Treaty enters into force.

These exceptions are necessary because, as of the drafting of this bill, the two treaties have not entered into force and will not do so until three months after 30 States deposit their instruments of ratification or accession with the Director General of WIPO. The exceptions ensure that the amendments that refer specifically to the two treaties do not become effective until the treaties themselves become effective. In addition, it was necessary to refer to each treaty separately in this section, because it is possible that the two treaties may enter into force at different times and the amendments particular to each treaty had to be grouped together to ensure that the provisions relating specifically to one treaty do not become effective once the other treaty enters into force. Finally, it was necessary to add the phrase "with respect to the United States" in paragraphs (1) and (2) to ensure that, if the Treaties enter into force before the United States deposits its instrument of accession, the United States does not extend benefits to Member States of these Treaties until the United States becomes party to the Treaties.

## TITLE II–INTERNET COPYRIGHT INFRINGEMENT LIABILITY

The liability of online service providers and Internet access providers for copyright infringements that take place in the online environment has been a controversial issue. Title II of the Digital Millennium Copyright Act, the Internet Copyright Infringement Liability Clarification Act, addresses this complex issue. Title II preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment. At the same time, it provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.

New section 512 contains limitations on service providers' liability for five general categories of activity set forth in subsections (a) through (d) and subsection (f). As provided in subsection (k), section 512 is not intended to imply that a service provider is or is not liable as an infringer either for conduct that qualifies for a limitation of liability or for conduct that fails to so qualify. Rather, the limitations of liability apply if the provider is found to be liable under existing principles of law.

The limitations in subsections (a) through (d) protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement. Monetary relief is defined in subsection (j)(2) as encompassing damages, costs, attorneys' fees, and any other form of monetary payment. These subsections also limit injunctive relief against qualifying service providers to the extent **\*41** specified in subsection (i). To qualify for these protections, service providers must meet the conditions set forth in subsection (h), and service providers' activities at issue must involve a function described in subsection (a), (b), (c), (d) or (f), respectively. The liability limitations apply to networks "operated by or for the service provider," thereby protecting both service providers who offer a service and subcontractors who may operate parts of, or an entire, system or network for another service provider.

Section 201. Short title

This title may be cited as the "Internet Copyright Infringement Liability Clarification Act of 1998."

Section 202. Limitations on liability for Internet copyright infringement

This section amends chapter 5 of the Copyright Act (17 U.S.C. 501, et. seq.) to create a new section 512, titled "Liability of service providers for online infringement of copyright."

Case 1:25-cv-08736-PAE     Document 96-5     Filed 07/21/26     Page 31 of 72

Subsection (a)–Digital network communications.–Subsection (a) applies to communications functions associated with sending digital communications of others across digital networks, such as the Internet and other online networks. It establishes a limitation on liability for infringements that may occur in the provision of services falling within the definition of subsection (j)(1)(A). The limitations on injunctive relief set forth in subsection (i)(1)(B) are applicable when the functions at issue fall within the provisions of subsection (a), and the service provider meets the threshold criteria of subsection (h). [23]

Subsection (a) applies to service providers transmitting, routing, or providing connections for material, and some forms of intermediate and transient storage of material in the course of performing these functions. For example, in the course of moving packets of information across digital online networks, many intermediate and transient copies of the information may be made in routers and servers along the way. Such copies are created as an automatic consequence of the transmission process. In this context, "intermediate and transient" refers to such a copy made and/or stored in the course of a transmission, not a copy made or stored at the points where the transmission is initiated or received.

The use of the term "transmitting" throughout section 512 is not intended to be limited to transmissions of "a performance or display" of "images or sounds" within the meaning of section 101 of the Copyright Act.

Subsections (a)(1) through (5) limit the range of activities that qualify under this subsection to ones in which a service provider plays the role of a "conduit" for the communications of others. This limitation on liability applies if: (1) the communication was initiated by or at the direction of a person other than the service provider; (2) it is carried out through an automatic technical process without selection of the material by the service provider; (3) the service provider does not select the recipients of the material except as an automatic response to the request of another; (4) no copy  *42  of the material made in the course of intermediate or transient storage is maintained on the system or network so that it is ordinarily accessible to other than the anticipated recipients, and no copy is maintained on the system or network in a manner ordinarily accessible to the anticipated recipients for a longer period than is reasonably necessary for the communication; and (5) the content (but not necessarily the form) of the material is not modified in the course of transmission. Thus, for example, an e-mail transmission may appear to the recipient without bolding or italics resulting from format codes contained in the sender's message.

The Committee intends the term "selection of the material" in subsection (a)(2) to reflect an editorial function of determining what material to send, or the specific sources of material to place online (e.g., a radio station), rather than "an automatic technical process" of responding to a command or request, such as one from a user, an Internet location tool, or another network. The term "automatic response to the request of another" is intended to encompass a service provider's actions in responding to requests by a user or other networks, such as requests to forward e-mail traffic or to route messages to a mailing list agent (such as a Listserv) or other discussion group. The Committee intends subsection (a)(4) to cover copies made of material while it is en route to its destination, such as copies made on a router or mail server, storage of a web page in the course of transmission to a specific user, store and forward functions, and other transient copies that occur en route. The term "ordinarily accessible" is intended to encompass stored material that is routinely accessible to third parties. For example, the fact that an illegal intruder might be able to obtain access to the material would not make it ordinarily accessible to third parties. Neither, for example, would occasional access in the course of maintenance by service provider personnel, nor access by law enforcement officials pursuant to subpoena make the material "ordinarily accessible." However, the term does not include copies made by a service provider for the purpose of making the material available to other users. Such copying is addressed in subsection (b).

Subsection (b)–System caching.–Subsection (b) applies to a different form of intermediate and temporary storage than is addressed in subsection (a). In terminology describing current technology, this storage is a form of "caching," which is used on some networks to increase network performance and to reduce network congestion generally, as well as to reduce congestion and delays to popular sites. This storage is intermediate in the sense that the service provider serves as an intermediary between the originating site and ultimate user. The material in question is stored on the service provider's system or network for some period of time to facilitate access by users subsequent to the one who previously sought access to it.

For subsection (b) to apply, the material must be made available on an originating site, transmitted at the direction of another person through the system or network operated by or for the service provider to a different person, and stored through an automatic technical process so that users of the system or network who subsequently request access to the material from the originating site may obtain access to the material from the system or network.

**\*43**  Subsections (b)(1) through (b)(5) further refine the circumstances under which subsection (b) applies. Subsection (b)(1) provides that the material must be transmitted to subsequent users without modification to its content in comparison to the way it was originally transmitted from the originating site. The Committee intends that this restriction apply, for example, so that a service provider who caches material from another site does not change the advertising associated with the cached material on the originating site without authorization from the originating site.

Subsection (b)(2) limits the applicability of the subsection to circumstances where the service provider complies with certain updating commands.

Subsection (b)(3) provides that the service provider shall not interfere with the ability of certain technology that is associated with the work by the operator of the originating site to return to the originating site information, such as user "hit" counts, that would have been available to the site had it not been cached. The technology must: (i) not significantly interfere with the performance of the storing provider's system or network or with intermediate storage of the material; (ii) be consistent with generally accepted industry standard communications protocols applicable to Internet and online communications, such as those approved by the Internet Engineering Task Force and the World Wide Web Consortium; and (iii) not extract information beyond that which would have been obtained had the subsequent users obtained access to the material directly on the originating site.

Subsection (b)(4) applies to circumstances in which the originating site imposes a prior condition on access.

Subsection (b)(5) establishes a notification and take down procedure for cached material modeled on the procedure under subsection (c). However, this take down obligation does not apply unless the material has previously been removed from the originating site, or the party submitting the notification has obtained a court order for it to be removed from the originating site and notifies the service provider's designated agent of that order. This proviso has been added to subsection (b)(5) because storage under subsection (b) occurs automatically and unless infringing material has been removed from the originating site, the infringing material would ordinarily simply be re-cached.

Subsection (c)–Information stored on service providers.–Subsection (c) limits the liability of qualifying service providers for claims of direct, vicarious and contributory infringement for storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider. Examples of such storage include providing server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users. Subsection (c) defines the scope of this limitation on liability. It also sets forth procedural requirements that copyright owners or their agents and service providers must follow with respect to notifications of claimed infringement under subsection (c)(3). Information that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user does not fall within the liability limitation of subsection (c).

**\*44**  Subsection (c)(1)–In general.–Subsection (c)(1)(A) sets forth the applicable knowledge standard. This standard is met either by actual knowledge of infringement or in the absence of such knowledge by awareness of facts or circumstances from which infringing activity is apparent. The term "activity" is intended to mean activity using the material on the system or network. The Committee intends such activity to refer to wrongful activity that is occurring at the site on the provider's system or network at which the material resides, regardless of whether copyright infringement is technically deemed to occur at that site or at the location where the material is received. For example, the activity at an online site offering audio or video may be unauthorized public performance of a musical composition, a sound recording, or an audio-visual work, rather than (or in addition to) the creation of an unauthorized copy of any of these works.

Subsection (c)(1)(A)(ii) can best be described as a "red flag" test. As stated in subsection (l), a service provider need not monitor its service or affirmatively seek facts indicating infringing activity (except to the extent consistent with a standard technical measure complying with subsection (h)), in order to claim this limitation on liability (or, indeed any other limitation provided by the legislation). However, if the service provider becomes aware of a "red flag" from which infringing activity is apparent, it will lose the limitation of liability if it takes no action. The "red flag" test has both a subjective and an objective element. In determining whether the service provider was aware of a "red flag," the subjective awareness of the service provider of the facts or circumstances in question must be determined. However, in deciding whether those facts or circumstances constitute a "red flag"–in other words, whether infringing activity would have been apparent to a reasonable person operating under the same or similar circumstances–an objective standard should be used.

Subsection (c)(1)(A)(iii) provides that once a service provider obtains actual knowledge or awareness of facts or circumstances from which infringing material or activity on the service provider's system or network is apparent, the service provider does not lose the limitation of liability set forth in subsection (c) if it acts expeditiously to remove or disable access to the infringing material. Because the factual circumstances and technical parameters may vary from case to case, it is not possible to identify a uniform time limit for expeditious action.

Subsection (c)(1)(B) sets forth the circumstances under which a service provider would lose the protection of subsection (c) by virtue of its benefit from and control over infringing activity. In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one. In general, a service provider conducting a legitimate business would not be considered to receive a "financial benefit directly attributable to the infringing activity" where the infringer makes the same kind of payment as non-infringing users of the provider's service. Thus, receiving a one-time set-up fee and flat periodic payments for service from a person engaging in infringing activities would not constitute receiving a "financial benefit directly attributable to the infringing activity." Nor is subparagraph (B) intended **\*45** to cover fees based on the length of the message (per number of bytes, for example) or by connect time. It would however, include any such fees where the value of the service lies in providing access to infringing material.

Subsection (c)(1)(C) establishes that in cases where a service provider is notified of infringing activity by a copyright owner or its authorized agent, in accordance with the notification procedures of subsection (c)(3), the limitation on the service provider's liability shall be maintained only if the service provider acts expeditiously either to remove the infringing material from its system or to prevent further access to the infringing material on the system or network. This "notice and takedown" procedure is a formalization and refinement of a cooperative process that has been employed to deal efficiently with network-based copyright infringement.

Section 512 does not require use of the notice and take-down procedure. A service provider wishing to benefit from the limitation on liability under subsection (c) must "take down" or disable access to infringing material residing on its system or network of which it has actual knowledge or that meets the "red flag" test, even if the copyright owner or its agent does not notify it of a claimed infringement. On the other hand, the service provider is free to refuse to "take down" the material or site, even after receiving a notification of claimed infringement from the copyright owner; in such a situation, the service provider's liability, if any, will be decided without reference to section 512(c). For their part, copyright owners are not obligated to give notification of claimed infringement in order to enforce their rights. However, neither actual knowledge nor awareness of a red flag may be imputed to a service provider based on information from a copyright owner or its agent that does not comply with the notification provisions of subsection (c)(3), and the limitation of liability set forth in subsection (c) may apply.

Subsection (c)(2)–Designated agent.–Subsection (c)(2) provides that to qualify for the liability limitation of subsection (c), the service provider must designate an agent to receive notifications under subsection (c)(1)(C). The designation, provided to the Register of Copyrights, and made available on the service provider's web site is to contain certain information necessary to communicate with the service provider concerning allegedly infringing material or activity. The Register of Copyrights is directed to maintain a directory of designated agents available for inspection by the public, both on the web site of the Library of Congress, and in hard copy format on file at the Copyright Office. The Committee does not intend or anticipate that the

Register will publish hard copies of the directory. The directory shall have entries for the name, address, telephone number and electronic mail address of an agent designated by service providers. The service provider's designation shall substantially comply with these elements.

Subsection (c)(3)–Elements of notification.–Subsection (c)(3) sets forth the procedures under which copyright owners and their agents may provide effective notification to a service provider of allegations of infringement on the provider's system or network. Subsection (c)(3)(A) requires that to count as an effective notification, the notification must be in writing and submitted to the service provider's designated agent.

**\*46** Subsections (c)(3)(A)(i)–(vi) then set forth the information to be included in an effective notification. The standard against which a notification is to be judged is one of substantial compliance. Subsection (c)(3)(A)(i) provides that the notification must be signed by the copyright owner or its authorized agent to be effective. The requirement for signature, either physical or electronic, relates to the verification requirements of subsections (c)(3)(A)(v) and (vi). Subsection (c)(3)(A)(ii) requires that the copyright owner identify the copyrighted work alleged to be infringed. Where multiple works at a single online site are covered by a single notification, a representative list of such works at that site is sufficient. Thus, where a party is operating an unauthorized Internet jukebox from a particular site, it is not necessary for a compliant notification to list every musical composition or sound recording that has been or could be infringed at that site, so long as a representative list of those compositions or recordings is provided so that the service provider can understand the nature and scope of the infringement being claimed.

Subsection (c)(3)(A)(iii) requires that the copyright owner or its authorized agent provide the service provider with information reasonably sufficient to permit the service provider to identify and locate the allegedly infringing material. An example of such sufficient information would be a copy or description of the allegedly infringing material and the URL address of the location (web page) which is alleged to contain the infringing material. The goal of this provision is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously.

Subsection (c)(3)(A)(iv) requires that the copyright owner or its authorized agent provide reasonably sufficient identifying information concerning the owner or its agent who submits the notification, such as an address, telephone number, and if available an electronic mail address so that the service provider may contact the complaining party.

Subsection (c)(3)(A)(v) makes clear that the notification from complaining parties must contain a statement that the complaining party has a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, or its agent, or the law.

Subsection (c)(3)(A)(vi) specifies that the notification must contain a statement that the information contained therein is accurate. The complaining party–whether the copyright owner, or an authorized representative–also must confirm under penalty of perjury, that it has authority to act on behalf of the owner of the exclusive right that is alleged to be infringed. The term "perjury" is used in the sense found elsewhere in the United States Code. See 28 U.S.C. 1746; 18 U.S.C. 1621.

Subsection (c)(3)(B) addresses the effect of notifications that do not substantially comply with the requirements of subsection (c)(3). Under this subsection, the court shall not consider such notifications as evidence of whether the service provider has actual knowledge, is aware of facts or circumstances, or has received a notification for purposes of subsection (c)(1)(A). However, a defective notice provided to the designated agent may be considered in evaluating **\*47** the service provider's knowledge or awareness of facts and circumstances, if (i) the complaining party has provided the requisite information concerning the identification of the copyrighted work, identification of the allegedly infringing material, and information sufficient for the service provider to contact the complaining party, and (ii) the service provider does not promptly attempt to contact the person making the notification or take other reasonable steps to assist in the receipt of notification that substantially complies with paragraph (3)(A). If the service provider subsequently receives a substantially compliant notice, the provisions of paragraph (1)(C) would then apply upon receipt of the notice.

The Committee intends that the substantial compliance standard in subsections (c)(2) and (c)(3) be applied so that technical errors (such as misspelling a name, supplying an outdated area code if the phone number is accompanied by an accurate address, or supplying an outdated name if accompanied by an e-mail address that remains valid for the successor of the prior designated agent or agent of a copyright owner) do not disqualify service providers and copyright owners from the protections afforded under subsection (c). The Committee expects that the parties will comply with the functional requirements of the notification provisions–such as providing sufficient information so that a designated agent or the complaining party submitting a notification may be contacted efficiently–in order to ensure that the notification and take down procedures set forth in this subsection operate smoothly.

Subsection (d)–Information location tools.–Subsection (d) applies to referring or linking users to an online location containing infringing material or infringing activity using information location tools. The reference to "infringing activity" is intended to refer to wrongful activity that is occurring at the location to which the link or reference refers, without regard to whether copyright infringement is technically deemed to occur at that location or at the location where the material is received. The term information location tools includes, for example: a directory or index of online sites or material such as a search engine that identifies pages by specified criteria, a reference to other online material such as a list of recommended sites, a pointer that stands for an Internet location or address, or a hypertext link which allows users to access material without entering its address.

Subsection (d) incorporates the notification and take down structure of subsection (c) and applies it to the provision of references and links to infringing sites. A service provider is entitled to the liability limitations of subsection (d) if it: (1) lacks actual knowledge of infringement on the other site, and is not aware of facts or circumstances from which infringing activity in that location is apparent; (2) does not receive a financial benefit directly attributable to the infringing activity on the site, where the service provider has the right and ability to control the infringing activity; and (3) responds expeditiously to remove or disable the reference or link upon receiving a notification of claimed infringement as described in subsection (c)(3). The notification procedures under subsection (d) follow those set forth in subsection (c). However, the information submitted by the complaining party under subsection (c)(3)(A)(iii) is identification of the reference or link to infringing **\*48** material or activity, and information reasonably sufficient to permit the service provider to locate that reference or link.

Section 512(d) provides a safe harbor that would limit the liability of a service provider that refers or links users to an online location containing infringing material or activity by using "information location tools," such as hyperlink directories and indexes. A question has been raised as to whether a service provider would be disqualified from the safe harbor based solely on evidence that it had viewed the infringing Internet site. If so, there is concern that online directories prepared by human editors and reviewers, who view and classify various Internet sites, would be denied eligibility to the information location tools safe harbor, in an unintended number of cases and circumstances. This is an important concern because such online directories play a valuable role in assisting Internet users to identify and locate the information they seek on the decentralized and dynamic networks of the Internet.

Like the information storage safe harbor in section 512(c), a service provider would qualify for this safe harbor if, among other requirements, it "does not have actual knowledge that the material or activity is infringing" or, in the absence of such actual knowledge, it is "not aware of facts or circumstances from which infringing activity is apparent." Under this standard, a service provider would have no obligation to seek out copyright infringement, but it would not qualify for the safe harbor if it had turned a blind eye to "red flags" of obvious infringement.

For instance, the copyright owner could show that the provider was aware of facts from which infringing activity was apparent if the copyright owner could prove that the location was clearly, at the time the directory provider viewed it, a "pirate" site of the type described below, where sound recordings, software, movies or books were available for unauthorized downloading, public performance or public display. Absent such "red flags" or actual knowledge, a directory provider would not be similarly aware merely because it saw one or more well known photographs of a celebrity at a site devoted to that person. The provider could not be expected, during the course of its brief cataloguing visit, to determine whether the photograph was still protected

by copyright or was in the public domain; if the photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine.

The important intended objective of this standard is to exclude sophisticated "pirate" directories–which refer Internet users to other selected Internet sites where pirate software, books, movies, and music can be downloaded or transmitted–from the safe harbor. Such pirate directories refer Internet users to sites that are obviously infringing because they typically use words such as "pirate," "bootleg," or slang terms in their uniform resource locator (URL) and header information to make their illegal purpose obvious to the pirate directories and other Internet users. Because the infringing nature of such sites would be apparent from even a brief and casual viewing, safe harbor status for a provider that views such a site and then establishes a link to it would not be appropriate. Pirate directories do not follow the routine business practices of legitimate service providers preparing directories, and thus **\*49** evidence that they have viewed the infringing site may be all that is available for copyright owners to rebut their claim to a safe harbor.

In this way, the "red flag" test in section 512(d) strikes the right balance. The common-sense result of this "red flag" test is that on-line editors and catalogers would not be required to make discriminating judgments about potential copyright infringement. If, however, an Internet site is obviously pirate, then seeing it may be all that is needed for the service provider to encounter a "red flag." A provider proceeding in the face of such a red flag must do so without the benefit of a safe harbor.

Information location tools are essential to the operation of the Internet; without them, users would not be able to find the information they need. Directories are particularly helpful in conducting effective searches by filtering out irrelevant and offensive material. The Yahoo! directory, for example, currently categorizes over 800,000 online locations and serves as a "card catalogue" to the World Wide Web, which over 35,000,000 different users visit each month. Directories such as Yahoo!'s usually are created by people visiting sites to categorize them. It is precisely the human judgment and editorial discretion exercised by these cataloguers which makes directories valuable.

This provision is intended to promote the development of information location tools generally, and Internet directories such as Yahoo!'s in particular, by establishing a safe-harbor from copyright infringement liability for information location tool providers if they comply with the notice and takedown procedures and other requirements of subsection (d). The knowledge or awareness standard should not be applied in a manner which would create a disincentive to the development of directories which involve human intervention. Absent actual knowledge, awareness of infringement as provided in subsection (d) should typically be imputed to a directory provider only with respect to pirate sites or in similarly obvious and conspicuous circumstances, and not simply because the provider viewed an infringing site during the course of assembling the directory.

Subsection (e)–Misrepresentations.–Subsection (e) establishes a right of action against any person who knowingly misrepresents that material or activity online is infringing, or that material or activity was removed or disabled by mistake or misidentification under the "put back" procedure set forth in subsection (f). Actions may be brought under subsection (e) by any copyright owner, copyright owner's licensee, or by a service provider, who is injured by such misrepresentation, as a result of the service provider relying upon the misrepresentation in either taking down material or putting material back online. Defendants who make such a knowing misrepresentation are liable for any damages, including costs and attorneys" fees, incurred by any of these parties as a result of the service provider's reliance upon the misrepresentation. This subsection is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and Internet users.

Subsection (f)–Immunity for take downs and user put back procedure.–Subsection (f) provides immunity to service providers for **\*50** taking down infringing material, and establishes a "put back" procedure under which subscribers may contest a complaining party's notification of infringement provided under subsection (c)(3). The put back procedures were added as an amendment to this title in order to address the concerns of several members of the Committee that other provisions of this title established strong incentives for service providers to take down material, but insufficient protections for third parties whose material would be taken down.

Subsection (f)(1) immunizes service providers from any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing. The immunity also applies to material or activity that a service provider disables access to or removes based on facts or circumstances from which infringing activity is apparent. This immunity applies even if the material or activity is ultimately determined not to be infringing. The purpose of this subsection is to protect service providers from liability to third parties whose material service providers take down in a good faith effort to comply with the requirements of subsection (c)(1).

Subsection (f)(2) establishes a "put back" procedure through an exception to the immunity set forth in subsection (f)(1). The exception applies in a case in which the service provider, pursuant to a notification provided under subsection (c)(1)(C) in accordance with subsection (c)(3), takes down material that a subscriber has posted to the system or network. In such instances, to retain the immunity set forth in subsection (f)(1) with respect to the subscriber whose content is taken down, the service provider is to follow up to three steps.

Under subsection (f)(2)(A), the service provider is to take reasonable steps to notify the subscriber promptly of the removal or disabling of access to the subscriber's material. The Committee intends that "reasonable steps" include, for example, sending an e-mail notice to an e-mail address associated with a posting, or if only the subscriber's name is identified in the posting, sending an e-mail to an e-mail address that the subscriber submitted with its subscription. The Committee does not intend that this subsection impose any obligation on service providers to search beyond the four corners of a subscriber's posting or their own records for that subscriber in order to obtain contact information. Nor does the Committee intend to create any right on the part of subscribers who submit falsified information in their postings or subscriptions to complain if a service provider relies upon the information submitted by the subscriber.

The subscriber may then file a counter notification, in accordance with the requirements of subsection (f)(3), contesting the original take down on grounds of mistake or misidentification of the material and requesting "put back" of the material that the service provider has taken down. If a subscriber files a counter notification with the service provider's designated agent, subparagraph (f)(2) calls for the service provider to promptly forward a copy to the complaining party who submitted the take down request. Finally, under subsection (f)(2)(C), the service provider is to place the subscriber's material back online or cease disabling access to it between 10 and 14 business days after receiving the counter notification **\*51** unless the designated agent receives a further notice from the complaining party that the complaining party has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity on the service provider's system or network with regard to the material in question.

Subscriber counter notifications must substantially comply with defined requirements set forth in subsection (f)(3). Notifications shall be signed by the subscriber physically or by electronic signature; identify the material taken down and the location from which it was taken down; include a statement under penalty of perjury that the subscriber has a good faith belief that the material was taken down as a result of mistake or misidentification of the material; and include the subscriber's contact information, as well as a statement consenting to the jurisdiction of a Federal district court and to accept service of process from the complaining party or the complaining party's agent. The substantial compliance standard is the same as that set forth in subsections (c)(2) and (3).

Subsection (f)(4) is included to make clear the obvious proposition that a service provider's compliance with the put back procedure does not subject it to liability for copyright infringement or cause it to lose its liability limitation with respect to the replaced material.

Subsection (g)–Identification of direct infringer.–Subsection (g) creates a procedure by which copyright owners or their authorized agents who have submitted or will submit a request for notification satisfying the requirements of subsection (c) (3)(A) may obtain an order for identification of alleged infringers who are users of a service provider's system or network. Under this procedure, the copyright owner or agent files three documents with the clerk of any U.S. District Court: a copy of

the notification, a proposed order, and a sworn declaration that the purpose of the order is to obtain the identity of an alleged infringer and that the information obtained will only be used to protect the owner's rights under this Title.

Orders issued under subsection (g) shall authorize and order the service provider expeditiously to disclose to the person seeking the order information sufficient to identify the alleged infringer to the extent such information is available to the service provider. The Committee intends that an order for disclosure be interpreted as requiring disclosure of information in the possession of the service provider, rather than obliging the service provider to conduct searches for information that is available from other systems or networks. The Committee intends that such orders be expeditiously issued if the notification meets the provisions of subsection (c)(3)(A) and the declaration is properly executed. The issuing of the order should be a ministerial function performed quickly for this provision to have its intended effect. After receiving the order, the service provider shall expeditiously disclose to the copyright owner or its agent the information required by the order to the extent that the information is available to the service provider, regardless of whether the service provider responds to the notification of claimed infringement.

Subsection (h)–Conditions for eligibility.–Subsection (h) sets forth two conditions that a service provider must satisfy to be eligible **\*52** for the limitations of liability provided in subsections (a) through (d).

First, the service provider is expected to adopt and reasonably implement a policy for the termination in appropriate circumstances of the accounts of subscribers [24] of the provider's service who are repeat online infringers of copyright. The Committee recognizes that there are different degrees of online copyright infringement, from the inadvertent to the noncommercial, to the willful and commercial. In addition, the Committee does not intend this provision to undermine the principles of subsection (l) or the knowledge standard of subsection (c) by suggesting that a provider must investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing. However, those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access.

Second, a provider's system must accommodate, and not interfere with, standard technical measures used to identify or protect copyrighted works. The Committee believes that technology is likely to be the solution to many of the issues facing copyright owners and service providers in this digital age. For that reason, we have included subsection (h)(1)(B), which is intended to encourage appropriate technological solutions to protect copyrighted works. The Committee strongly urges all of the affected parties expeditiously to commence voluntary, interindustry discussions to agree upon and implement the best technological solutions available to achieve these goals.

Subsection (h)(1)(B) is explicitly limited to "standard technical measures" that have been developed pursuant to a broad consensus of both copyright owners and service providers in an open, fair, voluntary, multi-industry standards process. The Committee anticipates that these provisions could be developed both in recognized open standards bodies or in ad hoc groups, as long as the process used is open, fair, voluntary, and multi-industry and the measures developed otherwise conform to the requirements of the definition of standard technical measures set forth in paragraph (h)(2). A number of recognized open standards bodies have substantial experience with Internet issues. The Committee also notes that an ad-hoc approach has been successful in developing standards in other contexts, such as the process that has developed copy protection technology for use in connection with DVD.

Subsection (i)–Injunctions.–Subsection (i) defines the terms and conditions under which an injunction may be issued against a service provider that qualifies for the limitations of liability set forth in subsections (a) through (d), but is otherwise subject to an injunction under existing principles of law. Subsection (i)(1) limits the scope of injunctive relief that may be ordered against a qualifying **\*53** provider. Subsection (i)(2) identifies factors a court must consider in deciding whether to grant injunctive relief and in determining the appropriate scope of injunctive relief.

Subsection (i)(1)–Scope of relief.–Subsection (i)(1) is divided into two subparagraphs. Subparagraph (A) defines the scope of injunctive relief available against service providers who qualify for the limitations of liability set forth in subsections (b), (c) or (d). Only three forms of injunctive relief may be granted. First, the court may provide for the removal or blocking of infringing material or activity that is residing at a specific location on the provider's system or network. This is essentially an order to take the actions identified in subsection (c)(1)(C) to "remove, or disable access" to the material that is claimed to be infringing or to be the subject of infringing activity.

Second, the court may order the provider to terminate the accounts of a subscriber [25] of the provider's service who is engaging in infringing activity.

Subsection (i)(1)(A) permits the court, under appropriate circumstances, to enter a different form of injunction if the court considers it necessary to prevent or restrain infringement of specific copyrighted material that resides at an identified online location. If a court enters an injunction other than that contemplated in the first two clauses of subparagraph (A), the court must determine that the injunctive relief is the least burdensome to the service provider among those forms of relief that are comparably effective.

Subsection (i)(1)(B) sets forth a different set of remedies available for injunctions against service providers qualifying for the limitation on remedies set forth in subsection (a). In such cases, if a court determines that injunctive relief is appropriate, it may only grant injunctive relief in one or both of two specified forms. The first is an order to the service provider to terminate subscriber accounts that are specified in the order. The second form of relief, available in cases in which a provider is engaging in infringing activity relating to a foreign online location, is an order to take reasonable steps to block access to a specific, identified foreign online location. Such blocking orders are not available against a service provider qualifying under subsection (a) in the case of infringing activity on a site within the United States or its territories.

Subsection (i)(2)–Considerations.–Subsection (i)(2) sets forth mandatory considerations for the court beyond those that exist under current law. These additional considerations require the court to consider factors of particular significance in the digital online environment.

Subsection (i)(3)–Notice and ex parte orders.–Subsection (i)(3) prohibits most forms of ex parte injunctive relief (including temporary and preliminary relief) against a service provider qualifying for a liability limitation under section 512. A court may issue an order to ensure the preservation of evidence or where the order will have no material adverse effect on the operation of the provider's network.

Subsection (j)–Definitions.–Subsection (j) sets forth two definitions of the term "service provider" as used in this title, as well as **\*54** a definition of the term "monetary relief." Only an entity that is performing the functions of a "service provider" is eligible for the limitations on liability set forth in section 512 with respect to those functions.

The first definition of a service provider, set forth in subsection (j)(1)(A), defines a narrower range of functions and applies to use of the term in subsection (a). As used in that subsection the term "service provider" means any entity offering the transmission, routing or providing of connections for digital online communications, between or among points specified by a user, of material of a user's choosing without modification to the content of the material as sent or received. This freestanding definition is derived from the definition of "telecommunications" found in 47 U.S.C. 153(48) in recognition of the fact that the functions covered by this definition are conduit activities, but the Committee has reworked the definition and written subsection (j)(1)(A) to make it appropriate for the Internet and online media. Thus, the subsection (j)(1)(A) definition includes the offering of transmission, routing or providing of connections. Although the transmission, routing or providing of connections may occur over digital or analog networks, the service provider must be providing such services for communications that are both digital and online. By online communications, the Committee intends to refer to communications over an interactive computer network, such as the Internet. Thus, over-the-air broadcasting, whether in analog or digital form, or a cable television system, or a satellite television service would not qualify, except to the extent it provides users with online access to a digital network such as the

Internet, or it provides transmission, routing or connections to connect material to such a network, and then only with respect to those functions. An entity is not disqualified from being a "service provider" because it alters the form of the material, so long as it does not alter the content of the material. As a threshold matter, a service provider's performance of a particular function with respect to allegedly infringing activity falls within the (j)(1)(A) definition of service provider if and only if such function is within the range of functions set forth in subsection (j)(1)(A). For example, hosting a World Wide Web site does not fall within the subsection (j)(1)(A) definition; providing connectivity for a world wide web site does fall within that definition. The subparagraph (A) definition of service provider is not intended to exclude providers that perform other functions in addition to those set forth in subparagraph (A), including the functions identified in subsection (j)(1)(B). Conversely, the fact that a provider performs some functions that fall within the definition of subparagraph (A) does not imply that its other functions that do not fall within the definition of subparagraph (A) qualify for the limitation of liability under subsection (a).

The second definition of "service provider," set forth in subsection (j)(1)(B), applies to the term as used in any other subsection of section 512. This definition is broader than the first, covering providers of online services or network access, or the operator of facilities therefor. This definition includes, for example, services such as providing Internet access, e-mail, chat room and web page hosting services. The (j)(1)(B) definition of service provider, for example, includes universities and schools to the extent they perform the functions  **55**  identified in subsection (j)(1)(B). The definition also specifically includes any entity that falls within the first definition of service provider. A broadcaster or cable television system or satellite television service would not qualify, except to the extent it performs functions covered by (j)(1)(B).

Finally, subsection (j)(2) defines the term "monetary relief" broadly for purposes of this section as encompassing damages, costs, attorneys' fees and any other form of monetary payment.

Subsection (k)–Other defenses not affected.–Subsection (k) clarifies that other defenses under copyright law are not affected and codifies several important principles.

New section 512 does not define what is actionable copyright infringement in the online environment, and does not create any new exceptions to the exclusive rights under copyright law. The rest of the Copyright Act sets those rules. Similarly, new section 512 does not create any new liabilities for service providers or affect any defense available to a service provider. Enactment of section 512 does not bear upon whether a service provider is or is not an infringer when its conduct falls within the scope of section 512. Even if a service provider's activities fall outside the limitations on liability specified in the bill, the service provider is not necessarily an infringer; liability in these circumstances would be adjudicated based on the doctrines of direct, vicarious or contributory liability for infringement as they are articulated in the Copyright Act and in the court decisions interpreting and applying that statute, which are unchanged by section 512. In the event that a service provider does not qualify for the limitation on liability, it still may claim all of the defenses available to it under current law. New section 512 simply defines the circumstances under which a service provider, as defined in this Section, may enjoy a limitation on liability for copyright infringement.

Subsection (l)–Protection of privacy.–Subsection (l) is designed to protect the privacy of Internet users. This subsection makes clear that the applicability of subsections (a) through (d) is no way conditioned on a service provider: (1) monitoring its service or affirmatively seeking facts indicating infringing activity except to the extent consistent with implementing a standard technical measure under subsection (h); or (2) accessing, removing or disabling access to material if such conduct is prohibited by law, such as the Electronic Communications Privacy Act.

Subsection (m)–Rule of construction.–Subsection (m) establishes a rule of construction applicable to subsections (a) through (d). Section 512's limitations on liability are based on functions, and each limitation is intended to describe a separate and distinct function. Consider, for example, a service provider that provides a hyperlink to a site containing infringing material which it then caches on its system in order to facilitate access to it by its users. This service provider is engaging in at least three functions that may be subject to the limitation on liability: transitory digital network communications under subsection (a), system caching under subsection (b), and information location tools under subsection (d). If this service provider (as defined

in subsection (j)(1)(A) in the case of transitory digital communications, or as defined in subsection (j)(1)(B) in the case of system caching or information location tools) meets the  **56**  threshold criteria spelled out in subsection (h)(1), then for its acts of system caching defined in subsection (b), it may avail itself of the liability limitations stated in subsection (b), which incorporate the limitations on injunctive relief described in subsection (i)(1)(B) and (i)(3). If it is claimed that the same company is committing an infringement by using information location tools to link its users to infringing material, as defined in subsection (d), then its fulfillment of the requirements to claim the system caching liability limitation does not affect whether it qualifies for the liability limitation for information location tools; the criteria in subsection (d), rather than those in subsection (b), are applicable. Section 512(m) codifies this principle by providing that the determination of whether a service provider qualifies for one liability limitation has no effect on the determination of whether it qualifies for a separate and distinct liability limitation under another subsection of section 512.

Section 203. Conforming amendment

This section amends the table of sections for chapter 5 of the Copyright Act (17 U.S.C. 501 et. seq.) to reflect the new section 512, as created by this title.

Section 204. Liability of educational institutions for online infringement of copyright

Subsection 204(a) directs the Register of Copyrights to consult with representatives of copyright owners and nonprofit educational institutions and to submit to the Congress within 6 months after enactment of the bill recommendations regarding the liability of nonprofit educational institutions for copyright infringements that take place through the use of the institution's computer system or network, where the institution qualifies as a "service provider" under the provisions of this Title. Included in the Register's report are to be any recommendations for legislation that the Register considers appropriate.

Subsection 204(b) sets forth specific considerations that the Register shall take into account, where relevant, in formulating her recommendations to the Congress.

TITLE III–COMPUTER MAINTENANCE OR REPAIR

Section 301. Limitation on exclusive rights; computer programs

This section effects a minor, yet important clarification in section 117 of the Copyright Act (17 U.S.C. 117) to ensure that the lawful owner or lessee of a computer machine may authorize an independent service provider–a person unaffiliated with either the owner or lessee of the machine–to activate the machine for the sole purpose of servicing its hardware components. When a computer is activated, certain software or parts thereof is automatically copied into the machine's random access memory, or "RAM". A clarification in the Copyright Act is necessary in light of judicial decisions holding that such copying is a "reproduction" under section 106 of the Copyright Act (17 U.S.C. 106), [26] thereby calling into question the right of an independent service provider who is not the licensee of  **57**  the computer program resident on the client's machine to even activate that machine for the purpose of servicing the hardware components. This section does not in any way alter the law with respect to the scope of the term "reproduction" as it is used in the Copyright Act. Rather, this section it is narrowly crafted to achieve the objectives just described–namely, ensuring that an independent service provider may turn on a client's computer machine in order to service its hardware components, provided that such service provider complies with the provisions of this section designed to protect the rights of copyright owners of computer software.

Paragraphs (1) and (2) make technical changes to the structure of section 117, dividing the existing provisions between two subsections, the first entitled "(a) Making of Additional Copy or Adaptation by Owner of Copy" and the second entitled "(b) Lease, Sale, or Other Transfer of Additional Copy or Adaptation." The operative provisions, and limitations, are in paragraph (3), which creates two new subsections in section 117, subsections (c) and (d).

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 42 of 72

Subsection (c)–Machine maintenance or repair.–The bill creates a new subsection (c) in section 117 of the Copyright Act (17 U.S.C. 117), which delineates the specific circumstances under which a reproduction of a computer program would not constitute infringement of copyright. The goal is to maintain undiminished copyright protection afforded under the Copyright Act to authors of computer programs, while making it possible for third parties to perform servicing of the hardware. This new subsection states that it is not an infringement of copyright for the owner or lessee of a machine to make or authorize the making of a copy of a computer program provided that the following conditions are met:

First, subsection (c) itself makes clear that the copy of the computer program must have been made solely and automatically by virtue of turning on the machine in order to perform repairs or maintenance on the hardware components of the machine. Moreover, the copy of the computer program which is reproduced as a direct and sole consequence of activation must be an authorized copy that has lawfully been installed in the machine. Authorized copies of computer programs are only those copies that have been made available with the consent of the copyright owner. Also, the acts performed by the service provider must be authorized by the owner or lessee of the machine.

Second, in accordance with paragraph (c)(1), the resulting copy may not be used by the person performing repairs or maintenance of the hardware components of the machine in any manner other than to effectuate the repair or maintenance of the machine. Once these tasks are completed, the copy of the program must be destroyed, which generally will happen automatically once the machine is turned off.

Third, as is made clear in paragraph (c)(2), the amendment is not intended to diminish the rights of copyright owners of those computer programs, or parts thereof, that also may be loaded into RAM when the computer is turned on, but which did not need to be so loaded in order for the machine to be turned on. A hardware manufacturer or **\*58** software developer might, for example, provide diagnostic and utility programs that load into RAM along with or as part of the operating system, even though they market those programs as separate products–either as freestanding programs, or pursuant to separate licensing agreements. Indeed, a password or other technical access device is sometimes required for the owner of the machine to be able to gain access to such programs. In other cases, it is not the hardware or software developer that has arranged for certain programs automatically to be reproduced when the machine is turned on; rather, the owner of the machine may have configured its computer to load certain applications programs into RAM as part of the boot-up process (such as a word processing program on a personal computer). This subsection is not intended to derogate from the rights of the copyright owners of such programs. In order to avoid inadvertent copyright infringement, these programs need to be covered by subsection (c), but only to the extent that they are automatically reproduced when the machine is turned on. This subsection is not intended to legitimize unauthorized access to and use of such programs just because they happen to be resident in the machine itself and are reproduced with or as a part of the operating system when the machine is turned on. According to paragraph (c)(2), if such a program is accessed or used without the authorization of the copyright owner, the initial reproduction of the program shall not be deemed exempt from infringement by this subsection.

Subsection (d)–Definitions.–Subsection (d) defines two terms not previously defined by the Copyright Act. Paragraph (1) defines the term "maintenance" as the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine. These acts can include, but are not limited to, cleaning the machine, tightening connections, installing new components such as memory chips, circuit boards and hard disks, checking the proper functioning of these components, and other similar acts.

Paragraph (2) defines the term "repair" as the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine. These acts of repairing the hardware include, but are not limited to, replacing worn or defective components such as memory chips, circuit boards and hard disks, correcting the improper installation of new components, and other similar acts.

Case 1:25-cv-08736-PAE   Document 96-5   Filed 07/21/26   Page 43 of 72

Both paragraphs (1) and (2) of this subsection are subject to the same limitations, which are intended to clarify that activating a machine in order to perform maintenance or repair does not constitute infringement as provided in subsection (c) if the maintenance or repair is undertaken to make the machine work in accordance with the parameters specified for such a machine and its component parts. Because technological improvements may lead customers to upgrade their machines, the language of both definitions authorizes service providers to maintain those components of the hardware that have been installed since the time the machine was **\*59** originally acquired, or to install new components. But their acts shall be noninfringing under subsection (c) only if the components being serviced have been lawfully acquired and installed. Finally, the terms "maintenance" and "repair" do not include unauthorized adaptations, modifications, error corrections or any other changes to any software which may be in the machine being serviced.

TITLE IV–EPHEMERAL RECORDINGS; DISTANCE EDUCATION; EXEMPTION FOR LIBRARIES AND ARCHIVES

Section 401. Ephemeral recordings

Section 401 amends section 112 of the Copyright Act (17 U.S.C. 112) to address two issues concerning the application of the ephemeral recording exemption in the digital age.

The first of these issues is the relationship between the ephemeral recording exemption and the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA"). The DPRA granted sound recording copyright owners the exclusive right to perform their works publicly by means of digital audio transmission, subject to certain limitations, particularly those set forth in section 114(d). Among those limitations is an exemption for nonsubscription broadcast transmissions, which are defined as those made by terrestrial broadcast stations licensed as such by the FCC. 17 U.S.C. 114(d)(1)(A)(iii) and (j)(2). The ephemeral recording exemption presently privileges certain activities of a transmitting organization when it is entitled to transmit a performance or display under a license or transfer of copyright ownership or under the limitations on exclusive rights in sound recordings specified by section 114(a). The Committee believes that the ephemeral recording exemption should apply to broadcast radio and television stations when they make nonsubscription digital broadcasts permitted by the DPRA. The Committee has therefore changed the existing language of the ephemeral recording exemption (redesignated as 112(a)(1)) to extend explicitly to broadcasters the same privilege they already enjoy with respect to analog broadcasts.

The second of these issues is the relationship between the ephemeral recording exemption and the anticircumvention provisions that the bill adds as section 1201 of the Copyright Act. Concerns were expressed that if use of copy protection technologies became widespread, a transmitting organization might be prevented from engaging in its traditional activities of assembling transmission programs and making ephemeral recordings permitted by section 112 for purposes of its own transmissions within its local service area and of archival preservation and security. To address this concern, the Committee has added to section 112 a new paragraph that permits transmitting organizations to engage in activities that otherwise would violate section 1201(a)(1) in certain limited circumstances when necessary for the exercise of the transmitting organization's privilege to make ephemeral recordings under redesignated section 112(a)(1). By way of example, if a radio station could not make a permitted ephemeral recording from a commercially available phonorecord without violating section 1201(a)(1), then the radio station could request from the copyright owner the necessary means of making a permitted ephemeral recording. If the **\*60** copyright owner did not then either provide a phonorecord that could be reproduced or otherwise provide the necessary means of making a permitted ephemeral recording from the phonorecord already in the possession of the radio station, the radio station would not be liable for violating section 1201(a)(1) for taking the steps necessary for engaging in activities permitted under section 112(a)(1). The radio station would, of course, be liable for violating section 1201(a)(1) if it engaged in activities prohibited by that section in other than the limited circumstances permitted by section 112(a)(1).

Section 402. Limitation on exclusive rights; distance education

Section 402(a) directs the Register of Copyrights to consult with representatives of copyright owners, nonprofit educational institutions, and nonprofit libraries and archives and to submit recommendations to the Congress no later than 6 months after

the date of enactment of the bill on how to promote distance education through digital technologies, including interactive digital networks, while maintaining an appropriate balance between the rights of copyright owners and the needs of users. Where appropriate, the Register shall include legislative recommendations to achieve those objectives.

Section 402(b) specifies considerations which the Register shall take into account in formulating such recommendations.

Section 403. Exemption for libraries and archives

Section 108 of the Copyright Act (17 U.S.C. 108) permits libraries and archives of the type described in that section to make and, in some cases, distribute a limited number of copies of certain types of copyrighted works, without the permission of the copyright holder, for specified purposes relating to these entities' functions as repositories of such works for public reference. Section 403 of the bill updates section 108 to allow these entities to take advantage of digital technologies when engaging in specified preservation activities.

Except for the amendment to paragraph (a)(3), which deals with the inclusion of copyright notice on all copies or phonorecords of works made or distributed pursuant to section 108, the amendments revise either subsection (b), which addresses the reproduction and distribution of a copy or phonorecord of an unpublished work for purposes of preservation and security or for deposit for research use in another library or archive of the type described; or subsection (c), which addresses the reproduction of a copy or phonorecord of a published work for the purpose of replacement of a copy of that work that is damaged, deteriorating, lost, or stolen, if an unused replacement copy cannot be obtained at a fair price.

The amendment to paragraph (a)(3) of section 108 is intended to ease the burden on libraries and archives of the current law's requirement that a notice of copyright be included on copies that are reproduced under section 108. Under this amendment, such notice would be required only where the particular copy that is reproduced by the library or archives itself bears a notice. In other words, a notice appearing on the material copied would still need to be maintained, and could not be deleted. On the other hand, if **\*61** the copy being reproduced does not bear a copyright notice, the library or archives would fully satisfy its obligation under this section by simply placing on the reproduction a legend that states "This work may be protected by copyright," or words to that effect. This minimal obligation is similar to those found in subsections (e) and (f) of existing section 108, which condition the exemption in those subsections on the display of a general notice or warning of potential copyright protection.

Subsection (b) currently permits a library or archive under this section to make and distribute one copy or phonorecord of an unpublished work solely for purposes of preservation and security or for deposit for research use in another library or archives, provided that the duplication of the work occurs "in facsimile form." The legislative history to that section makes clear that, when this language was enacted more than twenty years ago, Congress intended to permit the copy to be made by microfilm or electrostatic photocopying process, but not in a computerized form i.e., "in machine readable language for storage in an information system."[27]

The amendment to subsection (b) permits a library or archive to make (for itself or another library or archive of the type described by clause (2) of subsection (a)) up to 3 copies or phonorecords for these purposes, rather than just one, and permits such copies or phonorecords to be made in digital as well as analog formats. In recognition of the risk that uncontrolled public access to the copies or phonorecords in digital formats could substantially harm the interests of the copyright owner by facilitating immediate, flawless and widespread reproduction and distribution of additional copies or phonorecords of the work, the amendment provides that any copy of a work that the library or archive makes in a digital format must not be otherwise distributed in that format and must not be made available in that format to the public outside the premises of the library or archives. In this way, the amendment permits the utilization of digital technologies solely for the purposes of this subsection.

Similarly, subsection (c) currently permits a library or archives under this section to make one copy or phonorecord of any published work solely for purposes of replacement of a copy or phonorecord that is damaged, deteriorating, lost or stolen,

provided that the library or archive has determined after a reasonable effort that an unused replacement cannot be obtained at a fair price, and provided that the duplication of the work occurs "in facsimile form."

As in subsection (b), the amendment to subsection (c) permits a library or archive to make and use three copies or phonorecords for these purposes, rather than just one, and permits such copies or phonorecords to be made in digital as well as analog formats, with the proviso that any copy of a work that the library or archive makes in a digital format must not be made available to the public in that format except for use on the premises of a library or archives in lawful possession of such copy. In the view of the Committee, this proviso is necessary to ensure that the amendment strikes the appropriate balance, permitting the use of digital technology by libraries and archives while guarding against the potential **\*62** harm to the copyright owner's market from patrons obtaining unlimited access to digital copies from any location.

The amendment to subsection (c) also broadens its coverage to allow the updating of obsolete formats. It permits the making of such copies or phonorecords of a work "if the existing format in which the work is stored has become obsolete." This provision is intended to permit libraries and archives to ensure that copies of works in their collections continue to be accessible and useful to their patrons. In order to ensure that the provision does not inadvertently result in the suppression of ongoing commercial offerings of works in still-usable formats, the amendment explicitly provides that, for purposes of this subsection, a format will be considered obsolete only if the machine or device necessary to render perceptible a work stored in that format is no longer manufactured or reasonably available in a commercial marketplace. Under this language, if the needed machine or device can only be purchased in second-hand stores, it should not be considered "reasonably available."

Finally, the Committee wants to make clear that, just as when section 108 of the Copyright Act was first enacted, the term "libraries" and "archives" as used and described in this provision still refer to such institutions only in the conventional sense of entities that are established as, and conduct their operations through, physical premises in which collections of information may be used by researchers and other members of the public. Although online interactive digital networks have since given birth to online digital "libraries" and "archives" that exist only in the virtual (rather than physical) sense on websites, bulletin boards and homepages across the Internet, it is not the Committee's intent that section 108 as revised apply to such collections of information. The ease with which such sites are established online literally allows anyone to create his or her own digital "library" or "archives." The extension of the application of section 108 to all such sites would be tantamount to creating an exception to the exclusive rights of copyright holders that would permit any person who has an online website, bulletin board or a homepage to freely reproduce and distribute copyrighted works. Such an exemption would swallow the general rule and severely impair the copyright owners' right and ability to commercially exploit their copyrighted works. Consequently, the Committee intends that references to "the premises of the library or archives" in amended sections 108 (b)(2) and (c)(2) mean only physical premises.

## VI. COST ESTIMATE

U.S. Congress,
Congressional Budget Office,
Washington, DC, May 11, 1998.

Hon. Orrin G. Hatch,
Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.

Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for S. 2037, the Digital Millennium Copyright Act of 1998.

**\*63** If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Kim Cawley (for federal costs), Pepper Santalucia (for the state and local impact), and Matthew Eyles (for the private-sector impact).

Sincerely,

James L. Blum

(For June E. O'Neill, Director).

Enclosure.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

S. 2037–DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998

CBO estimates that enacting S. 2037 would have no significant impact on the federal budget. Enacting the bill would establish new criminal penalties and thus could affect both receipts and direct spending. hence, pay-as-you-go procedures would apply, but we expect that any changes in receipts and direct spending would be insignificant. S. 2037 contains an intergovernmental and a private-sector mandate as defined in the Unfunded Mandates Reform Act of 1995 (UMRA), but the costs of the mandates would not exceed the thresholds in the law.

Title I of S. 2037 would amend U.S. copyright law to comply with two treaties produced by the December 1996 conference of the World Intellectual Property Organization–one regarding the use of copyrighted material in digital environments, and the other dealing with international copyright protection of performers and producers of phonograms. Section 103 would establish criminal fines of up to $1 million for anyone attempting to circumvent copyright protection systems or falsifying or altering copyright management information. Enacting this provision could increase governmental receipts from the collection of fines, but we estimate that any such increase would be less than $500,000 annually. Criminal fines are deposited in the Crime Victims Fund and are spent in the following year. Thus any change in direct spending from the fund would also amount to less than $500,000 annually.

Title II would limit the liability for copyright infringement of persons who are providers of on-line services or network access. Title III would amend copyright law to allow copies of computer programs to be made for the purpose of repairing or maintaining a computer. Title IV would require copyright owners that protect their audio recordings with technical measures to prevent the reproduction of such work, to make available to transmitting organizations entitled to make a copy of such work the necessary means of making a copy, provided that it is technologically and economically feasible for the copyright owner to do so. The bill would direct the Copyright Office to make recommendations to the Congress concerning the liability for copyright infringement of nonprofit educational institutions when they are providers of Internet services. The bill also would seek recommendations from the Copyright Office in using digital technologies to promote distance learning while protecting the rights of copyright owners. Based on information from the Copyright Office, CBO estimates that preparing these provisions would cost less than $300,000.

**\*64** Section 4 of UMRA excludes from the application of that act any legislative provisions that are necessary for the ratification or implementation of international treaty obligations. CBO has determined that Title I of the bill fits within that exclusion, because it is necessary for the implementation of the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty.

Title IV of S. 2037 would impose a mandate on certain owners of copyrights who apply technical protections to works that prevent their reproduction. Title IV would require copyright owners who employ mechanisms that prevent the reproduction of copyrighted works to make available to federally licensed broadcasters the necessary means to copy such works. Under current law, federally licensed broadcasters are authorized to reproduce copyright-protected material under specific conditions. Since this mandate would apply to both public and private entities that own copyrights, it would be considered both a private-sector and an intergovernmental mandate.

The use of reproduction protections envisioned in the bill is not yet widespread. Furthermore, copyright owners may claim economic hardship or technical infeasibility to avoid the new requirement and the costs of providing federally licensed broadcasters with the means to copy technically protected works would likely be modest. Therefore, CBO estimates that the direct cost of the new mandates would be well below the statutory thresholds in UMRA.

The CBO staff contacts for this estimate are Kim Cawley (for Federal costs); Pepper Santalucia (for the State and local impact); and Matthew Eyles (for the private-sector impact). This estimate was approved by Paul N. Van de Water, Assistant Director for Budget Analysis.

## VII. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Senate, the Committee, after due consideration, concludes that S. 2037 will not have significant regulatory impact.

## *65 VIII. ADDITIONAL VIEWS OF MR. LEAHY

The successful adoption by the World Intellectual Property Organization (WIPO) in December 1996 of two new copyright treaties–one on written material and one on sound recordings–was appropriately lauded in the United States. The WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty will give a significant boost to the protection of intellectual property rights around the world, and stand to benefit important American creative industries–from movies, recordings, computer software and many other copyrighted materials that are subject to piracy online.

According to Secretary Daley of the Department of Commerce, for the most part, "the treaties largely incorporate intellectual property norms that are already part of U.S. law." What the treaties will do is give American owners of copyrighted material an important tool to protect their intellectual property in those countries that become a party to the treaties. With an ever-expanding global marketplace, such international protection is critical to protect American companies and, ultimately, American jobs and the U.S. economy.

The President submitted the two WIPO treaties to the U.S. Senate on July 29, 1997, as well as draft legislation to implement the two treaties. I was proud to introduce this draft implementing legislation, S. 1121, with Senators Hatch, Thompson, and Kohl on July 29, 1997.

This legislation is the culmination of an effort to ensure that the appropriate copyright protections are in place around the world to foster the enormous growth of the Internet and other digital computer networks. Our dependence on interconnected computers only grows as a means to communicate, manage our personal and business affairs and obtain the goods and services we want. Indeed, computer networks will increasingly become the means of transmitting copyrighted works in the years ahead. This presents great opportunities but also poses significant risks to authors and our copyright industries.

We must make sure that our copyright laws protect the intellectual property rights of creative works available online in ways that promote the use of the Internet, both by content providers and users. The future growth of computer networks like the Internet and of digital, electronic communications requires it. Otherwise, owners of intellectual property will be unwilling to put their material online. If there is no content worth reading online, the growth of this medium will be stifled, and public accessibility will be retarded.

The Clinton administration showed great foresight when it formed, in 1993, the Information Infrastructure Task Force (IITF), which in turn established the Working Group on Intellectual Property Rights to examine and recommend changes to keep copyright *66 law current with new technology. In 1995, the Administration's Working Group on Intellectual Property Rights released its report, "Intellectual Property and the National Information Infrastructure," in which it explained the importance of adequate copyright protection for the future of the Internet:

The full potential of the NII will not be realized if the education, information and entertainment products protected by intellectual property laws are not protected effectively when disseminated via the NII. Creators and other owners of intellectual

property will not be willing to put their interests at risk if appropriate systems–both in the U.S. and internationally–are not in place to permit them to set and enforce the terms and conditions under which their works are made available in the NII environment. Likewise, the public will not use the services available on the NII and generate the market necessary for its success unless a wide variety of works are available under equitable and reasonable terms and conditions, and the integrity of those works is assured. All the computers, telephones, fax machines, scanners, cameras, keyboards, televisions, monitors, printers, switches, routers, wires, cables, networks, and satellites in the world will not create a successful NII, if there is no content. What will drive the NII is the content moving through it.

The same year that report was issued, Senator Hatch and I joined together to introduce "The NII Copyright Protection Act of 1995", S. 1284, which incorporated the recommendations of the Administration. That legislative proposal confronted fundamental questions about the role of copyright in the next century–many of which are echoed by the Digital Millennium Copyright Act (DMCA), which was reported by the Senate Judiciary Committee.

I note that the Report of the Administration's Working Group on Intellectual Property also generally supported "the amendments to the copyright law and the criminal law (which sets out sanctions for criminal copyright violations) set forth in S. 1122, introduced in the 104th Congress by Senators Leahy and Feingold following consultations with the Justice Department." While the 104th Congress did not act on this legislation, I revised and reintroduced this bill as S. 1044 in 1997. This important legislation, the No Electronic Theft Act, to adapt to the emerging digital environment was finally enacted in this Congress.

Title I of the DMCA is based on the administration's recommendations for legislation to implement the two WIPO treaties, as reflected in S. 1121. In sum, Title I makes certain technical changes to conform our copyright laws to the treaties and substantive amendments to comply with two new treaty obligations. Specifically, the treaties oblige the signatories to provide legal protections against circumvention of technological measures used by copyright owners to protect their works, and against violations of the integrity of copyright management information (CMI), which identifies a work, its author, the copyright owner and any information about the terms and conditions of use of the work. The bill adds a new chapter to U.S. copyright law to implement the **\*67** anticircumvention and CMI provisions, along with corresponding civil and criminal penalties. Title II of the DMCA provides limitations, under certain conditions, on copyright infringement liability for Internet service providers (ISP's) and online service providers (OSP's). Title III provides a statutory exemption in the Copyright Act to ensure that the lawful owner or lessee of a computer machine may authorize an independent service technician to activate the computer in order to service its hardware components. Title IV begins the process of updating our Nation's copyright laws with respect to library, archives, and educational uses of copyrighted works in the digital age.

Following intensive discussions with a number of interested parties, including libraries, universities, small businesses, ISP's and OSP's, telephone companies, computer users, broadcasters, content providers and device manufacturers, the Senate Judiciary Committee was able to reach unanimous agreement on certain modifications and additions incorporated into the DMCA.

For example, significant provisions were added to the bill in Title II to clarify the liability for copyright infringement of online and Internet service providers. These provisions set forth "safe harbors" from liability for ISP's and OSP's under clearly defined circumstances, which both encourage responsible behavior and protect important intellectual property rights. In addition, during the Committee's consideration of this bill, an Ashcroft-Leahy-Hatch amendment was adopted to ensure that computer users are given reasonable notice of when their Web sites are the subject of infringement complaints, and to provide procedures for computer users to have material that is mistakenly taken down put back online.

This bill contains a number of provisions designed to help libraries and archives. First, libraries expressed concerns about the possibility of criminal sanctions or potentially ruinous monetary liability for actions taken in good faith. This bill makes sure that libraries acting in good faith can never be subject to fines or civil damages. Specifically, a library is exempt from monetary liability in a civil suit if it was not aware and had no reason to believe that its acts constituted a violation. In addition, libraries are completely exempt from the criminal provisions.

Second, the bill contains a "browsing" exception for libraries. Libraries have indicated that in an online environment dominated by encrypted works it may be impossible for them to gain access to works to decide whether or not to acquire them. The current version of the bill permits libraries to disregard access prevention technologies in order to make a good faith determination of whether or not it would like to buy a copy of a work. If the library decides that it wishes to acquire the work it must negotiate with the copyright owner just as libraries do today.

Third, Senator Hatch, Senator Ashcroft, and I crafted an amendment to provide for the preservation of digital works by qualified libraries and archives. The ability of libraries to preserve legible copies of works in digital form is one I consider critical. Under present law, libraries are permitted to make a single facsimile copy of works in their collections for preservation purposes, or to replace lost, damaged or stolen copies of works that have become commercially unavailable. This law, however, has become outmoded by **\*68** changing technology and preservation practices. The bill ensures that libraries' collections will continue to be available to future generations by permitting libraries to make up to three copies in any format–including in digital form. This was one of the proposals in The National Information Infrastructure (NII) Copyright Protection Act of 1995, which I sponsored in the last Congress. The Register of Copyrights, among others, has supported that proposal.

In addition, the bill would permit a library to transfer a work from one digital format to another if the equipment needed to read the earlier format becomes unavailable commercially. This change addresses a problem that should be familiar to anyone whose office has boxes of eight-inch floppy disks tucked away somewhere.

These provisions go a long way toward meeting the concerns that libraries have expressed about the original bill, S. 1121.

Another issue that the bill addresses is distance learning. When Congress enacted the present copyright law it recognized the potential of broadcast and cable technology to supplement classroom teaching, and to bring the classroom to those who, because of their disabilities or other special circumstances, are unable to attend classes. At the same time, Congress also recognized the potential for unauthorized transmissions of works to harm the markets for educational uses of copyrighted materials. In the present Copyright Act, we struck a careful balance and crafted a narrow exemption. But as with so many areas of copyright law, the advent of digital technology requires us to take another look at the issue.

I recognize that the issue of distance learning has been under consideration for the past several years by the Conference on Fair Use (CONFU) that was established by the administration to consider issues relating to fair use in the digital environment. In spite of the hard work of the participants, CONFU has so far been unable to forge a comprehensive agreement on guidelines for the application of fair use to digital distance learning.

We made tremendous strides in the Committee to chart the appropriate course for updating the Copyright Act to permit the use of copyrighted works in valid distance learning activities. Senator Hatch, Senator Ashcroft, and I joined together to ask the Copyright Office to facilitate discussions among interested library and educational groups and content providers with a view toward making recommendations that could be incorporated into the DMCA at the April 30 markup.

Based on the Copyright Office's recommendations, we incorporated into the DMCA a new section 122 requiring the Copyright Office to make broader recommendations to Congress on digital distance education within six months. Upon receiving the Copyright Office's recommendations, it is my hope that the Senate Judiciary Committee will promptly commence hearings on the issue and move expeditiously to enact further legislation on the matter. I know that all members on this Committee are as anxious as I am to complete the process that we started in Committee of updating the Copyright Act to permit the appropriate use of copyrighted works in valid distance learning activities. This step should be viewed as a beginning–not an end, and we are committed to reaching that end point as quickly as possible.

**\*69** Senator Feinstein had sought to clarify when a university would be held responsible for the actions of its employees in connection with its eligibility for the safe harbors spelled out in title II of the bill. I and others on the Committee agreed with

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 50 of 72

Senator Feinstein that, because of the importance, complexity, and implications for other online service providers, including libraries and archives of this issue, we should have the Copyright Office examine the issue in a comprehensive fashion as well.

Amendments sponsored by Senator Ashcroft, Senator Hatch, and I were also crafted to address the issues of reverse engineering, ephemeral recordings and to clarify the use of copyright management information in the course of certain analog and digital transmissions in broadcasting. Additional legislative language was incorporated into the bill to clarify that the law enforcement exemptions apply to all government agencies which conduct law enforcement and intelligence work, as well as to government contractors engaging in intelligence, investigative, or protective work.

Finally, to assuage the concerns of the consumer electronics manufacturers and others that the bill might require them to design their products to respond to any particular technological protection measure, Senator Hatch, Senator Ashcroft, and I crafted an amendment that clarified the bill on this issue. We also agreed to incorporate provisions into the bill clarifying that nothing in the bill will prevent parents form controlling their children's access to the Internet or individuals from protecting personal identifying information.

The DMCA is a product of the Senate Judiciary Committee's recognition that ours is a time of unprecedented challenge to copyright protection. Copyright has been the engine that has traditionally converted the energy of artistic creativity into publicly available arts and entertainment. Historically, the Government's role has been to encourage creativity and innovation by protecting copyrights that create incentives for the dissemination to the public of new works and forms of expression. That is the tradition which I have sought to honor and which I intend to continue to promote.

Now, with the DMCA, the Senate Judiciary Committee takes another important step toward protecting American ingenuity and creative expression. This bill is a well-balanced package of proposals that address the needs of creators, consumers and commerce in the digital age and well into the next century.

Patrick Leahy.

**\*70**  IX. CHANGES IN EXISTING LAW

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by S. 2037, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

UNITED STATES CODE

\* \* \* \* \* \* \*

TITLE 17–COPYRIGHTS

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

CHAPTER 1–SUBJECT MATTER AND SCOPE OF COPYRIGHT

\* \* \* \* \* \* \*

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

\* \* \* \* \* \* \*

[A work is a "Berne Convention work" if–

[(1) in the case of an unpublished work, one or more of the authors is a national of a nation adhering to the Berne Convention, or in the case of a published work, one of more of the authors is a national of a nation adhering to the Berne Convention on the date of first publication;

[(2) the work was first published in a nation adhering to the Berne Convention, or was simultaneously first published in a nation adhering to the Berne Convention and in a foreign nation that does not adhere to the Berne Convention;

[(3) in the case of an audiovisual work–

[(A) if one or more of the authors is a legal entity, that author has its headquarters in a nation adhering to the Berne Convention; or

[(B) if one or more of the authors is an individual, that author is domiciled, or has his or her habitual residence in a nation adhering to the Berne Convention;

 **71**  [(4) in the case of a pictorial, graphic, or sculptural work that is incorporated in a building or other structure, the building or structure is located in a nation adhering to the Berne Convention; or

[(5) in the case of an architectural work embodied in a building, such building is erected in a country adhering to the Berne Convention.

[For purposes of paragraph (1), an author who is domiciled in or has his or her habitual residence in, a nation adhering to the Berne Convention is considered to be a national of that nation. For purposes of paragraph (2), a work is considered to have been simultaneously published in two or more nations if its dates of publication are within 30 days of one another.]

* * * * * * *

[The "country of origin" of a Berne Convention work, for] For purposes of section 411, [is the United States] a work is a "United States work" only if–

(1) in the case of a published work, the work is first published–

(A) in the United States;

(B) simultaneously in the United States and another [nation or nations adhering to the Berne Convention] treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

(C) simultaneously in the United States and a foreign nation that [does not adhere to the Berne Convention] is not a treaty party; or

(D) in a foreign nation that [does not adhere to the Berne Convention] is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

(2) in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

Case 1:25-cv-08736-PAE     Document 96-5     Filed 07/21/26     Page 52 of 72

(3) in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

[For the purposes of section 411, the "country of origin" of any other Berne Convention work is not the United States.]

\* \* \* \* \* \* \*

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

**\*72** The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland on October 29, 1971.

The terms "including" and "such as" are illustrative and not limitative.

An "international agreement" is–

   (1) the Universal Copyright Convention;

   (2) the Geneva Phonograms Convention;

   (3) the Berne Convention;

   (4) the WTO Agreement;

   (5) the WIPO Copyright Treaty;

   (6) the WIPO Performances and Phonograms Treaty; and

   (7) any other copyright treaty to which the United States is a party.

\* \* \* \* \* \* \*

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

\* \* \* \* \* \* \*

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later re-married.

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland on December 20, 1996.

\* \* \* \* \* \* \*

A "work made for hire" is–

(1) a work prepared by an employee within the scope of his or her employment; or

\* \* \* \* \* \* \*

The "WTO Agreement" is the Agreement Establishing the World Trade Organization entered into on April 15, 1994. The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10) respectively of section 2 of the Uruguay Round Agreements Act.

\* \* \* \* \* \* \*

S 104. Subject matter of copyright: National origin

(a) Unpublished Works.–The works specified by sections 102 and 103, while unpublished, are subject to protection under this title without regard to the nationality or domicile of the author.

(b) Published Works.–The works specified by sections 102 and 103, when published, are subject to protection under this title if–

(1) on the date of first publication, one or more of the authors is a national or domiciliary of the United States, or is a  **\*73** national domiciliary, or sovereign authority of a [foreign nation that is a party to a copyright treaty to which the United States is also a party] treaty party, or is a stateless person, wherever that person may be domiciled; or

(2) the work is first published in the United States or in a foreign nation that, on the date of first publication, is a [party to the Universal Copyright Convention] treaty party; or

(3) the work is a sound recording that was first fixed in a treaty party; or

(4) the work is a [Berne Convention work] pictorial, graphic or sculptural work that is incorporated in a building or other structure, or an architectural work that is embodied in a building and the building or structure is located in the United States or a treaty party; or

[(3)] (5) the work is first published by the United Nations or any of its specialized agencies, or by the Organization of American States; or

[(5)] (6) the work comes within the scope of a Presidential proclamation. Whenever the President finds that a particular foreign nation extends, to works by authors who are nationals or domiciliaries of the United States or to works that are first published in the United States, copyright protection on substantially the same basis as that on which the foreign nation extends protection to works of its own nationals and domiciliaries and works first published in that nation, the President may by proclamation extend protection under this title to works of which one or more of the authors is, on the date of first publication, a national, domiciliary, or sovereign authority of that nation, or which was first published in that nation. The President may revise, suspend, or revoke any such proclamation or impose any conditions or limitations on protection under a proclamation.

(7) For purposes of paragraph (2), a work that is published in the United States or a treaty party within thirty days of publication in a foreign nation that is not a treaty party shall be considered first published in the United States or such treaty party as the case may be.

\* \* \* \* \* \* \*

(d) Effect of Phonograms Treaties.–Notwithstanding the provisions of subsection (b), no works other than sound recordings shall be eligible for protection under this title solely by virtue of the adherence of the United States to the Geneva Phonograms Convention or the WIPO Performances and Phonograms Treaty.

S 104A. Copyright in restored works

(a) Automatic Protection and Term.–

(1) Term.–

(A) Copyright subsists, in accordance with this section, in restored works, and vests automatically on the date of restoration.

* * * * * * *

(h) Definitions.–For purposes of this section and section 109(a):

**\*74**  (1) The term "date of adherence or proclamation" means the earlier of the date on which a foreign nation which, as of the date the WTO Agreement enters into force with respect to the United States, is not a nation adhering to the Berne Convention or a WTO member country, becomes–

[(A) a nation adhering to the Berne Convention or a WTO member country; or]

[(B) subject to a Presidential proclamation under subsection (g).]

(A) a nation adhering to the Berne Convention;

(B) a WTO member country;

(C) a nation adhering to the WIPO Copyright Treaty;

(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or

(E) subject to a Presidential proclamation under subsection (g).

* * * * * * *

[(3) The term "eligible country" means a nation, other than the United States, that is a WTO member country, adheres to the Berne Convention, or is subject to a proclamation under section 104A(g).]

(3) the term "eligible country" means a nation, other than the United States that–

(A) becomes a WTO member country after the date of enactment of the Uruguay Round Agreements Act;

(B) on the date of enactment is, or after the date of enactment becomes, a nation adhering to the Berne Convention;

(C) adheres to the WIPO Copyright Treaty;

(D) adheres to the WIPO Performances and Phonograms Treaty; or

(E) after such date of enactment becomes subject to a proclamation under subsection (g).

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 55 of 72

\* \* \* \* \* \* \*

(6) The term "restored work" means an original work of authorship that–

(A) is protected under subsection (a);

(B) is not in the public domain in its source country through expiration of term of protection;

(C) is in the public domain in the United States due to–

\* \* \* \* \* \* \*

(iii) lack of national eligibility; [and]

(D) has at least one author or rightholder who was, at the time the work was created, a national or domiciliary of an eligible country, and if published, was first published in an eligible country and not published in the United States during the 30-day period following publication in such eligible country[.]; and

(E) if the source country for the work is an eligible country solely by virtue of its adherence to the WIPO Performances and Phonograms Treaty, is a sound recording.

\* \* \* \* \* \* \*

(8) The "source country" of a restored work is–

 **\*75**  (A) a nation other than the United States;

(B) in the case of an unpublished work–

(i) the eligible country in which the author or rightholder is a national or domiciliary, or, if a restored work has more than 1 author or rightholder, of which the majority of foreign authors or rightholders are nationals or domiciliaries [of eligible countries]; or

\* \* \* \* \* \* \*

[(9) The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.]

\* \* \* \* \* \* \*

S 108. Limitations on exclusive rights: Reproduction by libraries and archives

(a) [Notwithstanding] Except as otherwise provided and notwithstanding the provisions of section 106, it is not an infringement of copyright for a library or archives, or any of its employees acting within the scope of their employment, to reproduce no more than one copy or phonorecord of a work except as provided in subsections (b) and (c), or to distribute such copy or phonorecord, under the conditions specified by this section, if–

\* \* \* \* \* \* \*

(3) the reproduction or distribution of the work includes a notice of copyright if such notice appears on the copy of phonorecord that is reproduced under the provisions of this section, or a legend stating that the work may be protected by copyright if no such notice can be found on the copy or phonorecord that is reproduced under the provisions of this section.

(b) The rights of reproduction and distribution under this section apply to [a copy or phonorecord] three copies or phonorecords of an unpublished work duplicated [in facsimile form] solely for purposes of preservation and security or for deposit for research use in another library or archives of the type described by clause (2) of subsection (a), [if the copy or phonorecord reproduced is currently in the collections of the library or archives.] if–

(1) the copy or phonorecord reproduced is currently in the collections of the library or archives; and

(2) any such copy or phonorecord that is reproduced in digital format is not otherwise distributed in that format and is not made available to the public outside the premises of the library or archives in that format.

(c) The right of reproduction under this section applies to [a copy or phonorecord] three copies or phonorecords of a published work duplicated [in facsimile form] solely for the purpose of replacement of a copy or phonorecord that is damaged, deteriorating, lost, or stolen, or if the existing format in which the work is stored has become obsolete, [if the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price.] if–

**\*76** (1) the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price; and

(2) any such copy or phonorecord that is reproduced in digital format is not made available to the public in that format except for use on the premises of the library or archives in lawful possession of such copy.

For purposes of this subsection, a format shall be considered obsolete if the machine or device necessary to render perceptible a work stored in that format is no longer manufactured or is no longer reasonably available in the commercial marketplace.

\* \* \* \* \* \* \*

S 112. Limitations on exclusive rights: Ephemeral recordings

[(a)] (a)(1) Notwithstanding the provisions of section 106, and except in the case of a motion picture or other audiovisual work, it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work, under a license or transfer of the copyright or under the limitations on exclusive rights in sound recordings specified by section, 114(a), or for a transmitting organization that is broadcast radio or television station licensed as such by the Federal Communications Commission that broadcasts a performance of a sound recording in a digital format on a nonsubscription basis. to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display, if–

[(1)] (A) the copy of phonorecord is retained and used solely by the transmitting organization that made it, and no further copies or phonorecords are reproduced from it; and

[(2)] (B) the copy or phonorecord is used solely for the transmitting organization's own transmissions within its local service area, or for purposes of archival preservation or security; and

[(3)] (C) unless preserved exclusively for archival purposes, the copy or phonorecord is destroyed within six months from the date the transmission program was first transmitted to the public.

(2) Where a transmitting organization entitled to make a copy or phonorecord under section 112(a)(1) in connection with the transmission to the public of a performance or display or a work pursuant to that section is prevented from making such copy or phonorecord by reason of the application by the copyright owner or technical measures that prevent the reproduction of the work, such copyright owner shall make available to the transmitting organization the necessary means for permitting the making of such copy of phonorecord within the meaning of that section, provided that it is technologically feasible and economically reasonable for the copyright owner to do so, and provided further that, if such copyright owner fails to do so in a timely manner in light of the transmitting organizations' reasonable business requirements, the transmitting organization shall not be liable for a violation of section 1201(a)(1) of this **\*77** title for engaging in such activities as are necessary to make such copies or phonorecords as permitted under section 112(a)(1).

Case 1:25-cv-08736-PAE   Document 96-5   Filed 07/21/26   Page 57 of 72

\* \* \* \* \* \* \*

S 117. Limitations on exclusive rights: Computer programs

[Notwithstanding] (a) Making of Additional Copy or Adaptation by Owner of Copy.–Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaption of that computer program provided:

\* \* \* \* \* \* \*

[Any exact] (b) Lease, Sale, or Other Transfer of Additional Copy or Adaptation.–Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

(c) Machine Maintenance or Repair.–Notwithstanding the provisions of section 106, it is not an infringement for an owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if–

(1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and

(2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

(d) Definitions.–For purposes of this section–

(1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and

(2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

\* \* \* \* \* \* \*

CHAPTER 4–COPYRIGHT NOTICE, DEPOSIT, AND REGISTRATION

\* \* \* \* \* \* \*

S 411. Registration and infringement actions

(a) Except for [actions for infringement of copyright in Berne Convention works whose country of origin is not the United States and] an action brought for a violation of the rights of the author under section 106A(a), and subject to the provisions of subsection **\*78** (b), no action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights. The Register may, at his or her option, become a party to the action with respect to the issue of registrability of the copyright claim by entering an appearance within sixty days after such service, but the Register's failure to become a party shall not deprive the court of jurisdiction to determine that issue.

\* \* \* \* \* \* \*

CHAPTER 5–COPYRIGHT INFRINGEMENT AND REMEDIES

Sec.

501. Infringement of copyright.

* * * * * * *

511. Liability of States, instrumentalities of States, and State officials for infringement of copyright.

512. Liability of service providers for online infringement of copyright.

* * * * * * *

(a) Criminal Proceedings.–Except as expressly provided elsewhere in this title, [No] no criminal proceeding shall be maintained under the provisions of this title unless it is commenced within three years after the cause of action arose.

* * * * * * *

S 512. Liability of service providers for online infringement of copyright

(a) Digital Network Communications.–A service provider shall not be liable for monetary relief, or except as provided in subsection (i) for injunctive or other equitable relief, for infringement for the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or the intermediate and transient storage of such material in the course of such transmitting, routing or providing connections, if–

(1) it was initiated by or at the direction of a person other than the service provider;

(2) it is carried out through an automatic technical process without selection of such material by the service provider;

(3) the service provider does not select the recipients of such material except as an automatic response to the request of another;

(4) no such copy of such material made by the service provider is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a **\*79** manner ordinarily accessible to the anticipated recipients for a longer period than is reasonably necessary for the communication; and

(5) the material is transmitted without modification to its content.

(b) System Caching.–A service provider shall not be liable for monetary relief, or except as provided in subsection (i) for injunctive or other equitable relief, for infringement for the intermediate and temporary storage of material on the system or network controlled or operated by or for the service provider, where (i) such material is made available online by a person other than such service provider, (ii) such material is transmitted from the person described in clause (i) through such system or network to someone other than that person at the direction of such other person, and (iii) the storage is carried out through an automatic technical process for the purpose of making such material available to users of such system or network who subsequently request access to that material from the person described in clause (i), provided that:

(1) such material is transmitted to such subsequent users without modification to its content from the manner in which the material otherwise was transmitted from the person described in clause (i);

(2) such service provider complies with rules concerning the refreshing, reloading or other updating of such material when specified by the person making that material available online in accordance with an accepted industry standard data communications protocol for the system or network through which that person makes the material available; provided that the rules are not used by the person described in clause (i) to prevent or unreasonably impair such intermediate storage;

(3) such service provider does not interfere with the ability of technology associated with such material that returns to the person described in clause (i) the information that would have been available to such person if such material had been obtained by such subsequent users directly from such person, provided that such technology–

(A) does not significantly interfere with the performance of the provider's system or network or with the intermediate storage of the material;

(B) is consistent with accepted industry standard communications protocols; and

(C) does not extract information from the provider's system or network other than the information that would have been available to such person if such material had been accessed by such users directly from such person;

(4) either–

(A) the person described in clause (i) does not currently condition access to such material; or

(B) if access to such material is so conditioned by such person, by a current individual pre-condition, such as a pre-condition based on payment of a fee, or provision of a password or other information, the service provider permits access to the stored material in significant part only to **\*80** users of its system or network that have been so authorized and only in accordance with those conditions; and

(5) if the person described in clause (i) makes that material available online without the authorization of the copyright owner, then the service provider responds expeditiously to remove, or disable access to, the material that is claimed to be infringing upon notification of claimed infringements described in subsection (c)(3); provided that the material has previously been removed from the originating site, and the party giving the notification includes in the notification a statement confirming that such material has been removed or access to it has been disabled or ordered to be removed or have access disabled.

(c) Information Stored on Service Providers.–

(1) In general.–A service provider shall not be liable for monetary relief, or except as provided in subsection (i) for injunctive or other equitable relief, for infringement for the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider–

(A)(i) does not have actual knowledge that the material or activity is infringing,

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent, or

(iii) if upon obtaining such knowledge or awareness, the service provider acts expeditiously to remove or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, where the service provider has the right and ability to control such activity; and

(C) in the instance of a notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2) Designated agent.–The limitations on liability established in this subsection apply only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by substantially making the name, address, phone number, electronic mail address of such agent, and other contact information deemed appropriate by the Register of Copyrights, available through its service, including on its website, and by providing such information to the Copyright Office. The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, in both electronic and hard copy formats.

(3) Elements of notification.–

(A) To be effective under this subsection, a notification of claimed infringement means any written communication provided to the service provider's designated agent that includes substantially the following:

(i) a physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

**\*81** (ii) identification of the copyrighted work claimed to have been infringed, or, if multiple such works at a single online site are covered by a single notification, a representative list of such works at that site;

(iii) identification of the material that is claimed to be infringing or to be the subject of infringing activity that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material;

(iv) information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available an electronic mail address at which the complaining party may be contacted;

(v) a statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, or its agent, or the law; and

(vi) a statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party has the authority to enforce the owner's rights that are claimed to be infringed.

(B) A notification from the copyright owner or from a person authorized to act on behalf of the copyright owner that fails substantially to conform to the provisions of paragraph (3)(A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent, provided that the provider promptly attempts to contact the complaining party or takes other reasonable steps to assist in the receipt of notice under paragraph (3)(A) when the notice is provided to the service provider's designated agent and substantially satisfies the provisions of subparagraphs (3)(A)(ii), (iii), and (iv).

(d) Information Location Tools.–A service provider shall not be liable for monetary relief, or except as provided in subsection (i) for injunctive or other equitable relief, for infringement for the provider referring or linking users to an online location containing infringing material or activity by using information location tools, including a directory, index, reference, pointer or hypertext link, if the provider–

(1) does not have actual knowledge that the material or activity is infringing or, in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent;

(2) does not receive a financial benefit directly attributable to the infringing activity, where the service provider has the right and ability to control such activity; and

(3) responds expeditiously to remove or disable the reference or link upon notification of claimed infringement as described in subsection (c)(3); provided that for the purposes of this paragraph, the element in subsection (c)(3)(A)(iii) shall be

identification of the reference or link, to material or activity claimed to  **\*82**  be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate such reference or link.

(e) Misrepresentations.–Any person who knowingly materially misrepresents under this section (1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by the service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

(f) Replacement of Removed or Disabled Material and Limitation on Other Liability.–

(1) Subject to paragraph (2) of this subsection, a service provider shall not be liable to any person for any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless or whether the material or activity is ultimately determined to be infringing.

(2) Paragraph (1) of this subsection shall not apply with respect to material residing at the direction of a subscriber of the service provider on a system or network controlled or operated by or for the service provider that is removed, or provided under subsection (c)(1)(C), unless the service provider:–

(A) takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material;

(B) upon receipt of a counter notice as described in paragraph (3), promptly provides the person who provided the notice under subsection (c)(1)(C) with a copy of the counter notice, and informs such person that it will replace the removed material or cease disabling access to it in ten business days; and

(C) replaces the removed material and ceases disabling access to it not less than ten, nor more than fourteen, business days following receipt of the counter notice, unless its designated agent first receives notice from the person who submitted the notification under subsection (c)(1)(C) that such person has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network.

(3) To be effective under this subsection, a counter notification means any written communication provided to the service provider's designated agent that includes substantially the following:

(A) a physical or electronic signature of the subscriber;

(B) identification of the material that has been removed or to which access has been disabled and the location at  **\*83**  which such material appeared before it was removed or access was disabled;

(C) a statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled;

(D) the subscriber's name, address and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notice under subsection (c)(1)(C) or agent of such person.

(4) A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).

(g) Identification of Direct Infringer.–The copyright owner or a person authorized to act on the owner's behalf may request an order for release of identification of an alleged infringer by filing (i) a copy of a notification described in subsection (c)(3)(A), including a proposed order, and (ii) a sworn declaration that the purpose of the order is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of this title, with the clerk of any United States district court. The order shall authorize and order the service provider receiving the notification to disclose expeditiously to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged direct infringer of the material described in the notification to the extent such information is available to the service provider. The order shall be expeditiously issued if the accompanying notification satisfies the provisions of subsection (c)(3)(A) and the accompanying declaration is properly executed. Upon receipt of the order, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), a service provider shall expeditiously give to the copyright owner or person authorized by the copyright owner the information required by the order, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

(h) Conditions for Eligibility.–

(1) Accommodation of technology.–The limitations on liability established by this section shall apply only if the service provider–

(A) has adopted and reasonably implemented, and informs subscribers of the service of, a policy for the termination of subscribers of the service who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures as defined in this subsection.

(2) Definition.–As used in this section, "standard technical measures" are technical measures, used by copyright owners to identify or protect copyrighted works, that–

**\*84**  (A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

(i) Injunctions.–The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies by operation of this section:

(1) Scope of relief.–

(A) With respect to conduct other than that which qualifies for the limitation on remedies as set forth in subsection (a), the court may only grant injunctive relief with respect to a service provider in one or more of the following forms:

(i) an order restraining it from providing access to infringing material or activity residing at a particular online site on the provider's system or network;
(ii) an order restraining it from providing access to an identified subscriber of the service provider's system or network who is engaging in infringing activity by terminating the specified accounts of such subscriber; or

(iii) such other injunctive remedies as the court may consider necessary to prevent or restrain infringement of specified copyrighted material at a particular online location, provided that such remedies are the least burdensome to the service provider that are comparably effective for that purpose.

(B) If the service provider qualifies for the limitation on remedies described in subsection (a), the court may only grant injunctive relief in one or both of the following forms:

(i) an order restraining it from providing access to an identified subscriber of the service provider's system or network who is using the provider's service to engage in infringing activity by terminating the specified accounts of such subscriber; or

(ii) an order restraining it from providing access, by taking specified reasonable steps to block access, to a specific, identified, foreign online location.

(2) Considerations.–The court, in considering the relevant criteria for injunctive relief under applicable law, shall consider:

(A) whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network;

(B) the magnitude of the harm likely to be suffered by the copyright owner in the digital network environment if steps are not taken to prevent or restrain the infringement;

(C) whether implementation of such an injunction would be technically feasible and effective, and would not interfere  **\*85** with access to noninfringing material at other online locations; and

(D) whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available.

(3) Notice and ex parte orders.–Injunctive relief under this subsection shall not be available without notice to the service provider and an opportunity for such provider to appear, except for orders ensuring the preservation of evidence or other orders having no material adverse effect on the operation of the service provider's communications network.

(j) Definitions.–

(1)(A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

(B) As used in any other subsection of this section, the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in the preceding paragraph of this subsection.

(2) As used in this section, the term "monetary relief" means damages, costs, attorneys' fees, and any other form of monetary payment.

(k) Other Defenses Not Affected.–The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.

(l) Protection of Privacy.–Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on–

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 64 of 72

(1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity except to the extent consistent with a standard technical measure complying with the provisions of subsection (h); or

(2) a service provider accessing, removing, or disabling access to material where such conduct is prohibited by law.

(m) Rule of Construction.–Subsections (a), (b), (c), and (d) are intended to describe separate and distinct functions for purposes of analysis under this section. Whether a service provider qualifies for the limitation on liability in any one such subsection and shall be based solely on the criteria in each such subsection and shall not affect a determination of whether such service provider qualifies for the limitations on liability under any other such subsection.

\* \* \* \* \* \* \*

CHAPTER 12–COPYRIGHT PROTECTION AND MANAGEMENT SYSTEMS

Sec.

1201. Circumvention of copyright protection systems.

**\*86** 1202. Integrity of copyright management information.

1203. Civil remedies.

1204. Criminal offenses and penalties.

S 1201. Circumvention of copyright protection systems

(a) Violations Regarding Circumvention of Technological Protection Measures.–(1) No person shall circumvent a technological protection measure that effectively controls access to a work protected under this title.

(2) No person shall manufacture, import, offer to the public, provide or otherwise traffic in any technology, product, service, device, component, or part thereof that–

(A) is primarily designed or produced for the purpose of circumventing a technological protection measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological protection measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological protection measure that effectively controls access to a work protected under this title.

(3) As used in this subsection–

(A) to "circumvent a technological protection measure" means to descramble a work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological protection measure, without the authority of the copyright owner; and

(B) a technological protection measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

(b) Additional Violations.–(1) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof that–

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

(2) As used in this subsection–

(A) to "circumvent protection afforded by a technological protection measure" means avoiding, bypassing, removing, deactivating, **\*87** or otherwise impairing a technological protection measure; and

(B) a technological protection measure "effectively protects a right of a copyright owner under this title" if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title.

(c) Importation.–The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee of any technology, product, service, device, component, or part thereof as described in subsection (a) or (b) shall be actionable under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).

(d) Other Rights, Etc., Not Affected.–(1) Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

(2) Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component or part thereof.

(3) Nothing in this section shall require that the design of, or design and selection of parts and components for, a consumer electronics, telecommunications, or computing product provide for a response to any particular technological protection measure, so long as such part or component or the product, in which such part or component is integrated, does not otherwise fall within the prohibitions of subsections (a)(2) or (b)(1).

(e) Exemption for Nonprofit Libraries, Archives, and Educational Institutions.–(1) A nonprofit library, archives, or educational institution which gains access to a commercially exploited copyrighted work solely in order to make a good faith determination of whether to acquire a copy of that work for the sole purpose of engaging in conduct permitted under this title shall not be in violation of subsection (a)(1). A copy of a work to which access has been gained under this paragraph–

(A) may not be retained longer than necessary to make such good faith determination; and

(B) may not be used for any other purpose.

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 66 of 72

(2) The exemption made available under paragraph (1) shall only apply with respect to a work when an identical copy of that work is not reasonably available in another form.

(3) A nonprofit library, archives, or educational institution that willfully for the purpose of commercial advantage or financial gain violates paragraph (1)–

   (A) shall, for the first offense, be subject to the civil remedies under section 1203; and

   (B) shall, for repeated or subsequent offenses, in addition to the

(4) This subsection may not be used as a defense to a claim under subsection (a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or educational institution to manufacture, import, offer to the public, provide or otherwise traffic in any technology which circumvents a technological protection measure.

 **\*88**  (5) In order for a library or archives to qualify for the exemption under this subsection, the collections of that library or archives shall be–

   (A) open to the public;

   (B) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

(f) Law Enforcement and Intelligence Activities.–This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of an officer, agent or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with such entities.

(g) Notwithstanding the provisions of subsection 1201(a)(1), a person who has lawfully obtained the right to use a copy of a computer program may circumvent a technological protection measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs, and that have not previously been readily available to the person engaging in the circumvention, to the extent any such acts of identification and analysis do not constitute infringement under this title.

(h) Notwithstanding the provisions of subsections 1201(a)(2) and (b), a person may develop and employ technological means to circumvent for the identification and analysis described in subsection (g), or for the limited purpose of achieving interoperability of an independently created computer program with other programs, where such means are necessary to achieve such interoperability, to the extent that doing so does not constitute infringement under this title.

(i) The information acquired through the acts permitted under subsection (g), and the means permitted under subsection (h), may be made available to others if the person referred to in subsections (g) or (h) provides such information or means solely for the purpose of achieving interoperability of an independently created computer program with other programs, and to the extent that doing so does not constitute infringement under this title, or violate applicable law other than this title.

(j) For purposes of subsections (g), (h) and (i), the term "interoperability" means the ability of computer programs to exchange information, and for such programs mutually to use the information which has been exchanged.

Case 1:25-cv-08736-PAE    Document 96-5    Filed 07/21/26    Page 67 of 72

(k) In applying subsection (a) to a component or part, the court may consider the necessity for its intended and actual incorporation in a technology, product, service or device, which (i) does not itself violate the provisions of this chapter and (ii) has the sole purpose to prevent the access of minors to material on the Internet.

S 1202. Integrity of copyright management information

(a) False Copyright Management Information.–No person shall knowingly–

(1) provide copyright management information that is false, or

(2) distribute or import for distribution copyright management information that is false, with the intent to induce, enable, facilitate or conceal infringement.

(b) Removal or Alteration of Copyright Management Information.–No person shall, without the authority of the copyright owner or the law–

(1) intentionally remove or alter any copyright management information,

**\*89** (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right under this title.

(c) Definition.–As used in this chapter, copyright management information means the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form–

(1) the title and other information identifying the work, including the information set forth on a notice of copyright;

(2) the name of, and other identifying information about, the author of a work;

(3) the name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright;

(4) with the exception of public performances of works by radio and television broadcast stations the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work;

(5) with the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work;

(6) identifying numbers of symbols referring to such information or links to such information; or

(7) such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

(d) Law Enforcement and Intelligence Activities.–This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with such entities.

(e) Limitations on Liability.–

(1) Analog transmissions.–In the case of an analog transmission, a person who is making transmissions in its capacity as a radio or television broadcast station, or as a cable system,  **\*90**  or someone who provides programming to such station or system, shall not be liable for a violation of subsection (b) if–

(A) avoiding the activity that constitutes such violation is not technically feasible or would create an undue financial hardship on such person; and

(B) such person did not intend, by engaging in such activity, to induce, enable, facilitate or conceal infringement.

(2) Digital transmissions.–

(A) If a digital transmission standard for the placement of copyright management information for a category of works is set in a voluntary, consensus standard-setting process involving a representative cross-section or radio or television broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems, a person identified in subsection (e)(1) shall not be liable for a violation of subsection (b) with respect to the particular copyright management information addressed by such standard if–

(i) the placement of such information by someone other than such person is not in accordance with such standard; and
(ii) the activity that constitutes such violation is not intended to induce, enable, facilitate or conceal infringement.
(B) Until a digital transmission standard has been set pursuant to subparagraph (A) with respect to the placement of copyright management information for a category or works, a person identified in subsection (e)(1) shall not be liable for a violation of subsection (b) with respect to such copyright management information, where the activity that constitutes such violation is not intended to induce, enable, facilitate or conceal infringement, if–

(i) the transmission of such information by such person would result in a perceptible visual or aural degradation of the digital signal; or
(ii) the transmission of such information by such person would conflict with
(I) an applicable government regulation relating to
(II) an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted by a voluntary consensus standards body prior to the effective date of this section; or
(III) an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted in a voluntary, consensus standards-setting process open to participation by a representative cross-section of radio or television broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems.

 **\*91**  S 1203. Civil remedies

(a) Civil Actions.–Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.

(b) Powers of the Court.–In an action brought under subsection (a), the court–

(1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation;

(2) at any time while an action is pending, may order the impounding, on such terms as it deems reasonable, or any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation;

(3) may award damages under subsection(c);

(4) in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;

(5) in its discretion may award reasonable attorney's fees to the prevailing party; and

(6) may, as part of a final judgment or decree finding a violation, order the remedial modification or the destruction of any device or product involved in the violation that is in the custody or control of the violator or has been impounded under paragraph (2).

(c) Award of Damages.–

(1) In general.–Except as otherwise provided in this chapter, a person committing a violation of section 1201 or 1202 is liable for either–

(A) the actual damages and any additional profits of the violator, as provided in paragraph (2), or

(B) statutory damages, as provided in paragraph (3).

(2) Actual damages.–The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.

(3) Statutory damages.–

(A) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

(B) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000.

(4) Repeated violations.–In any case in which the injured party sustains the burden of proving, and the court finds, that a person has violated section 1201 or 1202 within three years after a final judgment was entered against the person for another such violation, the court may increase the award of damages **\*92** up to triple the amount that would otherwise be awarded, as the court considers just.

(5) Innocent violations.–

(A) In general.–The court in its discretion may reduce or remit the total award of damages in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation.

(B) Nonprofit library, archives, or educational institutions.–In the case of a nonprofit library, archives, or educational institution, the court shall remit damages in any case in which the library archives, or educational institution sustains the

burden of proving, and the court finds, that the library, archives, or educational institution was not aware and had no reason to believe that its acts constituted a violation.

S 1204. Criminal offenses and penalties

(a) In General.–Any person who violates section 1201 or 1202 willfully and for purposes of commercial advantage or private financial gain–

(1) shall be fined not more than $500,000 or imprisoned for not more than 5 years, or both for the first offense; and

(2) shall be fined not more than $1,000,000 or imprisoned for not more than 10 years, or both for any or subsequent offense.

(b) Limitation for Nonprofit Library, Archives, or Educational Institution.–Subsection (a) shall not apply to a nonprofit library, archives, or educational institution.

(c) Statute of Limitations.–Notwithstanding section 507(a) of this title, no criminal proceeding shall be brought under this section unless such proceeding is commenced within five years after the cause of action arose.

S 1205. Savings Clause

Nothing in this chapter abrogates, diminishes or weakens the provisions of, nor provides any defense or element or mitigation in a criminal prosecution or civil action under, any federal or state law that prevents the violation of the privacy of an individual in connection with the individual's use of the Internet.

1 White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1 (1908).

2 Sony Corporation of America v. Universal City Studios, Inc., 464 U.S. 417 (1984).

3 Information Infrastructure Task Force, Intellectual Property and the National Information Infrastructure: The Report of the Working Group on Intellectual Property Rights 1 (1995). The "National Information Infrastructure" encompasses digital, interactive services now available, such as the Internet, as well as those contemplated for the future.

4 Id. at 2.

5 See Request for Comments on Intellectual Property Issues Involved in the National Information Infrastructure Initiative, 58 Fed. Reg. 53,917 (Oct. 19, 1993).

6 See Information Infrastructure Task Force, Working Group on Intellectual Property Rights, Intellectual Property and the National Information Infrastructure: A Preliminary Draft of the Report of the Working Group on Intellectual Property Rights (July 1994).

7 See Notice of Hearings and Request for Comments on Preliminary Draft of the Report of the Working Group on Intellectual Property Rights, 59 Fed. Reg. 42,819 (Aug. 19, 1994); Extension of Deadline for Comments on Preliminary Draft of the Report of the Working Group on Intellectual Property Rights, 59 Fed. Reg. 50,222 (Oct. 3, 1994).

8 See, supra note 3, at 4 (1995).

9 See The Conference on Fair Use; An Interim Report to the Commissioner (December 1996); Report to the Commissioner on the Conclusion of the First Phase of the Conference on Fair Use (September 1997).

10 See, supra note 3, at 5 (1995).

11 Representatives Coble, Bono, Burr, Minge, Luther, and Jacobs cosponsored H.R. 2241.

12 Basic Proposal for the Substantive Provisions of the Treaty on Certain Questions Concerning the Protection of Literary and Artistic Works to Be Considered by the Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, WIPO Document AB/XX/2, Annex A, item PRG.02(2), paragraph 1 (Aug. 30, 1996).

13 World Intellectual Property Organization, Basic Proposal for the Substantive Provisions of the Treaty on Certain Questions Concerning the Protection of Literary and Artistic Works to Be Considered by the Diplomatic Conference, art. 7(1) (Aug. 30, 1996).

14 Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, WIPO Copyright Treaty, art. 11, WIPO Document CRNR/DC/94 (December 20, 1996).

15 Representatives Hyde, Conyers, Frank, Bono, McCullum, and Berman cosponsored the bill.

16 Concerning Art. 1(4).

17 Art. 11.

18 Rights management information is "information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work . . . which is attached to a copy of a work or appears in connection with communication of the work to the public." Art. 12. Rights management information is more commonly referred to in the U.S. as copyright management information (CMI). The purpose of CMI is to facilitate licensing of copyright for use on the Internet and to discourage piracy.

19 Note that even if a device does not have circumvention as its primary purpose or design, that is, that it does not fall within the prohibition of section 1201(a)(2)(A), the device would still be illegal if it fell within the prohibitions of either 1201 (a) (2)(B) and (C).

20 For example, Religious Technology Center v. Netcom On-line Communications Services, 907 F. Supp. 1361 (N.D. Cal. 1995); Playboy Enterprises v. Frena, 839 F. Supp. 1552 (M.D. Fla. 1993); and Marobie-FL v. Nat. Assn. Of Fire Equipment Distributors, 983 F. Supp. 1167 (N.D. Ill. 1997).

21 See MAI Sys. Corp. v. Peak Computer, 991 F.2d 511 (9th Cir. 1993), cert. denied, 114 S.Ct. 671 (1994).

22 Article 12 of the WIPO Copyright Treaty provides:

(1) Contracting Parties shall provide adequate and effective legal remedies against any person knowingly performing any of the following acts knowing, or with respect to civil remedies having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right covered by this Treaty or the Berne Convention:

(i) to remove or alter any electronic rights management information without authority;

(ii) to distribute, import for distribution, broadcast or communicate to the public, without authority, works or copies of works knowing that electronic rights management information has been removed or altered without authority.

(2) As used in this Article, "rights management information" means information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a work or appears in connection with the communication of the work to the public.

Article 19 of the WIPO Performances and Phonograms Treaty provides:

(1) Contracting Parties shall provide adequate and effective legal remedies against any person knowingly performing any of the following acts knowing, or with respect to civil remedies having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right covered by this Treaty:

(i) to remove or alter any electronic rights management information without authority;

(ii) to distribute, import for distribution, broadcast, communicate or make available to the public, without authority, performances, copies of fixed performances or phonograms knowing that electronic rights management information has been removed or altered without authority.

(2) As used in this Article, "rights management information" means information which identifies the performer, the performance of the performer, the producer of the phonogram, the phonogram, the owner of any right in the performance or phonogram, or information about the terms and conditions of use of the performance or phonogram, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a fixed performance or a phonogram or appears in connection with the communication or making available of a fixed performance or a phonogram to the public.

23 These threshold criteria apply to all of the liability limitations contained in section 512.

24 By "subscribers,"the Committee intends to include account holders who are parties with a business relationship to the service provider that justifies treating them as subscribers, for the purposes of section 512, even if no formal subscription agreement exists. Examples include students who are granted access to a university's system or network for digital online communications; employees who have access to their employer's system or network; or household members with access to a consumer online service by virtue of a subscription agreement between the service provider and another member of that household.

25 See footnote 24.

26 See MAI Sys. Corp. v. Peak Computer, 991 F.2d 511 (9th Cir. 1993), cert. denied, 114 S.Ct. 671 (1994).

27 See H.R. Rep. No. 1476, 94th Cong., 2d Sess. (1976).

S. REP. 105-190, S. Rep. No. 190, 105TH Cong., 2ND Sess. 1998, 1998 WL 239623 (Leg.Hist.)

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.